EVAN M. JONES (S.B. #115827)
ANDREW M. PARLEN (S.B. #230429)
JENNIFER M. TAYLOR (S.B. #241191)
EVAN T. PICKERING (S.B. #271634)
JAMIE OH (S.B. #274419)
O'MELVENY & MYERS LLP
400 South Hope Street
Los Angeles, CA 90071-2899
Telephone:     (213) 430-6000
Facsimile:     (213) 430-6407
Email: aparlen@omm.com

Proposed Attorneys for Verdugo Mental
Health, Debtor and Debtor in Possession

## UNITED STATES BANKRUPTCY COURT FOR

## THE CENTRAL DISTRICT OF CALIFORNIA

## LOS ANGELES DIVISION

| | |
|---|---|
| In re Verdugo Mental Health,<br><br>Debtor.[1] | Case No.  2:11-bk-XXXXX-XX<br><br>Chapter 11<br><br>**DECLARATION OF WILLIAM J. SMITH IN SUPPORT OF CHAPTER 11 PETITION AND REQUEST FOR FIRST-DAY RELIEF** |

I, William J. Smith, hereby declare:

1.      I am the Chief Executive Officer ("CEO") of Verdugo Mental Health, a California

501(c)(3) nonprofit public benefit corporation and the above-captioned debtor and debtor in

possession (the "Debtor").  Among other degrees, I hold a doctorate in clinical psychology

granted by the California School of Professional Psychology (Los Angeles) in 1994 and a

master's of business administration awarded by Pepperdine University in 2003.  My duties

include managing the Debtor's day-to-day operations, supporting the Debtor's Board of

Directors, and developing and monitoring all aspects of the Debtor's financial practices.  In this

capacity, I am familiar with the Debtor's business records and business affairs.  I have served as

---

[1] The Debtor in this case, along with the last four digits of the federal tax identification number for the Debtor, is Verdugo Mental Health (0064).  The Debtor is a California non-profit public benefit corporation.  The Debtor's address is 1540 East Colorado Street, Glendale, California, 91205.

1  the CEO of the Debtor since 2009.  Prior to that I served as the Chief Operating Officer,

2  Coordinator and Director of Adult Programs, Adult Outpatient Program Director and Postdoctoral

3  Fellow of the Debtor over the course of 16 years.

4       2.     I submit this Declaration in connection with the voluntary chapter 11 petition and

5  first-day motions of the Debtor filed in the above-captioned chapter 11 case (the "Chapter 11

6  Case").  All facts set forth in this Declaration are based on my personal knowledge, on

7  information supplied to me by people who report to me, on information supplied to me by the

8  Debtor's professionals and consultants, on my review of relevant documents, or on my opinion

9  based on my experience and knowledge with respect to the Debtor's operations, financial

10  condition, and related business issues.  The documents attached hereto, referenced herein, or

11  otherwise relied on by me for purposes of this Declaration are the business records of the Debtor,

12  prepared and kept in ordinary and regularly conducted business activity of the Debtor, and used

13  by me for those purposes.  If I were called on to testify, I could and would testify competently to

14  the facts set forth herein, and I am authorized to submit this Declaration on behalf of the Debtor.

15       3.     Part I of this Declaration describes the Debtor's operations and the relevant

16  background preceding and leading up to the filing of the Chapter 11 Case.  Part II of this

17  Declaration sets forth the relevant facts in support of each first-day motion filed by the Debtor

18  concurrently herewith.

19                                    **I.**

20                              **BACKGROUND**

21  **A.     The Debtor**

22       4.     The Debtor is a stand-alone outpatient behavioral healthcare clinic that provides

23  mental health services within the Southern California communities of Glendale, Burbank,

24  Montrose, La Cañada-Flintridge, and Eagle Rock.  Established in 1957, the Debtor was the first

25  private agency to contract with the Los Angeles County Department of Mental Health ("DMH")

26  under California's seminal community mental health services legislation, the Short-Doyle Act of

27  1957.  The Debtor since has evolved into a multiprogrammed behavioral healthcare organization,

28  operating under the names Verdugo Mental Health, Verdugo Mental Health Center, VMH Care,

1    the Glen Roberts Child Study Center, and Positive Directions.  The Debtor's staff is committed to

2    enhancing the quality of life of individuals and families while helping to provide a stable future

3    for those members of the community afflicted with more severe and persistent mental illness.  For

4    54 years, the Debtor has been committed to providing accessible, affordable, multicultural, and

5    multilingual behavioral healthcare treatment, with an emphasis on target populations whose

6    ability to access care and advocate for themselves is limited.

7         5.    The Debtor, which is the largest nonprofit mental health services provider in the

8    Glendale area, plays a critical role in Los Angeles County's provision of mental health services

9    because of the unique socioeconomic and cultural attributes of Glendale and the surrounding

10   foothill communities.  Despite enclaves of relative affluence, 15.5% of the more than 200,000

11   people living in Glendale fall below the federal poverty level.  Adult clients often suffer from

12   severe and chronic mental illness, while children and adolescent clients tend to be in the severely

13   emotionally disturbed spectrum.  Clients are either uninsured or are insured through public

14   programs such as Medi-Cal/Medicare or Healthy Families.  Given its sizeable foreign-born

15   population, a large percentage of which has fled war and political turmoil, the community has a

16   substantial need for a nonprofit mental health provider.  Specifically, Glendale is home to one of

17   the largest concentrations of Armenian-Americans in the United States, with approximately one

18   in four residents of Armenian descent.  To provide mental health services for a community of

19   Glendale's diversity and complexity, the Debtor's employees possess specialized linguistic and

20   cultural expertise.  Indeed, the Debtor is the largest provider of Armenian and Russian language

21   mental health services in Los Angeles County and, as such, actively trains and recruits mental

22   health professionals who have the skills and desire to work with the population the Debtor serves.

23        6.    The Debtor takes great pride in rendering the highest level of service to its clients.

24   These efforts have been recognized at the federal, state, and local level, with the Debtor receiving

25   numerous commendations for the quality of its services, including, in 2009, DMH's "Best

26   Practices Award."

27   **B.**     **The Debtor's Governance and Staff**

28        7.    The Debtor is governed by a Board of Directors composed of seven members who

1    are leaders in the local community.  The Debtor's Chief Financial Officer is Ellen Park, who has

2    served in this position since 1981.

3         8.    The Debtor's workforce consists of paid staff and volunteer interns and students

4    from various clinical disciplines.  As of the Petition Date, the Debtor employed 64 people,

5    including psychiatrists, psychologists, nurses, social workers, marriage and family therapists, and

6    administrative staff.  The Debtor is staffed to provide services to up to 200 clients on a typical

7    day.

8    **C.    <u>The Debtor's Services</u>**

9         9.    The Debtor provides an array of mental health services on a fiscal year budget of

10    approximately $5,000,000 to approximately 2,000 clients annually, divided between adults with

11    psychotic-spectrum, mood, and substance-abuse disorders, and children with severe emotional

12    disturbances.  Services include crisis intervention and stabilization, psychiatric and psychological

13    assessment, medication management, cognitive-behavioral therapy, psychotherapy, play therapy,

14    individual rehabilitation, and case management.  Therapeutic and program goals include

15    improving school attendance and performance, maintenance of children in their family placement,

16    reduction in inpatient psychiatric hospitalizations, reduction in homelessness, reduction in jail

17    recidivism, acculturation of immigrant clients, increased employment, reduction in public benefit

18    subsidies, and training of future mental health professionals in the field of nonprofit mental

19    health.

20         10.    The Debtor's adult outpatient program is operated under contract with DMH, as

21    well as a blanket purchase agreement with the United States Pretrial Services agency of the

22    United States District Court for the Central District of California ("<u>U.S. Pretrial Services</u>").  The

23    program focuses on medication support and rehabilitation services for adults with serious and

24    chronic mental illness.  Services provided include medication evaluation and monitoring;

25    individual, group, and family therapy; consumer and family education; and other services aimed

26    at increasing community functioning and effective life management.  The program accepts

27    uninsured clients and clients with Medicare or Medi-Cal insurance.

28         11.    The Glen Roberts Child Study Center is a nationally recognized program that

1    treats children, adolescents, and families in a child-oriented setting.  It is also one of the largest

2    professional training sites for masters degree and doctoral students in Los Angeles County.  The

3    client population at the center includes the most economically disadvantaged children and

4    families in the community, with more than 90% at or below the poverty level.  The program

5    serves children with a range of issues, including serious mental illness, abuse, neglect, domestic

6    violence, depression and school-related issues.  Services rendered at the Glen Roberts Child

7    Study Center include individual, family, and group therapy; play therapy; psychological

8    assessment and testing; medication support; state-mandated special education mental health

9    services; and parent education.  These services are provided by a dedicated staff of licensed

10   psychologists, marriage and family therapists, and a psychiatrist, as well as postdoctoral fellows,

11   psychology interns, and other interns and trainees.  The program accepts Medi-Cal, Medicare,

12   Healthy Families, clients entitled to mental health services under California Assembly Bill 3632

13   (a bill mandating provision of mental health services to certain special-education students)

14   ("AB3632"), and uninsured clients.

15        12.    Under the Positive Directions name, the Debtor offers high-quality, low-fee

16   counseling and psychotherapy conducted by marriage, family, and child therapist trainees and

17   interns, all of whom are supervised by licensed clinicians.  Positive Directions' counseling

18   services are for persons over eighteen and include individual and couples therapy, as well as

19   alcohol and drug counseling, including court-mandated services.  Positive Directions does not

20   accept insurance or Medi-Cal, but offers a low fee of $30 per session for clients who need

21   counseling services and do not qualify for county-sponsored services.  Positive Directions also is

22   under contract with the Los Angeles County Department of Public Health (Substance Abuse

23   Prevention and Control Division) ("DPH"), from which it receives funding for court-ordered

24   substance-abuse counseling services and community education/support services.

25        13.    The Debtor's school-based program places mental health clinicians at local school

26   campuses to provide services to more than 200 low-income children and their families.  Through

27   this program, the Debtor provides services at six Glendale Unified School District campuses as

28   well as five campuses in the Alhambra Unified School District.  The school-based program

supports abused and emotionally disturbed children and adolescents.  This program accepts Medi-Cal and Healthy Families.  The program also offers low-fee services to clients who do not meet insurance coverage requirements.

**D.    The Debtor's Material Assets**

    **i.    Real Property**

    14.    The Debtor's headquarters is a two-story, elevator-serviced, 18,713 square foot Class "C/D" office building located on a rectangular 42,725 square foot lot at 1540 East Colorado Street, Glendale, California, 91205 (the "VMH Facility").  The VMH Facility is the Debtor's largest physical asset, and other than the school-based program, all of the Debtor's services are rendered at the VMH Facility.  The VMH Facility originally consisted of a 4,165 square foot building constructed in 1987, but largely with proceeds of a 2007 loan based on the sale of state-backed bonds (discussed in detail below), the Debtor completed extensive renovations and addition of an adjoining structure in 2008.  As renovated, the VMH Facility is a two-part structure conjoined to function as one contiguous facility.  The facility utilizes a "zone" security concept with separate "public," "therapy office," and "staff" zones secured by key-card access.  The facility maintains 24 subterranean parking spaces (for staff), and 54 above ground parking spaces for clients and visitors.

    15.    The newer, now-primary structure built in 2008 houses all service provision functions, including therapy and clinical staff offices.  It was uniquely designed and configured to meet the service needs and demands of a community mental health agency.  The first floor of this two-story structure houses adult service programs and community groups.  In addition to individual therapy offices and larger group therapy rooms, the first floor provides a secured medical suite and reception area for medical staff.  The second story houses children and family services with specifically designed play therapy and group rooms to facilitate therapeutic interactions in a safe and supportive environment.

    16.    The secondary structure—remodeled at the time of construction of the new primary facility—is a two-story structure that primarily serves as the Debtor's administration, information technology, and finance offices.  In addition, this structure includes space for a

1    contracted pharmacy that dispenses medications to the Debtor's clients.

2        17.    In an appraisal prepared in conformity with the requirements of the Uniform

3    Standards of Professional Appraisal Practice, Syn-Mar Associates formed the opinion that, as of

4    February 28, 2011, the market value of the VMH Facility is $4,300,000 (or $229.79 per square

5    foot) (the "Appraisal").  A true and correct copy of the Appraisal as furnished to the Debtor by

6    Syn-Mar Associates is attached hereto as Exhibit A.

7        **ii.**    **Contracts**

8            **a.**    **DMH Mental Health Services Contract**

9        18.    The primary source of the Debtor's revenue is its mental health services contract

10    with DMH.  Under this contract, DMH has engaged the Debtor as a provider of public mental

11    health services in the area designated as Service Area 2, encompassing Glendale, California and

12    certain surrounding communities.  In return, DMH provides cash-advance funding at provisional

13    rates in accordance with the terms of the contract, up to the amount identified by each program.

14    The maximum funding amount under the DMH contract for fiscal year 2010–2011 (i.e., July 1,

15    2010, through June 30, 2011) is $4,987,021.  Due to circumstances described below in Section

16    I.F., however, the Debtor is on pace to receive 2010-11 fiscal year funding of $3,927,891.

17        19.    During the first five months of each fiscal year, DMH advances monthly an

18    amount equal to one-twelfth of the total annual contract.  Following the five-month cash-flow

19    advance period, the Debtor is paid in arrears for actual units of service provided up to the

20    maximum funding amount.  A reconciliation/audited settlement with DMH occurs following the

21    end of each fiscal year.  DMH does not reimburse the Debtor for amounts incurred by the Debtor

22    in excess of the maximum funding amount or for costs that are not properly incurred or reported.

23    On the other hand, if the results of the reconciliation indicate that the funding advanced by DMH

24    exceeded the actual costs incurred during the relevant period, the Debtor is required to return the

25    excess to DMH.  In addition, approximately three to five years after the end of each fiscal year,

26    the state Department of Mental Health issues its Countywide Audit Report to DMH.  Based on

27    this audit report, DMH issues a State Audit Cost Report Settlement, which informs the provider

28    of amounts, if any, owed by the provider to Los Angeles County or by Los Angeles County to the

1   provider.

2                b.      **DMH Information Technology Contract**

3          20.     In September 2010, the Debtor and DMH entered into a three-year contract

4   pursuant to which the Debtor may receive up to $235,071 for information technology

5   advancement.  The funding under this contract is provided through the Mental Health Services

6   Act with the goal of modernization/transformation of electronic billing and records systems.  The

7   Debtor directly invoices DMH for information technology–related services set forth in the

8   contract.  To date, the Debtor has received $29,432.76 under this contract.

9                c.      **Department of Public Health Contract**

10         21.     The Debtor also is party to contracts with DPH's (Substance Abuse Prevention and

11  Control Division) pursuant to which the Debtor provides substance-abuse counseling and

12  prevention services.  These contracts are "fee-for-service" in nature, with DPH compensating the

13  Debtor for service hours provided under the contracts with payments not to exceed the maximum

14  contract amounts.  For fiscal year 2010–11, the aggregate amount of funding under these

15  contracts is $122,861.

16               d.      **U.S. Pretrial Services Purchase Agreement**

17         22.     In December 2009, U.S. Pretrial Services awarded the Debtor a blanket purchase

18  agreement to provide mental health services to federal defendants.  The purchase agreement binds

19  the agency to a negotiated rate based on the type of service provided.  Program revenue is directly

20  tied to the number of service hours rendered.  For the first two quarters of fiscal year 2010–11,

21  the Debtor received $23,693 under this contract.

22         **iii.    The Debtor's Accounts**

23         23.     The Debtor maintains certain deposit accounts with Pacific Western Bank

24  ("<u>PWB</u>") and a deposit account with BNY Mellon ("<u>BNY</u>" and together with PWB, the

25  "<u>Banks</u>").  As of the Petition Date, the aggregate balance of the Debtor's PWB accounts was

26  $63,154.13, the balance of the BNY account was $269,194.16.  A more complete description of

27  these accounts is set forth in section II.G. below.

28

**E.      The Debtor's Material Liabilities**

      **i.      The VMH Financings**

      24.      In order to refinance certain existing indebtedness and finance the construction and remodeling of the VMH Facility, the Debtor entered into two separate financing transactions in 2005 and 2007 (the "VMH Financings").  Both financings involve the same parties and use similar documentation, and for that reason, are discussed together below.

      25.      In April 2005 and March 2007, respectively, the California Health Facilities Financing Authority ("CHFFA") and the Treasurer of the State of California issued the California Health Facilities Financing Authority Insured Refunding Revenue Bonds (Small Facilities Refinancing Program), 2005 Series A (the "2005 Bonds"), and the California Health Facilities Financing Authority Insured Refunding Revenue Bonds (Verdugo Mental Health), 2007 Series A (the "2007 Bonds" and collectively with the 2005 Bonds, the "Bonds").  The Bonds were issued pursuant to that certain Indenture dated as of April 1, 2005 (the "2005 Indenture") and that certain Indenture dated as of March 1, 2007 (the "2007 Indenture," and together with the 2005 Indenture, the "Indentures"), respectively.  U.S. Bank N.A. is the indenture trustee under each of the Indentures (in such capacity, "U.S. Bank").  Depending on the applicable maturity date, the 2005 Bonds bear interest at an annual rate of 3.00% to 5.00%, while the 2007 Bonds bear interest at an annual rate of 3.625% to 4.40%.

      26.      The proceeds of the sale of the 2005 Bonds in the amount of $1,025,000 were loaned to the Debtor (the "2005 Loan") pursuant to a Loan Agreement dated as of April 1, 2005, between CHFFA and the Debtor (the "2005 Loan Agreement").  Similarly, the proceeds of the sale of the 2007 Bonds were loaned to the Debtor (the "2007 Loan" and collectively with the 2005 Loans, the "Loans") pursuant to a Loan Agreement dated as of March 1, 2007, between CHFFA and the Debtor (the "2007 Loan Agreement" and collectively with the 2005 Loan Agreement, the "Loan Agreements").

      27.      In connection with the Bonds and the Loans, the Office of Statewide Health Planning and Development of the State of California ("OSHPD" and together with U.S. Bank and DMH, the "Secured Creditors") issued a Contract of Insurance in both 2005 and 2007 (the

"Contracts of Insurance") to insure the repayment of the Bonds, essentially guaranteeing payment of the Bonds and transferring credit risk under the Loans to OSHPD.  To obligate the Debtor to repay any sums paid by OSHPD under the Contracts of Insurance and to provide security to OSHPD, the Debtor entered into a Regulatory Agreement in both 2005 and 2007 (the "Regulatory Agreements") with CHFFA and OSHPD under which the Debtor granted CHFFA and OSHPD a security interest in substantially all of its assets, including all revenues, moneys, accounts, accounts receivable, and other rights to payment.  The Regulatory Agreements purport to create a perfected lien in such collateral pursuant to California Health and Safety Code § 129052.[2]  The Debtor's obligations to CHFFA and OSHPD in connection with the Loan Agreements and the Regulatory Agreements were further secured by a security interest in substantially all assets of the Debtor pursuant to a Deed of Trust dated as of April 1, 2005, between the Debtor and Stewart Title Guaranty Company, as trustee for the benefit of the OSHPD and CHFFA (the "2005 Deed of Trust"), as amended by a First Supplemental Deed of Trust dated as of March 1, 2007, between the Debtor and Stewart Title Guaranty Company, as trustee for the benefit of OSHPD and CHFFA (the "2007 Deed of Trust").

       28.     Although CHFFA, U.S. Bank, and OSHPD are parties to the various Loan documents, OSHPD has sole authority to consent to use of the Debtor's cash collateral.  While CHFFA is the nominal lender under the Loan Agreements, pursuant to section 5.01(b) of each Indenture, CHFFA assigned certain rights, including all of its rights under the Loan Agreements, the Regulatory Agreements, and the Deed of Trust, to U.S. Bank.  Similarly, both the Indentures and the Regulatory Agreements provide that so long as OSHPD is not in default of its obligations (which it is not), OSHPD represents the holders of the Bonds in the Debtor's bankruptcy proceeding and may consent to any agreement on behalf of such holders.[3]

---

[2] The Regulatory Agreements excerpt the following language from California Health and Safety Code § 129052: "The revenues, moneys, accounts, accounts, receivable, contract rights, general intangibles, documents, instruments, chattel paper, and other rights to payment of whatever kind pledged by or to the office of its assignees shall immediately be subject to the lien of the pledge without physical delivery or further act.  The lien of such pledge shall be valid and binding against all parties, irrespective of whether the parties have notice of the lien.  The indenture, trust agreement, resolution, or another instrument by which such pledge is created need not be recorded or the security interest otherwise perfected."

[3] Section V of the each Regulatory Agreement provides:  "So long as the Contract of Insurance is in full force and effect and [OSHPD] is not in default thereunder, [OSHPD] shall represent Bondholders in all bankruptcy proceedings

29.   The 2005 Loan matures on March 1, 2022, and the 2007 Loan matures on March 1, 2037. During the life of the Loans, payments are due on the first day of each month, with the payment amount calculated to service the annual payout of the bonds maturing that year and interest due according to the varying rates of interest on the outstanding Bonds. For the period from April 1, 2010 through March 1, 2011, the Debtor was obligated to make a monthly payment in the amount of $7,648.75 on the 2005 Loan and $29,713.96 on the 2007 Loan. For the period from April 1, 2011 through March 1, 2012, the monthly payment amount is $7,483.75 on the 2005 Loan and $29,385.83 on the 2007 Loan. Of the proceeds loaned to the Debtor, $92,825 from the 2005 Loan and $356,750 from the 2007 Loan was deposited at the respective closings into reserve accounts held by U.S. Bank on behalf of the holders of the Bonds (the "Reserve Accounts") for the purpose of making up any interest or principal deficiencies of the Debtor or for the payment or redemption of the Bonds allocable to the Debtor.

30.   The Debtor ceased making monthly payments on the Loans beginning with the payment due on December 1, 2010. Accordingly, on December 9, 2010, OSHPD noticed an event of default under the Regulatory Agreements. To date, OSHPD has refrained from exercising any remedies, and no amounts in the reserve account for the Loans have been used or withdrawn.

31.   As of the Petition Date, the outstanding principal of the 2005 Loan was approximately $773,336 and accrued and unpaid interest thereon was approximately $30,595, for a total of approximately $803,931, while the outstanding principal of the 2007 Loan was approximately $5,150,000 and accrued and unpaid interest thereon was approximately $118,856, for a total of approximately $5,268,856. The aggregate indebtedness under the Loans as of the Petition Date is $6,072,787.

32.   OSHPD has informed the Debtor that the aggregate outstanding principal balance of the 2005 Bonds is $810,000 and that the aggregate outstanding principal balance of the 2007 Bonds is $5,220,000. On April 1, 2011, payments of $91,785 and $356,567.50 are due from U.S.

---

and may take such action or consent to any agreement on behalf of Bondholders, provided that any such action or consent shall in no way impair the rights and benefits due Bondholders under the Contract of Insurance." Section 7.06 of each Indenture includes nearly identical language.

1    Bank in respect of the 2005 Bonds and 2007 Bonds, respectively.  I am informed that to make up

2    for the four unpaid monthly payments due from the Debtor under the Loans, U.S. Bank will use a

3    portion of the funds in the Reserve Accounts to pay the amounts due to holders of the Bonds on

4    April 1, 2011.

5              33.    OSHPD further has informed the Debtor that it intends to defease the Bonds.  On

6    March 9, 2011, OSHPD issued a notice that, pursuant to the Contracts of Insurance, a payment in

7    the amount of $5,583,098.76 ($694,252.03 in respect of the 2005 Bonds and $4,888,846.73 in

8    respect of the 2007 Bonds) will be made on April 4, 2011 from the Health Facility Construction

9    Loan Insurance Fund to U.S. Bank.  I understand that, concurrently, U.S. Bank will draw down of

10   the remainder of the funds in the Reserve Account, which, along with the payment under the

11   Contracts of Insurance, will defease the Bonds in full.  Accordingly, following application of the

12   funds in the Reserve Accounts in connection with the defeasance of the Bonds, the Debtor's

13   outstanding indebtedness will be $694,252.03 under the 2005 Loan and 2005 Regulatory

14   Agreement and $4,888,846.73 under the 2007 Loan and 2007 Regulatory Agreement, for a total

15   of $5,583,098.76.  Interest will accrue on that amount from an after April 4, 2011.

16             **ii.    <u>DMH Claims</u>**

17             34.    As noted above, DMH advance-funds a portion, but not all, of the costs expected

18   to be incurred by the Debtor in connection with the provision of mental health services.  If the

19   results of the periodic audits conducted by the Debtor indicate that the actual costs incurred

20   during the relevant period are less than the projected costs for which DMH advanced funding, the

21   Debtor is required to return the excess to DMH.  In practice, DMH recovers such overpayments

22   by reducing the amount that it advances to the Debtor to cover future costs.  On December 21,

23   2010, DMH notified the Debtor that for fiscal year 2004–05, the Debtor owes Los Angeles

24   County $131,638.  The Debtor has appealed this audit finding.  In addition, the Debtor estimates

25   that $8,451 is due to the Debtor based upon prior fiscal year audits.  However, fiscal years 2005–

26   06 through 2010–11 remain subject to state audit disallowances for Medi-Cal reimbursements.

27   State audits for those years have yet to take place.

28             35.    Additionally, in November 2010, DMH notified the Debtor that, as a result of an

1    audit of California's AB3632 funding, DMH intends to reduce future advances by an additional

2    $236,413.  As of the Petition Date, however, DMH has not provided the Debtor with an official

3    notice of intention to recoup these funds.  The Debtor understands that this adjustment results

4    from amounts that the State of California determined were owed it by DMH in connection with

5    overpayments for AB3632 services.  DMH, in turn, allocated these liabilities among its health

6    service providers that were providers of AB3632 services during prior fiscal years.  The liabilities

7    do not arise under the existing contract between DMH and the Debtor.

8            36.    DMH contends that it possesses certain rights of setoff and/or recoupment with

9    respect to the funds held by the Debtor and owed to DMH and that it holds a security interest in

10    the funds held by the Debtor.

11            **iii.    The SELPA Judgment**

12            37.    In 2010, the Debtor entered into arbitration with Foothill Special Education Local

13    Plan Area ("SELPA").  SELPA is a consortium among the Glendale, Burbank, and La Cañada

14    unified school districts for the purpose of providing special-education services to students served

15    by those districts.  The parties entered into the arbitration to resolve a dispute concerning the

16    interpretation of certain agreements for the provision of the Debtor's services to the school

17    districts.

18            38.    On June 22, 2010, an arbitrator entered an award against the Debtor in favor of

19    SELPA in the amount of $631,029.12, plus post-award interest at the legal rate of 10% per

20    annum.  SELPA subsequently obtained entry of judgment in this amount against the Debtor on

21    December 13, 2010.  On February 14, 2011 (within the ninety-day period immediately prior to

22    the Petition Date), SELPA recorded a judgment lien against the Debtor's real property with the

23    County of Los Angeles Registrar-Recorder/County Clerk.

24            **iv.    The Verdugo Mental Health Foundation Note**

25            39.    The Debtor is the sole member of Verdugo Mental Health Foundation (the

26    "Foundation").  The Foundation is a nonprofit public benefit corporation formed in 1997 as a

27    supporting organization under Internal Revenue Code section 509(a)(3) for the specific purpose

28    of providing support for the Debtor.  The Foundation, which has its own board of directors,

1   currently holds approximately $388,057.26 in cash — all of which is subject to a charitable trust

2   and constitutes endowment funds to be used in perpetuity solely for the purposes specified by the

3   donors thereof.

4       40.    On September 30, 2009, the Debtor issued a Promissory Note Secured by Deed of

5   Trust to the Foundation in the amount of $1,200,000 (the "<u>Foundation Note</u>") as evidence of the

6   loans that had been extended to the Debtor by the Foundation in connection with construction of

7   the VMH Facility and support of the Debtor's operations.  Notwithstanding the title of the

8   Foundation Note, the Foundation Note is unsecured.  Interest and principal on the Foundation

9   Note are payable quarterly with the balance maturing on September 30, 2014.  In March 2010 and

10  June 2010, the Debtor made payments to the Foundation Note totaling $54,000.  The Debtor has

11  not made any payments to the Foundation in respect of the Foundation Note since June 2010.

12  The outstanding principal balance on the Foundation Note is approximately $1,184,181.

13  **F.    Events Leading to the Bankruptcy**

14      **i.    Overview**

15      41.    Shortly after completion of the VMH Facility and in the wake of the worldwide

16  financial crisis, a series of events and factors began to threaten the Debtor's viability.  These

17  events and factors, which are discussed in detail below, included substantial cost overruns on

18  construction of and necessary improvements to the VMH Facility, cancellation of the Debtor's

19  lines of credit, decreased private donations, and reduction in funding under government contracts

20  due to both budget cuts and programmatic changes.  As a result, in fiscal year 2009–10, the

21  Debtor operated at a loss of $304,102.  By fall 2010, the Debtor was experiencing liquidity

22  pressure and, in turn, defaulted on the Foundation Note in September 2010 and then the Loans in

23  December 2010.  The Debtor estimates that for fiscal year 2010–11, its operating deficit will be

24  minimal, but this is largely on account of the Debtor defaulting on the Loans in December 2010

25  and on the Foundation Note in September 2010.  However, if the Debtor continues to operate

26  through the end of its fiscal year (June 30, 2011), it projects that its cash will be depleted.

27

28

LA1:1204114

ii.    **Specific Events and Factors**

a.    **Depletion of Debtor's Reserves and Foundation Funds**

42.    While the proceeds of the 2007 Loan provided much of the funding necessary for the construction and remodeling of the VMH Facility, the funding was not sufficient to complete the project due to cost overruns and unforeseen additional expenses totaling approximately $1,900,000.  The Debtor had two primary sources for supplying the necessary incremental funding.  First, the Debtor accessed approximately $650,000 of availability on its secured lines of credit.  The Debtor subsequently retired this indebtedness using its own reserve funds as well as funds borrowed from the Foundation, at which time the creditor financial institutions then canceled the lines of credit, materially decreasing the Debtor's liquidity.  Second, the Debtor received contributions from the Foundation of approximately $1,200,000.  These contributions, coupled with the Foundation funds used to pay down the Debtor's lines of credit and the loans evidenced by the Foundation Note, exhausted all of the Foundation's funds other than the approximately $388,057.26 remaining in the Foundation's accounts, all of which, as noted above, are endowment funds.

b.    **Substantial Decrease in Private Donations**

43.    The Debtor historically relied on private donations to support clinical and operational expenses for which the Debtor did not receive reimbursement under its government contracts.  The substantial majority — approximately 72% — of philanthropic donations to the Debtor were in the form of bequests from individuals residing in the Glendale area.  Over the last 15 years, such bequests totaled more than $3,100,000.  In recent years, however, the frequency and amount of these bequests have declined markedly.  Indeed, the Debtor most recently received a bequest in 2009 and does not anticipate receiving any future bequests.  Because the Debtor is a nonprofit that operates almost exclusively on a cost reimbursement basis, these bequests provided critical incremental funding to the Debtor, the absence of which has prevented the Debtor from reestablishing its reserves and left the Debtor without any cushion in the event of reduced funding on account of dips in production.

c.    **Reduction in Funding, Programmatic Changes, and Recoupment**

44.    Beginning in 2009, the State of California and Los Angeles County implemented budget cuts that substantially reduced the Debtor's funding.  In August 2009, DMH notified the Debtor that budget shortfalls necessitated a material reduction in DMH's funding of the Debtor. In addition, shortly thereafter, the Debtor's contract under DPH's Substance Abuse Prevention and Control program was eliminated due to cessation of funding of that program, resulting in further decreased funding of approximately $51,000 per year.  In the face of these cutbacks, the Debtor terminated approximately 20% of its staff, instituted pay cuts and freezes, and otherwise reduced expenditures.

45.    A programmatic change implemented by DMH for fiscal year 2010–11 also adversely impacted the Debtor's funding.  Specifically, approximately $1,350,000 of the funding for which the Debtor is eligible under the DMH Contract was reallocated for prevention and early intervention services that may be provided only by certified clinicians who are trained in specific counseling and therapy techniques.  Due to a number of circumstances, the Debtor expects to produce only approximately $250,000 in prevention and early intervention services and, thus, miss out on approximately $1,100,000 of funding allocated under the DMH Contract.

46.    In addition, funds owed by the Debtor to DMH on account of DMH overpayments have and likely will continue to impair the Debtor's liquidity.  Since 2009, DMH has recouped $463,322 from the Debtor.  And, as noted above, DMH asserts that the Debtor owes approximately $368,000 for overpayments for fiscal year 2004–05 and in connection with AB3632 funding.  Moreover, state audits for fiscal years 2005–06 through 2010–11 have yet to occur, leaving open the possibility DMH recouping substantial amounts from the Debtor's future funding.

G.    **Efforts to Resolve Financial Difficulties**

47.    Recognizing that it could not survive as a going concern, the Debtor began exploring means by which to both maximize the value of its assets for creditors and ensure that its charitable mission would continue to be performed in the Glendale area without interruption.  In determining how to meet this objective, the Debtor first analyzed the value of its assets and the

1   security interests to which its assets are subject.  The Debtor concluded that substantially all of its

2   assets, including the VMH Facility, all of its personal property, and its cash and cash equivalents,

3   comprise collateral securing the Debtor's obligations to OSHPD and U.S. Bank under the VMH

4   Financings.  The Debtor's preliminary analysis indicated that the value of its assets is materially

5   less than the amount owed under the Loans and, therefore, that OSHPD and U.S. Bank are

6   undersecured.

7        48.    To confirm its initial conclusion that its assets are worth substantially less than the

8   amount outstanding under the Loans, the Debtor retained Syn-Mar Associates, a real estate

9   appraisal firm, to conduct the Appraisal of its primary saleable asset: the VMH Facility (as

10  described above).

11       49.    The debt outstanding under the Loans is approximately $6.1 million.  Because

12  OSHPD and U.S. Bank are substantially undersecured, the Debtor sought input from OSHPD

13  (which I understand has authority to consent to the use and disposition of collateral in a

14  bankruptcy proceeding on behalf of U.S. Bank) regarding disposition of the VMH Facility.

15  OSHPD informed the Debtor that it preferred VMH sell the VMH Facility on a short-sale basis

16  over OSHPD foreclosing on the facility.  OSHPD also informed the Debtor that OSHPD

17  supported VMH's efforts to sell the VMH Facility to a nonprofit mental healthcare provider that

18  would continue VMH's charitable mission.

19  **H.    The Proposed Transaction**

20       50.    After consultation with DMH and OSHPD, the Debtor concluded that the best way

21  for its clients to receive uninterrupted mental health services was for a third party nonprofit entity

22  already performing mental health services under a DMH contract to engage in a dual-prong

23  transaction.  One component of the transaction would be the third-party's acquisition of the

24  Debtor's assets, including the VMH Facility, under terms acceptable to OSHPD.  The other

25  component would be the allocation to the third party of the Debtor's DMH funding in the form of

26  amendment of the third party's existing DMH contract.

27       51.    To achieve this objective, the Debtor contacted six nonprofit mental health

28  providers in Los Angeles County to determine whether any had interest in pursuing such a

transaction. Four entities expressed interest in a potential transaction. The Debtor entered into nondisclosure agreements and held in-person meetings with each of these four entities. Three of the entities subsequently conducted diligence.

52.     Two of these entities expressed interest in attempting to negotiate a purchase of the Debtor's assets with the intent of continuing to provide mental health services at the VMH Facility. Given its status as an undersecured creditor, OSHPD also engaged in discussions with both entities.

53.     Ultimately, only one entity made an offer to purchase the VMH Facility and the Debtor's other assets: Didi Hirsch Psychiatric Service, a California Nonprofit Public Benefit Corporation, dba Didi Hirsch Mental Services ("Didi Hirsch"), which is one of the largest and most highly regarded nonprofit mental health service providers in Los Angeles County. Following negotiations, the Debtor and Didi Hirsch are in the process of finalizing an asset sale agreement (the "APA"), which provides for the sale, pursuant to section 363 of the Bankruptcy Code, of the VMH Facility and all assets related to the Debtor's provision of mental health services (the "Purchased Assets").

**I.      Description of Purchased Assets**

54.     The Purchased Assets consist of the VMH Facility and all other personal property (other than expressly excluded assets) on site at the VMH Facility (regardless of whether such property is obsolete). Excluded assets include the Debtor's cash, cash equivalents, and deposit accounts; clinical records of clients; and the Debtor's contracts with government agencies, including the Debtor's contract with DMH.

55.     The personal property consists of equipment, furniture, and supplies necessary to provide mental health services to the Debtor's clients as well as intellectual property, accounts receivable and books and records (but not clinical records of clients). The Debtor maintains a computer system, upgraded in 2006, with approximately 38 computers and printers and a telecommunication system that includes 107 phones and four fax machines. Additionally, the facility is furnished with approximately 32 cubicle work stations, 29 tables for the therapy room, 45 desks, 36 bookcases, 47 filing cabinets, and 300 chairs. The aggregate book value of all of the

1    personal property on site at the VMH Facility does not exceed $250,000.

2        56.    While no formal agreements have been reached, the Purchaser is likely to offer

3    employment to a majority of the Debtor's employees.  However, none of the board members or

4    officers of the Debtor intend to be formally affiliated with the Purchaser either as board members

5    or employees of the Purchaser after the sale is consummated.

6    **J.    Key Terms of Proposed Transaction**

7        57.    Didi Hirsch's proposed purchase price for the Purchased Assets is $5,000,000

8    ($700,000 more than the value set forth in the Appraisal).  Didi Hirsch will pay purchase price

9    through assumption of $5,000,000 of the Debtor's liability under the Loans, subject to refinancing

10    by OSHPD of such liability on an interest-only basis for three years at rates from 1.75% to 2.75%

11    followed by amortization over 30 years at 3% and on such other terms and conditions set forth in

12    the APA.  Subject to approval by the Court, Didi Hirsch will take the Purchased Assets free and

13    clear of all liens other than the liens of OSHPD and U.S. Bank securing the Loans.

14        58.    As a critical component of the proposed transaction, Didi Hirsch has conditioned

15    the APA on DMH amending Didi Hirsch's existing DMH contract to include funding

16    currently allocated to the Debtor.  DMH has informed the Debtor that it supports the proposed

17    transaction and that subject to Bankruptcy Court approval of the sale, it will amend its contract

18    with Didi Hirsch to include funding currently allocated to the Debtor (although DMH informs the

19    Debtor that this agreement is subject to any direction by the Los Angeles County Board of

20    Supervisors not to proceed).  Upon consummation of the sale, Didi Hirsch will occupy the VMH

21    Facility and provide uninterrupted services to the Debtor's clientele.

22                        **II.**

23                  **FIRST-DAY MOTIONS**

24        59.    The Debtor has requested various types of relief in first-day motions (collectively,

25    the "First-Day Motions") in order to minimize the adverse effects of the commencement of the

26    Chapter 11 Case on the Debtor's ability to provide mental health services pending the sale of the

27    Debtor's assets to a new provider.  I believe that approval of the First-Day Motions is necessary

28    to facilitate an orderly transition of services and the winding down of the Debtor's business.  The

factual background of each First-Day Motion is set forth below and in the general discussion above.

**A. Debtor's Emergency Motion for Order (I) Authorizing Interim and Final Use of Cash Collateral; (II) Granting Adequate Protection for Use of Prepetition Collateral; and (III) Granting Related Relief (the "Cash Collateral Motion")**

60.     By the Cash Collateral Motion, the Debtor requests that the Court conduct an interim hearing to consider the entry of the interim order: (1) approving the use of "cash collateral," including cash and funds in deposit accounts currently on hand in the Debtor's estate and cash and other receipts generated in connection with the Debtor's provision of mental health services ("Cash Collateral") on an emergency interim basis, pending a final hearing, in accordance with the Budget (defined below), necessary to (a) enable the Debtor to continue to provide mental health services to the community in furtherance of its charitable mission pending the sale of the Debtor's assets to a new provider and (b) facilitate an orderly transition to a new provider and the winding down of the Debtor; (2) granting adequate protection to the Secured Creditors on an interim basis; and (3) scheduling and establishing deadlines regarding a final hearing on the Debtor's use of Cash Collateral.

61.     In anticipation of the Chapter 11 Case, the Debtor has developed cash flow projections reflecting anticipated revenue and expenditures through the end of June 2011, contained in a 13-week cash flow forecast attached hereto as Exhibit B (the "Budget"), *provided* that (i) the Debtor may use in any period amounts set forth for that period plus unused amount for any prior period, and (ii) the Debtor's actual expenditures may exceed 15% of the aggregate of the monthly expenditures reflected in the Budget (clauses (i) and (ii), collectively, the "Allowed Variance"); *provided further* that the Debtor may amend the Budget at any time upon prior notice to the Secured Creditors (a "Proposed Budget").  Unless a Secured Creditor provides written notice to the Debtor within five days after receipt of the Proposed Budget that the Proposed Budget has not been approved by the Secured Creditors, the Proposed Budget shall become the Budget for the purposes hereof.  If a Proposed Budget is not approved by the Secured Creditors, then the Debtor shall have the right to petition the Court for approval of the Proposed Budget, which if approved by the Court shall become the "Budget" for the purposes hereof.  In the event

1    that the Secured Creditors (or, if applicable, this Court) fail to approve a Proposed Budget, then

2    the Debtor shall be permitted to continue to use Cash Collateral in accordance with the last

3    approved Budget.

4        62.    The Budget, which I reviewed and approved, sets forth the amount of cash

5    necessary for the Debtor to continue to provide mental health services to the community pending

6    the sale of the Debtor's assets, transition those services to a new provider and then begin winding

7    down.  The Budget takes into account the effect this bankruptcy filing may have on the Debtor's

8    provision of services and the expenses of the administration of the Chapter 11 Case.

9        63.    The Debtor has an immediate need for the use of Cash Collateral in order to

10    maintain continuity in its provision of mental health services to the community in furtherance of

11    its charitable mission pending the sale of the Debtor's assets to a new provider and to avoid

12    irreparable harm by facilitating an orderly transition and winddown.  The Debtor's expected use

13    of Cash Collateral during the interim and final periods is reflected in the Budget.  All payments

14    described in the Budget are necessary to maintain and continue the Debtor's provision of mental

15    health services in the community and to seamlessly transition these services to a purchaser of the

16    Debtor's assets in order to protect the Debtor's clients and to maximize value for the benefit of

17    the Debtor's creditors.  Specifically, the Debtor must have access to Cash Collateral to make

18    payments to vendors for postpetition goods, employees, utilities, doctors, nurses, and other

19    pertinent, ordinary expenses incurred in connection with the provision of mental health services.

20    Failure to make payments in accordance with the Budget would result in the cessation of the

21    Debtor's services in the community, causing immediate and irreparable harm to the community

22    and to the Debtor's creditors.  Because the value to the community and the Debtor's creditors of a

23    liquidation of the Debtor's assets is substantially less than the going-concern transition of those

24    services to a new provider, creditors would likely receive substantially less (and clients are more

25    likely to experience an interruption in much-needed healthcare) in liquidation than they would if

26    the Debtor is allowed to continue to provide services, sell its assets and conduct an orderly

27    transition of services and winddown.  Put simply, the Debtor cannot continue to provide crucial

28    mental health services on a charitable basis without the use of Cash Collateral, and if the Debtor

1   is unable to provide mental health services in the community, all parties will be harmed.

2          64.     As discussed above, each of the Secured Creditors asserts a security interest or lien

3   in the Cash Collateral.  Each of the Secured Creditors has consented to the Debtor's use of Cash

4   Collateral on the terms and conditions set forth in the Cash Collateral Motion.  In addition, the

5   Debtor submits that the terms of the proposed adequate protection arrangements (set forth in the

6   Cash Collateral Motion) and use of the Cash Collateral are fair and reasonable, reflect the

7   Debtor's prudent exercise of business judgment and provide adequate protection to the Secured

8   Creditors.

9          65.     Allowing the Debtor to use Cash Collateral to finance its ongoing provision of

10  services will preserve and enhance the Secured Creditors' existing collateral.  The value of the

11  Debtor's assets is enhanced by the value of the revenue generated by the Debtor as well as the

12  goodwill associated with the Debtor's business.  The Debtor's ability to maximize the value of its

13  assets is inextricably tied to maintaining the going-concern value of the Debtor, which in turn is

14  dependent on having cash available to pay for operating expenses.  The Debtor is in the

15  healthcare business and without the continuity of services and an uninterrupted ability to operate,

16  the Debtor could face significant patient and employee loss, which would have an immediate and

17  devastating effect upon the Debtor's future revenues and opportunity for maximizing value

18  through a sale.  If the Debtor does not have access to Cash Collateral to pay its operating

19  expenses, even for a short time, it would likely be forced to shut down and would be liquidated

20  for far less than fair value.  The use of Cash Collateral (including all cash existing on the Petition

21  Date plus all postpetition revenue generated) to provide the Debtor's services will not only

22  preserve and protect the value of the Secured Creditors' collateral generally—thus providing the

23  Secured Creditors with adequate protection of their interests— but also enhance and maximize

24  the potential recovery for all creditors of the estates.

25  **B.   Debtor's Emergency Motion for Order Approving (I) Sale Procedures; (II) Notice
        Procedures; (III) Assumption and Assignment Procedures; (IV) Date for Sale Hearing;**
26      **and (V) Related Relief (the "Sale Procedures Motion")**

27         66.     By the Sale Procedures Motion, the Debtor seeks an order of this Court approving

28  (1) sale procedures for the sale of substantially all assets related to the Debtor's provision of

1   mental health services (the "Purchased Assets"), (2) notice procedures, (3) procedures for the

2   assumption and assignment of executory contracts, and (4) date for sale hearing.

3       67.     I believe that the Sale Procedures summarized in the Notice of Motion and

4   attached as Exhibit B to the Sale Procedures Motion, and the opportunity for competitive bidding

5   embodied therein, are reasonable and calculated to obtain the highest and best offer for the

6   Debtor's assets, taking into consideration the Debtor's charitable mission and the public need.

7       68.     The Debtor has formulated proposed procedures relating to the assumption and

8   assignment of executory contracts (the "Assumption and Assignment Procedures"), which I

9   believe will expedite the sale of the Purchased Assets.

10      69.     I believe that the Assumption and Assignment Procedures are reasonable and

11  protect the rights of Non-Debtor Parties, and that such procedures will facilitate a faster, smoother

12  closing of the contemplated asset sale by establishing a process for resolving disputes regarding

13  cure amounts and assurances of future performance by the purchaser of the Purchased Assets.

14      70.     The Debtor submits that the notice procedures outlined in the Sale Procedures

15  Motion are reasonably calculated to provide timely and adequate notice to the Debtor's creditors

16  and other parties in interest, and also to each party to whom the Debtor has marketed the

17  Purchased Assets.  Additionally, pursuant to the Motion to Limit Notice, each of the Debtor's

18  creditors and clients will have been notified of the limited notice procedures, and, accordingly,

19  will have had an opportunity to request special notice under Bankruptcy Rule 2002.

20      71.     I believe that the proposed notice procedures are appropriate in light of the nature

21  of the Purchased Assets.  The VMH Facility was uniquely designed and configured to meet the

22  service needs and demands of a community mental health agency.  Among other features, many

23  of the VMH Facility's rooms are small spaces designed for one-on-one or small group therapy, its

24  pharmacy space is suited for that specific use only, and the administrative section of the VMH

25  Facility is partitioned such that there is limited access to treatment areas (and none at all from the

26  second floor).  Thus, any party wishing to use the VMH Facility for any other function would

27  incur significant costs to remodel the building for another purpose.

28      72.     Because the Debtor's other valuable assets, including its employees and its

contract with DMH, are not assets that could be sold, an interested bidder would have to ascribe

the majority of the value in the proposed transaction to the VMH Facility.  In light of its purpose-

built character, the only interested parties have been other community mental health agencies, and

the Debtor spent a significant amount of time prior to the Petition Date attempting to negotiate a

possible sale to other nonprofit mental health providers in Los Angeles County in an effort to

maximize the value of its assets for creditors and to ensure that its charitable mission would

continue to be performed in the Glendale area.

73.     For these reasons, the Debtor submits that the notice procedures requested in the

Sale Procedures Motion constitute good and sufficient notice under the circumstances with

respect to the Sale Procedures Motion, all proceedings to be held thereon, and the entry of an

order or orders granting all of the relief requested therein.  The Debtor further submits that no

further notice need be given.

**C.  Debtor's Emergency Motion for Order (I) Limiting Notice; (II) Establishing the Manner
of Notice; (III) Limiting Disclosure of Confidential Client List; and (IV) Granting
Related Relief ("Motion to Limit Notice")**

74.     By the Motion to Limit Notice, the Debtor seeks an order of this Court

establishing notice requirements and procedures.  Specifically, the Debtor requests that the Court

enter an order: (1) limiting the parties upon whom notice must be served, and (2) establishing the

manner of service with respect to all matters for which the Bankruptcy Code and the Bankruptcy

Rules authorize the Court to designate or limit the parties entitled to notice and the manner of

service, including matters subject to Bankruptcy Rules 2002, 4001, 6004, 6006, 6007, or 7004,

and including (a) permission to serve insured depository institutions by first-class mail and (b)

permission for the Debtor to maintain a confidential list of client names and the last known

address of each such client as set forth in the Debtor's books and records (the "Confidential

Client List"), which will not be included in the Debtor's master mailing list or otherwise filed

with the Court, to file all appropriate proofs of service for mailings to the Debtor's clients under

seal, and to grant the Debtor's proposed general bankruptcy counsel, O'Melveny & Myers LLP

("O'Melveny"), access to the Confidential Client List for the purpose of effectuating service and

1    filing such proofs of service in each case in order to comply with the Debtor's legal obligations to

2    protect private client information.  The relief requested by the Motion to Limit Notice is

3    necessary to ensure the efficient, orderly, and expeditious administration of the Chapter 11 Case

4    while ensuring that all parties with significant interests in these proceedings have an opportunity

5    to be heard.

6            75.    I believe that it is necessary and appropriate to adopt the procedures proposed in

7    the Motion to Limit Notice because of the large number of parties in interest in the Chapter 11

8    Case.  The Debtor has currently identified more than 300 potential creditors on the creditor

9    matrix.  Furthermore, as of the Petition Date, the Debtor is in possession of clinical records for

10   approximately 7,600 clients (the "Known Clients").  Approximately 1,600 of the Known Clients

11   have open "episodes" (also referred to as "charts") as reflected in the Debtor's books and records

12   (the "Current Clients").  Approximately 6,000 of the Known Clients have closed episodes, or

13   charts, as reflected in the Debtor's books and records (the "Former Clients").  The Debtor

14   generally closes adult episodes if it has had no client contact for 90 days, though billing purposes

15   may require that an episode may remain open beyond this time period.  With respect to child

16   clients, following four weeks of non-attendance, the Debtor sends a letter to the child's

17   guardian(s) and, if the Debtor receives no response within two weeks, the Debtor closes the

18   episode (again, unless billing issues are outstanding).  In accordance with applicable law and

19   DMH policy, the Debtor is in possession of Former Client clinical records dating back to, in

20   certain cases, the early 1990s.  I am not presently aware of any claims held or asserted by any

21   Known Client against the Debtor.

22           76.    As of the Petition Date, the Debtor employed 64 people, roughly half of whom are

23   part-time employees, and the majority of whom work as psychiatrists, psychologists, nurses,

24   social workers, and marriage and family therapists in treating approximately 2,000 clients

25   annually.  Since the Debtor's business operations do not generally require serving notices or other

26   documents to thousands of current and former patients, the Debtor lacks the personnel,

27   equipment, and other resources to do so.  Without outside assistance, the Debtor would be unable

28   to effectuate timely service of documents in the Chapter 11 Case on the Known Clients.  For this

LA1:1204114                              - 25 -

1    reason, the Debtor must heavily rely on the capabilities of O'Melveny & Myers LLP, a large

2    international law firm with numerous employees who devote their full time to effectuating service

3    of legal documents, in order to satisfy the service requirements of the Chapter 11 Case.

4          77.    Providing notice of all matters in this case to thousands of parties in interest would

5    delay the provision of notices in the Chapter 11 Case and would be unjustifiably burdensome for

6    an entity with such limited resources, diminishing the assets available for creditors without

7    conferring any meaningful benefit on the Debtor's estate and possibly jeopardizing the Debtor's

8    continued provision of mental health services.  It also would place a large administrative burden

9    on the Debtor, a small nonprofit operation, and would impede the efficient and expeditious

10   administration of the Chapter 11 Case.  Furthermore, providing notice of all matters to the many

11   entities otherwise entitled to notice of such matters and serving all notices to depository

12   institutions by certified mail, rather than first class or overnight delivery, would unnecessarily

13   increase the costs of administering this case and could delay service to these institutions.  Finally,

14   since some of the client records are approximately twenty years old and are likely to have stale

15   contact information, it is highly improbable that the Debtor will be able to contact and obtain the

16   consent of every single client, on an individual basis, to authorize public disclosure of the

17   Confidential Client List.

18         78.    Ultimately, I believe that the proposed notice procedure will provide sufficient

19   notice to parties in interest while mitigating the administrative burden that would otherwise be

20   imposed upon the estate.  I submit that the proposed limited scope of notice is necessary to avoid

21   the administrative costs of serving notice of all pleadings on hundreds of parties, to ensure that

22   interested parties in the Chapter 11 Case receive proper and sufficient notice of all applicable

23   matters, and to maintain the privacy interests of Current Clients and Former Clients as required

24   under applicable law.  If the relief requested herein is granted, the burden, complication, delay

25   and cost to the Debtor's estate that is associated with administering the Chapter 11 Case and

26   providing notice of the proceedings to thousands of parties would be dramatically reduced.

27   Accordingly, the Debtor submits such notice is appropriate under the circumstances.

28         79.    By the Motion to Limit Notice, the Debtor further seeks to establish certain

1    procedures concerning notices to clients.  The Debtor has not included Known Clients on its

2    creditor matrix both because the Debtor does not believe that any clients are current creditors and,

3    out of an abundance of caution, to respect client privacy and comply with laws concerning patient

4    confidentiality.

5          80.    I understand that the Debtor and the clinicians employed by the Debtor are

6    governed by a number of laws, regulations, policies and ethical codes that require the protection

7    of patient privacy and confidentiality.  The Debtor's *Clinical Policy and Procedure Manual*

8    implements these laws, and I understand that in a number of cases, it imposes requirements more

9    stringent than applicable law.

10          81.    To comply with these privacy and disclosure requirements, the Debtor intends to

11    keep a list containing the Confidential Client List that it will not file with the Court and proposes

12    that the Court grant the Debtor prior approval to file proofs of service of all mailings sent to its

13    clients under seal.  The Debtor does not intend to disclose the names of its clients in any Court

14    filing barring direction to the contrary from the Court.

15          82.    Using the confidential procedures set forth in the Motion to Limit Notice, on the

16    Petition Date the Debtor served a letter substantially in the form of the letter attached as Exhibit B

17    to the Motion to Limit Notice on each Current Client, via first class mail, addressed to each such

18    Current Client at the Current Client's last known address contained in the Debtor's books and

19    records.  In addition to disclosing the Debtor's proposed transition of its operations to Didi

20    Hirsch, the letter also provides the Current Client with contact information for obtaining

21    information about the Chapter 11 Case, and seeks each Current Client's authorization to transfer

22    his or her file to Didi Hirsch.  The Debtor proposes to also serve the Current Clients, via first-

23    class mail to their last known addresses contained in the Debtor's books and records, all notices

24    or other documents that are required to be served on all of the Debtor's creditors, including,

25    without limitation, the notice of the commencement of the Chapter 11 Case, the notice of the

26    claims bar date, and any notices or motions related to client records.

27          83.    Additionally, the Debtor proposes to grant O'Melveny access to the Confidential

28    Client List for the specific purpose of effectuating service on the Debtor's clients and to file

1   related proofs of service.  I am informed that, upon entry of an order granting the relief requested

2   in the Motion to Limit Notice, O'Melveny will enter into a business associate agreement in a

3   form meeting the requirements of the Health Insurance Portability and Accountability Act of

4   1996[4] ("HIPAA"), pursuant to which it will agree to comply with the privacy obligations imposed

5   by HIPAA.  I am further informed that, upon discharge of its duties as counsel to the Debtor,

6   O'Melveny will destroy all Confidential Client List in its possession at that time other than copies

7   of any proof of service filed with the Court, which O'Melveny will destroy upon the expiration of

8   five years from the date of filing.

9        84.    The Debtor seeks the entry of an order providing that none of the Debtor,

10  O'Melveny, or any of their respective successor, current and former equity holders, officers,

11  directors, affiliates, subsidiaries, partners, investors, administrators, attorneys, advisors,

12  consultants, independent contractors, employees, agents, or other professional shall have or incur

13  any liability to any person for any act taken or omitted to be taken with respect to the Confidential

14  Client List to the extent authorized by the order granting the relief requested in the Motion to

15  Limit Notice, including, without limitation, preparing documents for service and serving

16  documents on the Debtor's clients using the Confidential Client List and filing proof of such

17  service with the Court under seal using the Confidential Client List; *provided, however,* that the

18  foregoing shall have no effect on the liability of any person that results from any such act or

19  omission that is determined in a final order to have constituted fraud, gross negligence or willful

20  misconduct.

21       85.    The Debtor respectfully submits that these procedures are necessary to satisfy the

22  privacy and disclosure requirements of applicable law, and are in the best interests of its clients,

23  and requests that the Court approve the foregoing procedures as adequate and sufficient means of

24  providing notice to the Debtor's clients.

25  **D.  Debtor's Emergency Motion for Order (I) Prohibiting Utilities from Altering, Refusing
    or Discontinuing Service; (II) Determining Adequate Assurance of Payment for Future
26  Utility Services; and (III) Granting Related Relief (the "Utilities Motion")**

27       86.    By the Utilities Motion, the Debtor seeks an order of this Court pursuant to section

28  ─────────────
    [4] Public Law 104-191

1   366(c)(3) of the Bankruptcy Code establishing adequate assurances of payment to the utility

2   providers listed on Exhibit A to the Utilities Motion (the "Utilities").  Specifically, the Debtor

3   requests that the Court enter an order: (1) determining that the provision of deposits by the Debtor

4   to each Utility in an amount equal to one-half of the Debtor's average monthly invoice amount

5   for such services over the six months prior to the Petition Date for each such Utility, as set forth

6   in Exhibit A to the Utilities Motion in the column "Proposed Deposit" (the "Deposits"),

7   constitutes adequate assurance of payment for future utility services, subject to a Utility's right to

8   seek modification of the proposed amount pursuant to specified procedures, as more fully

9   discussed in the Utilities Motion, and (2) otherwise, prohibiting utilities from altering, refusing, or

10  discounting services without further order of this Court.

11       87.    In connection with its daily operations, the Debtor uses electricity, gas, water,

12  waste removal, and other utility services from the Utilities through various accounts with an

13  average monthly aggregate cost of approximately $10,302.00 (based on the Debtor's monthly

14  costs over the six months prior to the Petition Date).  A list of the Utilities that provide these

15  utility services is attached as Exhibit A to the Utilities Motion.

16       88.    Uninterrupted utility services are essential to the Debtor's ongoing operations and

17  provision of mental health services.  Should a Utility refuse or discontinue service, even for a

18  brief period, the Debtor's provision of services could be disrupted.  Indeed, the Debtor requires

19  full utility service to provide mental health services to clients and provide DMH, the Debtor's

20  primary source of funding, and other governmental agencies with information and other reports

21  required under the Debtor's various government contracts.  Without utility services, the Debtor

22  would be unable to provide services to clients, and thus, would cease operating.  As a

23  consequence, any discontinuation in service could irreparably disrupt the Debtor's ability to

24  provide mental health services.  It is, therefore, critical that the Utilities continue uninterrupted

25  service to the Debtor.

26       89.    As a matter of practice, the Debtor has paid its regular monthly utility obligations

27  when due.  As of the Petition Date, the Debtor is current on all of its obligations to the Utilities

28  that are due and payable.  Debtor anticipates that it will have adequate cash to meet all of its

LA1:1204114                              - 29 -

postpetition obligations to the Utilities on a current basis. The Debtor has specifically included in the Budget amounts for payments to Utilities, including the Deposits.

90.     Without the procedures set forth in the Utilities Motion, the Debtor's limited resources could be diverted to addressing requests by the Utilities instead of administering the Chapter 11 Case and continuing to provide mental health services in a manner that maximizes value for creditors and protects the Debtor's clients and would force the Debtor to capitulate to unreasonable demands by a Utility to avoid the discontinuation of services and interruption of the Debtor's operations. The orderly process contemplated by the procedures set forth in the motion will avert such outcomes and enable the Debtor to make a smooth transition into chapter 11, while ensuring a fair process for providing adequate assurance to the Utilities to the extent required and in conformity with the Bankruptcy Code.

**E.    Debtor's Emergency Motion for Order Authorizing (I) Continuation of All Insurance Policies and Agreements Relating Thereto; (II) the Debtor to Honor Certain Obligations in Respect Thereof Pursuant to Sections 105(a) and 363(b) of the Bankruptcy Code; and (III) Granting Related Relief (the "Insurance Motion")**

91.     By the Insurance Motion, the Debtor seeks an order of this Court, pursuant to sections 105(a) and 363(b) of the Bankruptcy Code, authorizing the Debtor to (1) maintain and continue to make all postpetition payments (including postpetition fees, premiums, and deductibles) with respect to the Insurance Policies (defined below) on an uninterrupted basis; (2) maintain and continue on an uninterrupted basis the Debtor's prepetition practices with respect to the assertion of claims against each Insurance Policy; (3) pay any prepetition premiums related to the Insurance Policies to the extent that the Debtor determines, in its discretion, that such payment is necessary to avoid cancellation, default, alteration, assignment, attachment, lapse or any form of impairment to the coverage, benefits, or proceeds provided under the Insurance Policies; and (4) enter into new policies or renew the existing Insurance Policies in the ordinary course of the Debtor's provision of mental health services.

92.     In connection with the Debtor's provision of mental health services and its occupation and management of the VMH Facility, the Debtor maintains the following four insurance policies: (i) a directors and officers liability policy, (ii) a commercial line policy

1    (providing, *inter alia*, professional liability, property, general liability, auto, and crime coverage),

2    (iii) a commercial excess umbrella liability policy, and (iv) a workers' compensation policy

3    (collectively, the "Insurance Policies" and each, an "Insurance Policy").  The first three policies

4    are issued by Philadelphia Insurance Companies, while the workers' compensation policy is

5    issued by KRM Risk Management.  A list of the Insurance Policies, the annual premium for each

6    Insurance Policy, and a true and correct description of each Insurance Policy's payment schedule

7    is attached to the Insurance Motion as Exhibit A.

8        93.    The premium for the workers' compensation policy is paid in monthly installments

9    of $3,678 on the first day of each month.  With respect to the Philadelphia Insurance Companies

10    policies other than the directors and officers liability policy, twenty-five percent of the premium

11    is paid up-front at the beginning of each policy term and the remaining seventy-five percent is

12    paid in nine monthly installments.  The next payments on the Debtor's general commercial line

13    and commercial excess policy are due April 21.  The premiums for the Debtor's current directors

14    and officers liability policy (including tail coverage for a period of one year) have been fully paid.

15    The Debtor's general commercial and commercial excess policies expire on December 6, 2011,

16    while the Debtor's directors and officers liability policy expires on July 30, 2011.  The Debtor's

17    workers' compensation policy, however, expires on April 1, 2011 and will have to be renewed

18    during the course of the Chapter 11 Case.  As of the Petition Date, I believe that the Debtor is

19    current on such installments.

20        94.    In addition to paying a fixed annual premium for coverage, several of the

21    Insurance Policies provide that the Debtor remains liable for self-insured deductible portions of

22    claims made against the Insurance Policies.  For example, under the Debtor's commercial line

23    policy provided by Philadelphia Insurance Companies, the Debtor pays an estimated annual

24    premium of $91,134.80 regardless of the number or amount of claims made under the policy.  Yet

25    the Debtor remains liable for a self-insured deductible of up to $1,000 for automobile collision

26    and employee misconduct claims and up to $5,000 for claims relating to damage to the Debtor's

27    facilities or personal property.  Although I believe the Debtor is current on payments of all its

28    obligations as of the Petition Date, the Debtor may be required in the future to reimburse its

insurance providers for deductible requirements under the Insurance Policies.  The Debtor seeks the authority to make these payments if it is required to do so to ensure that it remains protected under its Insurance Policies.

95.    Finally, because the Insurance Policies expire annually, the Debtor seeks authority to renew the Insurance Policies or enter into new insurance policies on competitive terms without further Court approval.  If the Debtor is not able to renew these Insurance Policies, it may experience a lapse in coverage or could be forced to pay higher rates or expend money to acquire a new provider.  In particular, the Debtor's workers compensation policy is due to expire as of April 1, 2011.  In light of the imminent expiration of this policy, the relief sought in the Insurance Motion is of immediate importance to the Debtor's continued operation.

96.    The Insurance Policies are essential to the Debtor's continued operation during the Chapter 11 Case, and in many cases such coverages are required by various contracts that govern the Debtor's provision of mental health services.  In particular, Section 21 of the Debtor's contract with DMH, which is the Debtor's primary source of funding, requires the Debtor to maintain certain minimum types and levels of insurance coverage, including coverage for commercial general liability, automobile liability, workers compensation and employers' liability, sexual misconduct liability, professional/errors and omission liability, and property damage.  The Debtor is required to deliver evidence of such coverage to DMH, and failure to maintain such coverage constitutes a material breach of the agreement, which may result in the termination of funding.  Additionally, it is a reasonable business practice for the Debtor to carry malpractice insurance as a provider of mental health services.  The Debtor has more than a thousand current clients, and a single lawsuit could jeopardize the ability of the Debtor to continue to provide mental health services and seamlessly transition those services to a new provider.

97.    Because the Insurance Policies are essential to the Debtor's ongoing operations and provision of mental health services, I believe it is in the best interests of its estate and the Debtor's charitable mission to permit the Debtor to honor its obligations under the Insurance Policies.  Any other alternative would likely require considerable additional cash expenditures and would be detrimental to the Debtor's ability to continue providing mental health services and,

therefore, to its estate.

98.     The Debtor will need to continue the Insurance Policies throughout the duration of the Chapter 11 Case.  The Debtor respectfully submits that, to the extent necessary, the renewal or negotiation of these Insurance Policies falls squarely within the ordinary course of its business.  I believe that maintaining continued and uninterrupted insurance coverage under the favorable terms and conditions provided by the Insurance Policies is in the best interests of the Debtor, its estate, and its charitable mission.

**F.    Debtor's Emergency Motion for Order Authorizing (I) the Debtor to Pay Prepetition (A) Salaries and Wages, (B) Employee Medical, Workers' Compensation and Similar Benefits, and (C) Reimbursable Employee Expenses; (II) the Debtor to Continue its Practices, Policies and Programs with Respect to the Foregoing; (III) Banks and Other Financial Institutions to Honor All Checks and Electronic Payment Requests Relating to the Foregoing and the Debtor to Reissue Dishonored Checks or Electronic Transfer Requests Relating to the Foregoing Pursuant to §§ 105(a), 363(b), 503, 507, 1107 and 1108 of the Bankruptcy Code; and (IV) Granting Related Relief (the "Employee Benefits Motion")**

99.     By the Employee Benefits Motion, the Debtor seeks entry of an order that (1) authorizes but does not direct the Debtor, in its sole discretion, to pay certain prepetition Employee Obligations (as defined below) (other than accrued vacation time) and to continue to pay certain Employee Obligations accrued postpetition (including the liquidated amount of any vacation time accrued postpetition upon postpetition separation of any Employee from employment with the Debtor) in accordance with the Debtor's ordinary course of business and stated policies; (2) authorizes but does not direct the Debtor, in its sole discretion, to continue its practices, programs and policies in effect as of the Petition Date with respect to all Employee Obligations (including honoring vacation time that was accrued but unused, as of the Petition Date); and (3) authorizes and directs banks and other financial institutions to honor and pay all prepetition and postpetition checks issued or to be issued and fund transfers requested or to be requested by the Debtor in respect of the Employee Obligations.  The Debtor also seeks authority to issue new postpetition checks or fund transfer requests with respect to prepetition obligations that may have been dishonored by the banks in respect of the Employee Obligations, if necessary.

100.     As discussed above, as of the Petition Date, the Debtor employed approximately

64 employees, including psychiatrists, psychologists, nurses, social workers, marriage and family

therapists, and administrative staff, of whom approximately 33 are full time and 31 are part-time

(herein referred to as the "Employees").  Forty-two are members of the clinical staff and 22 are

members of the administrative staff.  The Debtor also employs three independent contractors,

including a registered nurse, a clinical supervisor, and a program supervisor.  Additionally, the

Debtor employs a temporary psychiatrist through a temporary agency, locumtenens.com.  The

Employees perform a variety of critical functions for the approximately 2,000 adults and children

to whom the Debtor provides services annually.  In fact, the success of each of the counseling,

therapy, and rehabilitation programs depends largely on the experience and expertise brought by

the psychiatrists, psychologists, nurses, social workers, and therapists whom the Debtor employs.

101.    Notwithstanding the financial difficulties facing the Debtor, the Employees have

remained loyal and committed, providing high-quality care to clients even while facing workforce

reductions, pay cuts and freezes, and reductions in benefits.  Furthermore, the ability of the

professional staff to provide exceptional service to clients is bolstered by the administrative

staff's knowledge and understanding of the Debtor's business.  These Employees are assets to the

Debtor and are essential to the Debtor's provision of mental health services and fulfillment of its

charitable mission.

102.    As a result of the commencement of the Chapter 11 Case, and in the absence of an

order of the Court providing otherwise, the Debtor will be prohibited from paying or otherwise

satisfying its prepetition obligations to its Employees, including its obligations under wage,

salary, retirement, healthcare, unemployment services, and various other benefit programs.  In

addition, checks, wire transfers and direct deposit transfers issued in respect of the Employee

Obligations may be dishonored.  To retain Employees and maintain Employee morale at this

critical time, and to minimize the personal hardship the Employees would suffer if prepetition

Employee Obligations are not paid or honored when due, the Debtor seeks authority to pay and

honor certain obligations in its sole discretion, as described below.

103.    The Debtor's petition for relief under chapter 11 of the Bankruptcy Code will very

likely cause the Employees to question their current employment status.  While these Employees

1    have demonstrated loyalty to the Debtor despite uncertainty in the months prior to the

2    commencement of the Chapter 11 Case, their search for stability with regard to compensation and

3    benefits may lead to Employee departures.  A failure to compensate Employees for the Employee

4    Obligations or any deterioration in morale among Employees at this time would have a

5    devastating impact on the Debtor, the Debtor's clients, and the Debtor's ability to fulfill its

6    charitable mission by consummating a sale of its assets and transitioning its services to a new

7    provider.  Accordingly, the Debtor seeks the relief set forth in the Employee Benefits Motion with

8    respect to the following (the "Employee Obligations"):

9         (a) employee salaries, wages and related deductions;

10        (b) reimbursable business expenses;

11        (c) employee health benefit claims;

12        (d) supplemental plan contributions to Unemployment Services Trust ("Unemployment

13   Services Trust");

14        (e) disability claims;

15        (f) life insurance premiums; and

16        (g) administrative fees associated with employee benefits.

17        **i.        Employee Salaries and Wages**

18        104.    In the ordinary course of business, the Debtor's Employees are paid semi-monthly

19   for the pay periods consisting of the 1st through the 15th of the month and the 16th through the

20   last day of the month.  Employees turn in timesheets to supervisors on the day after the pay period

21   ends (the 16th or the 1st of the next month, respectively).  Once the timesheets are approved, they

22   are entered into the payroll system and paychecks are generally issued the following day.

23   Therefore, payday generally occurs three days after the end of the pay period (i.e., the 18th or the

24   3rd of the next month, respectively, unless there are intervening weekends).  If payday falls on a

25   Saturday, Sunday, or regularly scheduled holiday, paychecks will be issued the following

26   business day.  The Debtor's last payroll prior to the Petition Date was made by issuing cashier's

27   checks to Employees on March 24, 2011, and reflected wages earned in the period up to and

28   including March 24, 2011.  The next scheduled payday for Employees is April 3, 2011.  This

would relate to wages earned from March 25, 2011 to March 31, 2011.

105.    As of the Petition Date, while the Debtor estimates that all prepetition wages have been paid, the Debtor estimates that payroll checks in the amount of $2,213.75 have yet to be cashed by the Debtor's Employees.  The Debtor seeks authority, but not direction, to pay Employees (including individuals considered insiders under the Bankruptcy Code) prepetition wages that were not paid up to the Petition Date, in an amount not to exceed $11,725.00 per employee.  The Debtor also seeks authority, but not direction, to continue with its payday schedule in the ordinary course postpetition.  These costs are minimal compared to the damage to the Chapter 11 Case that would occur if Employee morale were disrupted by the Debtor's failure to meet the payroll portion of its Employee Obligations.

**ii.    Prepetition Amounts Withheld from Employee Paychecks and Related Deductions and Payments**

106.    In the ordinary course of business, the Debtor deducts from the Employees' paychecks the following deductions (as applicable): (i) payroll taxes and the Employees' portion of FICA and unemployment taxes; (ii) Employee contributions for health and disability related benefits and flexible spending accounts; (iii) Employee contributions to the 403(b) Plan (as defined below); (iv) legally ordered deductions such as wage garnishments, child support and tax levies; and (v) miscellaneous other items (collectively, the "Employee Deductions").  The Debtor forwards amounts equal to the Employee Deductions from its operating accounts to appropriate third-party recipients, as applicable.

107.    On average, the Debtor deducts from the Employees' paychecks an aggregate amount of approximately $50,216 per month.  While I believe that all funds deducted from Employee paychecks were forwarded to the appropriate third-party recipients as of the Petition Date, out of an abundance of caution, the Debtor seeks authority, but not direction, to forward to the appropriate parties any prepetition Employee Deductions that were not forwarded as of, or due to, the commencement of the Chapter 11 Case and to continue to forward postpetition Employee Deductions in the ordinary course of business.

LA1:1204114

- 36 -

### iii.    Business Expense Reimbursements

108.    In the ordinary course of its business, the Debtor reimburses employees for certain business expenses incurred by the Employees on behalf of the Debtor (collectively, "Employee Expenses").  Employee Expenses include car, meals, parking, other travel expenses, tuition or training reimbursement, and other business related costs.  The Debtor's reimbursement policy requires that Employees get preapproved by their supervisors prior to incurring these expenses.  Once the expenses have been incurred, Employees submit their expenses for reimbursement and receive checks from the accounts payable department.

109.    As of the Petition Date, the Debtor estimates that all Employee Expenses have been paid.  However, out of an abundance of caution, the Debtor seeks authority, but not direction, to pay prepetition Employee Expenses and to continue to pay postpetition Employee Expenses in the ordinary course of business.

### iv.    Time-Off Days

110.    The Debtor also seeks authority, but not direction, to permit Employees to use vacation time, personal time, sick leave, bereavement leave and other paid time off, whether accrued before or after the Petition Date (collectively, "Time-Off Days"), in accordance with the Debtor's prepetition policies described below.

#### a.    Vacation Time

111.    The first 30 continuous days of employment by the Debtor are considered an introductory period ("Introductory Period") during which time the newly hired Employee is not eligible for certain benefits, including health insurance, sick leave, and vacation leave.  The Debtor may at its discretion extend the Introductory Period up to an additional 60 days.  After the end of the Introductory Period, the new Employee is evaluated by the supervisor, who then submits a "Status Change" report to the proper department.  An Employee who has successfully completed the Introductory Period is classified as a regular employee ("Regular Employee").  All Regular Employees working at least 20 hours per week are eligible to accrue paid vacation time ("Vacation Time") based on their length of employment and whether they are employed on an hourly or salaried basis.  Vacation Time for Regular Employees accrues as follows:

| Period of Service as Regular Employee | Full-time Nonexempt (hourly) | | Full-time Exempt (salaried) | | Part-time working 20+ hours/week | |
|---|---|---|---|---|---|---|
| | Monthly | Annually | Monthly | Annually | Monthly | Annually |
| Years 1-3 | 6.66 hrs | 80 hrs | 10 hrs | 120 hrs | Pro rata | Pro rata |
| Years 4-5 | 10 hrs | 120 hrs | 13.33 hrs | 160 hrs | Pro rata | Pro rata |
| Years 6+ | 13.33 hrs | 160 hrs | 13.33 hrs | 160 hrs | Pro rata | Pro rata |

Part-time Employees accrue vacation days pro-rata based on the percentage of hours worked compared to a full-time 40 hour/week Employee.

112.    No vacation time may be taken until an Employee has completed 6 months of employment as a Regular Employee.  After completing six months of employment as a Regular Employee, nonexempt Employees may use up to 40 hours (or five vacation days) and exempt employees may use up to 60 hours (or 7 and a half days of vacation).  After another six months of employment, Employees may use the rest of their accrued Vacation Time.

113.    Employees may accrue up to a maximum of 1.5 times the individual's annual accrual rate of Vacation Time.  Employees may carry over accrued but unused Vacation Time hours from year to year.  However, when Employees have reached the maximum number of Vacation Time hours they may accrue, they will cease accruing Vacation Time hours until they have used sufficient Vacation Time hours to reduce their total below the maximum number allowed.  The Debtor's vacation policy requires that requests for vacation be approved by the Employee's supervisor at least one month in advance.

114.    The approximate aggregate value of unused, accrued Vacation Time earned within 180 days before the Petition Date is $85,486.03.  This aggregate amount includes Vacation Time for 53 Employees and, on an individual basis, ranges from $290.72 to $7,079.54.  The amount also includes $3,848.32 of Vacation Time for myself and $2,886.24 of Vacation Time for CFO Ellen Park.  The Debtor seeks authority, but not direction, to allow Employees to use postpetition any Vacation Time accrued prepetition and to allow Employees to continue to accrue Vacation Time postpetition.  While the Debtor does not seek the authority, at this time, to pay Employees for any unused Vacation Time accrued prepetition, the Debtor does seek authority, but not direction, to pay in the ordinary course of business the liquidated amounts for any Vacation Time

accrued after the Petition Date for any Employee who separates from the Debtor postpetition.

### b.    Other Time-Off Days

115.    In addition to the Vacation Time described above, full-time Regular Employees are eligible for 80 hours (or 10 days) of sick leave annually, accrued on a monthly basis. Part-time Regular Employees working more than 20 hours per week accrue sick leave on a prorated basis. Sick leave may be taken for Employee illness or injury, and for medical and dental appointments. In addition, Employees may use up to half of their accrued sick leave to care for a child, spouse, registered domestic partner, or parent with a serious illness. Sick leave may not be carried forward each year and unused sick leave is not paid at termination.

116.    Full-time and part-time Regular Employees are also entitled to up to three days of paid bereavement leave for the death of an immediate family member. Unused bereavement leave days will not carry forward from one calendar year to the next calendar year for the Employees. Upon termination, the Employees will not receive payment for bereavement leave days not taken in that calendar year.

117.    Employees summoned for jury duty are entitled to the difference between regular compensation and jury fees received for a maximum of five days each calendar year. Employees must notify their immediate supervisor within twenty-four hours after receiving a summons for jury duty. Documentation verifying daily attendance at court and actual jury service must be presented by the Employee to a supervisor and any fees received for jury service will be deducted from the Employee's regular pay.

118.    The Debtor seeks authority, in its sole discretion, to continue its practice, programs and policies in effect as of the Petition Date with respect to Time-Off Days (other than Vacation Time) in the ordinary course of business. The Debtor does not seek the authority to pay Employees for any unused accrued prepetition Time-Off Days.

### v.    Employee Benefits

119.    As part of the Debtor's Employee Obligations, the Debtor has also established a variety of benefit plans and programs (the "Employee Benefits") designed to assist its Employees and its Employees' eligible dependants in meeting certain financial burdens, including those that

arise from illness, disability and death.  I believe that all amounts and obligations related to

Employee Benefits that were owed prior to the Petition Date have been paid in full except as

otherwise noted herein.  However, out of an abundance of caution, the Debtor seeks authority, but

not direction, to pay or otherwise honor prepetition Employee Benefits (up to $11,725.00 for all

contributions to Employee Benefit plans per Employee) and to continue to pay postpetition

Employee Benefits in the ordinary course of business.

### a.    Medical, Dental, and Vision Insurance

120.    The Debtor maintains several medical plans.  Regular Employees scheduled to

work at least 20 hours per week and who have completed the Introductory Period are offered

medical benefits through a choice of two HMO plans and one PPO plan administered through

Anthem Blue Cross of California.  The Debtor also offers Regular Employees coverage under a

vision plan administered by Anthem Blue Cross of California.  Depending upon the level of

coverage selected, premiums are paid on a cost-sharing basis between the Debtor and the

Employees.  In addition, the Debtor has established the following policy for determining the

percentage of the Employee Benefits to be paid by the Debtor and by the Employee depending on

hours worked:

| Regular Scheduled Hours | Debtor Pays | Employee Pays |
|---|---|---|
| 30-40 hours per week | 100% | 0% |
| 25-29 hours per week | 84% | 16% |
| 20-24 hours per week | 67% | 33% |

121.    Approximately 45 Employees participate in one of the two Anthem Blue Cross of

California HMO plans, approximately two Employees in the Anthem Blue Cross of California

PPO plan, approximately 13 Employees in the Guardian Life Insurance dental plan, and

approximately 47 Employees in the Anthem Blue Cross of California vision plan.  The Debtor's

portion of the aggregate monthly premiums are approximately $18,654.00 for the Anthem Blue

Cross of California HMO plans, approximately $796.00 for the Anthem Blue Cross of California

PPO plan, and approximately $356.00 for the Anthem Blue Cross of California vision plan.  The

dental plan premiums and any associated fees administered under Guardian Life Insurance are

paid for by the Employees.

122.   Employees rely on the Debtor to provide continuing medical insurance coverage.

Employee welfare and morale would be significantly harmed if the Debtor were to fail to pay any

due amounts with respect to the health insurance plans.  While I believe that all amounts and

obligations related to the health insurance plans prior to the Petition Date have been paid in full,

out of an abundance of caution, the Debtor requests authority, but not direction, to pay any

prepetition costs related to such Employee Benefits (up to $11,725.00 for all contributions to

Employee Benefit plans per Employee) and to continue to pay postpetition expenses related to

such Employee Benefits in the ordinary course of business.

123.   Furthermore, and for similar reasons, the Debtor seeks to continue to perform its

obligations under Section 4980B of the Internal Revenue Code to administer Continuation Health

Coverage ("COBRA") (see 26 U.S.C. § 4980B) with respect to former Employees.  COBRA is

administered by Conexis, for which the Debtor pays $73.60 per month in administrative fees.  I

believe that all amounts and obligations related to the administration of COBRA benefits prior to

the Petition Date have been paid in full.  However, out of an abundance of caution, the Debtor

requests authority to pay any prepetition costs (up to $11,725.00 for all contributions to Employee

Benefit plans per Employee) and to continue to pay postpetition expenses related to

administration of COBRA benefits in the ordinary course of business.

### b.     Employee Life and Other Insurance Benefits

124.   The Debtor also provides Employees with group term life, accidental death and

dismemberment ("AD&D"), and disability coverage.  All Employees are eligible for the Anthem

Blue Cross of California life insurance and AD&D plan, for which the Debtor pays approximately

$937.00 per month in insurance premiums.  Additionally, those Employees working at least 20

hours per week are entitled to coverage under Guardian Life Insurance long term disability plan.

The Debtor pays Guardian approximately $824.00 per month in long-term disability insurance

coverage premiums.  Employees are also eligible for short-term disability coverage through the

1    State of California's State Disability Insurance program.

2         125.    As noted above, I believe that all amounts and obligations related to group life,

3    AD&D, and disability insurance coverage prior to the Petition Date have been paid in full.

4    However, out of an abundance of caution, the Debtor requests authority to pay any prepetition

5    costs related to group life, AD&D, and disability insurance coverage (up to $11,725.00 for all

6    contributions to Employee Benefit plans per Employee) and to continue to pay postpetition

7    amounts related to such costs in the ordinary course of business.

8         126.    Furthermore, I understand that under California law, the Debtor is required to pay

9    a percentage of the wages paid to Employees to fund unemployment insurance.  Generally,

10    employers make these payments directly to the State of California Unemployment Insurance

11    Program (the "State"), and former Employees apply to the State Employment Development

12    Department to receive unemployment benefits.  Nonprofit organizations, however, may opt out of

13    this general system and, in the alternative, self-fund their liability for unemployment insurance

14    benefits or, as with the Debtor, contribute to a trust to fund the cost of reimbursing the State for

15    benefits paid to former Employees.  Unemployment Services Trust serves this function for the

16    Debtor.  The advantage of contributing to Unemployment Services Trust rather than making

17    payments directly to the State program is that the Debtor benefits from a portion of the income

18    that Unemployment Services Trust receives through investments of its pooled assets.  Under this

19    system, the Debtor makes contributions to Unemployment Services Trust in the amount of

20    $6,257.00 per quarter and Unemployment Services Trust subsequently reimburses the State for

21    unemployment payments made on behalf of the Debtor.  However, when reimbursements by

22    Unemployment Services Trust exceed the contributions made to the fund by the Debtor, the

23    Debtor must make additional contributions to Unemployment Services Trust.  As of the Petition

24    Date, the Debtor owes Unemployment Services Trust $32,433.95 for the difference between the

25    amount of reimbursements to the State by Unemployment Services Trust and the contributions

26    made by the Debtor to Unemployment Services Trust during the 2010 calendar year (the "2010

27    Deficiency").  If these payments are not timely made, the Debtor's agreement with

28    Unemployment Services Trust will terminate and Unemployment Services Trust will no longer be

1   obligated to pay any unemployment claims of the Debtor's former Employees.  Unemployment

2   Services Trust will then notify the State that the Debtor will be paying its unemployment

3   responsibility directly to the State for the periods on and after the date of termination.  This will

4   create administrative burdens for the Debtor and may cause a delay in the payment of benefits to

5   the Debtor's former Employees.  To avoid that detrimental outcome, the Debtor asks the Court

6   for authority, but not direction, to pay Unemployment Services Trust for supplemental plan

7   contributions for the 2010 Deficiency in the amount of $3,243.00 per month until paid in full and

8   also to continue to make payments to Unemployment Services Trust for unemployment insurance

9   in the ordinary course of business after the Petition Date.

10                      **c.**      **Flexible Spending Accounts**

11          127.    Employees who will have health care expenses that are not covered by the

12   insurance plan may elect to participate in the Debtor's Cafeteria Plan.  The Cafeteria Plan is

13   maintained pursuant to section 125 of the Internal Revenue Code and permits Employees to take

14   pretax deductions to cover qualified health or dependent care expenses.  Presently, eight

15   Employees contribute to the Cafeteria Plan, which is self-administered by the Debtor.  Employees

16   estimate their total annual out-of-pocket expenses and determine how much they wish to set aside

17   for the year.  This amount will be divided into 26 equal pretax deductions for the pay periods

18   throughout the year and will be credited to the Employee's special health care account.  As

19   expenses are incurred, Employees submit claims to the Debtor and the Debtor reimburses the

20   Employee from the Employee's account.  The maximum that can be set aside each year by each

21   Employee is $2,000.00.  The amount designated must be used by the end of each year, as any

22   unused portion of the amount will not be reimbursed to the Employee (as stipulated by the IRS).

23   As of the Petition Date, the Debtor estimates that all Cafeteria Plan claims have been paid.

24   However, out of an abundance of caution, the Debtor seeks authority, but not direction, to pay

25   prepetition claims against the Cafeteria Plan and to continue to pay postpetition claims against the

26   Cafeteria Plan in the ordinary course of business.

27                      **d.**      **Retirement Benefits Plan**

28          128.    The Debtor offers eligible Employees the opportunity to participate in a 403(b)

1  Savings and Retirement Plan (the "403(b) Plan").  Employees participating in this program are

2  permitted to contribute an unlimited amount of their salary up to the statutory cap.

3  Approximately 17 Employees contribute to the 403(b) Plan.  The Debtor pays approximately

4  $1,500 per year to American Funds for administrative expenses associated with the 403(b) Plan.

5       129.    Further, the Debtor deducts from Employees' paychecks 403(b) Plan contributions

6  and loan payments.  The Debtor issues its payroll checks and forwards withheld 403(b) Plan

7  contributions and loan payments to American Funds.  Failure to timely forward these 403(b) Plan

8  deductions may be a violation of the Employee Retirement Income Security Act of 1974, as

9  amended, potentially resulting in personal liability for the Debtor's officers for such deducted

10  amounts.  While I believe that all funds deducted from Employee paychecks were forwarded to

11  American Funds as of the Petition Date, out of an abundance of caution, the Debtor seeks

12  authority, but not direction, to forward any prepetition 403(b) contributions that were not

13  forwarded as of and/or due to the commencement of the Chapter 11 Case and to continue to

14  forward postpetition 403(b) contributions in the ordinary course of business.

15       130.    Additionally, I believe that maintaining the 403(b) Plan is critical in maintaining

16  Employee morale.  Accordingly, the Debtor seeks authority, but not direction, to pay and to

17  continue to pay administrative and other related expenses required to maintain the 403(b) Plan.

18              **e.    Workers' Compensation**

19       131.    The Debtor provides workers' compensation insurance for all Employees at the

20  statutory-required level through KRM Risk Management ("Workers' Compensation").  The

21  Debtor pays monthly premiums for coverage under Workers' Compensation.  This policy is due

22  to expire on April 1, 2011.  The monthly premium for the Debtor's existing Workers'

23  Compensation insurance is $3,678.00, which is subject to change upon renewal.

24       132.    By the Employee Benefits Motion, the Debtor requests authority, but not direction,

25  to continue to maintain, renew, or replace, in its sole discretion, its Workers' Compensation

26  insurance in the ordinary course of business and to pay any and all prepetition amounts related

27  thereto including, without limitation, any payments for Workers' Compensation claims,

28  deductibles, premiums and fees owed for administrative costs and other amounts required in

1    connection with the Workers' Compensation insurance, as such amounts become due in the

2    ordinary course of business.

3        133.    Obtaining the relief requested in the Employee Benefits Motion is essential to the

4    Debtor's continued provision of mental health services.  A significant number of Employee

5    departures at this time will substantially and adversely impact the quality of the Debtor's services

6    as well as strain relationships with clients who depend on the Debtor to provide stability in their

7    mental health services.  This will, in turn, make operations during the pendency of the Chapter 11

8    Case difficult, or even impossible, and jeopardize the transition of the Debtor's services to a new

9    provider.

10        134.    The relief sought is vital to the Employees as well.  Nonpayment of Employee

11    compensation and benefits and the inability to engender normalcy in the postpetition workplace

12    by assuring Employees that the Debtor can continue certain prepetition employment practices and

13    programs, such as Employee health benefits and vacation and sick time practices, could severely

14    undermine morale.  There is a risk that Employees will suffer financial and personal hardship, and

15    perhaps lose access to critical services or be unable to meet their own personal obligations if the

16    Debtor is unable to satisfy these obligations.

17        135.    The Debtor submits that the amounts to be paid pursuant to the Employee Benefits

18    Motion are *de minimis* in light of the importance and necessity of preserving the Employees'

19    services and morale and the difficulties and losses the Debtor and its estate will suffer if

20    Employees leave in significant numbers.  The Debtor also submits that there is ample justification

21    for its belief that even the slightest delay in providing this relief to its Employees will hamper its

22    operations and damage its estate.

23        136.    The requested relief will also reduce the administrative burden that would

24    otherwise be imposed in the Chapter 11 Case.  The wages, salaries, vacation and other Employee

25    benefits that the Debtor seeks to pay or otherwise honor generally constitute priority claims under

26    the Bankruptcy Code to the extent of $11,725 per Employee.  Since priority claims must be paid

27    pursuant to section 11 U.S.C. § 1129(a)(9) of the Bankruptcy Code in order to confirm a plan of

28    reorganization, payment of such obligations at this time merely affects the timing of such

1    payments.  The Debtor will not pay any prepetition claims in excess of the statutory cap.

2    **G.  Debtor's Emergency Motion for Order Authorizing (I) Maintenance of Existing Bank**
3    **Accounts; (II) Continued Use of Existing Cash Management System; (III) Continued**
     **Use of Business Forms; (IV) Payment of Bank Fees and Expenses Related to Cash**
4    **Management System; and (V) Related Relief (the "Cash Management Motion")**

5            137.    By the Cash Management Motion, the Debtor seeks an order of this Court: (1)

6    authorizing the Debtor to maintain and continue using the existing accounts set forth in Exhibit A

7    to the Cash Management Motion (the "Accounts"), (2) authorizing the Debtor to continue using

8    its electronically generated business forms without "Debtor in Possession" being imprinted on

9    them for a period of forty-five days until the Debtor can alter its software to include that

10   designation and case number of the Chapter 11 Case on its forms and to utilize its preprinted

11   forms without the "Debtor in Possession" designation until the supply is depleted; (3) authorizing

12   the Debtor to continue using its existing checks without "Debtor in Possession" being imprinted

13   on them for a period of forty-five days until the Debtor receives new checks with the designation

14   and case number of the Chapter 11 Case preprinted on them and to approve the use of a "Debtor

15   in Possession" stamp on all checks issued until the Debtor's new checks have arrived, (4)

16   authorizing and directing the Banks to honor postpetition checks drawn on and transfers made

17   from the Accounts in the ordinary course of business; (5) requiring that in the event that either of

18   the Banks refuses to honor checks drawn on the Accounts or transfer instructions made on the

19   Accounts (provided there are sufficient good funds in the account to honor the checks or transfer

20   instructions and the checks are otherwise properly payable) the bank must immediately turn over

21   the deposits held in the applicable Account upon the Debtor's request; (6) granting the Banks

22   limited relief from the automatic stay to continue to offset standard monthly or periodic bank fees

23   against the Accounts in the same manner as such fees were offset prepetition; and (7) granting

24   such other and further relief as is just and proper under the circumstances.

25          138.    The Debtor's business has historically required the collection, payment and

26   transfer of funds through several bank accounts.  In the ordinary course of operations prior to the

27   Petition Date, the Debtor has maintained a centralized cash management system (the "Cash

28   Management System").  The present Cash Management System is designed to efficiently collect,

transfer, consolidate, track, and disburse funds and to accurately record such collections,

transfers, and disbursements as they are made.  Moreover, just prior to the Petition Date, the

Debtor took steps to streamline the Cash Management System, as described in the Cash

Management Motion, in order to maximize efficiency and oversight of funds of the Debtor's

estate.

139.    The Cash Management System involves the following Accounts:

a.    Primary Business Account
The Debtor's Primary Business Account is held at BNY (Account No.
000622723) and was established shortly before the Petition Date to
facilitate the Debtor's preparation for the Chapter 11 Case and transition to
operating as a Debtor in possession.  All funds received by the Debtor via
government contracts, client fees, and donations are deposited into the
Primary Business Account.  Employee payroll is disbursed from the
Primary Business Account, but all other checks are issued from the
Corporate Disbursement Account (described below).  This system permits
the Debtor to efficiently track and control its prepetition and postpetition
income and disbursements by funneling substantially all of its monies
through two accounts rather than tracking a complicated web of
transactions.  Additionally, the Debtor's available cash is readily
determinable at any point in time.  The balance of the Primary Business
Account as of the Petition Date was $269,194.16.

b.    Corporate Disbursement Account
The Corporate Disbursement Account (Account No. 1000218923) is held
at PWB.  The account is utilized to issue checks to the Debtor's vendors.
In the ordinary course of operations, the Primary Business Account funds
the Corporate Disbursement Account daily with only the funds necessary
to satisfy the checks written from the Corporate Disbursement Account
each day.  The Corporate Disbursement Account permits the Debtor to
quickly stop payment on a check when required.  In general, the Debtor
attempts to maintain only a float of approximately $2,000 in the Corporate
Disbursement Account; funds in excess of this amount, if any, are
generally transferred back to the Primary Business Account.  As of the
Petition Date, however, the balance of the Primary Business Account was
$50,384.90.[5]

c.    Employee Flex Spending Account
The Employee Flex Spending Account (Account No. 1716484) is an
employee Cafeteria Plan holding account maintained at PWB.  Certain of

---

[5] Prior to the Petition Date the Debtor deposited a check from the Primary Business Account in this amount to satisfy
certain prepetition payroll obligations, but because that check did not clear on a timely basis, the Debtor was forced
to also wire funds to the Corporate Disbursement Account to meet its payroll obligations, resulting in a balance in
excess of the customary $2,000 float.  The Debtor intends to return any excess to its Primary Business Account in the
ordinary course of business.

the Debtor's employees may elect to participate in the Cafeteria Plan. The Cafeteria Plan is maintained pursuant to section 125 of the Internal Revenue Code and permits employees to take pre-tax deductions to cover qualified health or dependent care expenses. Presently, eight of the Debtor's employees contribute to the Cafeteria Plan, which is self-administered by the Debtor. Employees estimate their total annual out-of-pocket expenses and determine how much they wish to set aside for the year. As expenses are incurred, employees submit claims to the Debtor and the Debtor reimburses the employee from the employee's account. The maximum amount that can be set aside each year per employee is $2,000.00. The balance of the Employee Flex Spending Account as of the Petition Date was $5,379.11.

d.    Client Trust Account

The Client Trust Account (Account No. 1000405215), maintained at PWB, is utilized as a client Social Security benefits and supplemental security income trust account. If a client desires, he or she can direct the Social Security Administration to deposit a portion of his or her monthly benefits to this Account. The Client Trust Account is separate from the Debtor's operating account, as the funds in this Account do not belong to the Debtor. Any interest earned is credited to the clients in accordance with applicable Social Security Administration guidelines. Approximately $4,000.00 is deposited in the Client Trust Account each month, and the balance as of the Petition Date was $7,390.12.

140.    The daily use of the Cash Management System and the Accounts constitutes the Debtor's ordinary business practices, which the Debtor views as essential. The Cash Management System provides significant benefit to the Debtor's operations, including the ability to (1) efficiently control the flow of funds, (2) ensure the maximum availability of funds when necessary, (3) reduce administrative expenses by facilitating the movement of funds, and (4) develop timely and accurate account balance information.

141.    The Debtor seeks authority to continue its Cash Management System and maintain its current Accounts, as this will facilitate necessary postpetition transfers made in the ordinary course of the Debtor's operations and related transactions, and will greatly simplify tracking of administrative aspects of the Debtor's operations during the pendency of the Chapter 11 Case. Consistent with its historical practice, the Debtor intends to continue to maintain records of all transfers within the Cash Management System, so that all transfers and transactions will be properly documented and accurate balances will be maintained.

142.    Requiring the Debtor to close its Accounts and open new accounts will disrupt the Debtor's business and cash flow. For example, procedures have been established that permit the

1    Debtor, in connection with Automatic Data Processing, Inc., the Debtor's payroll administrator,

2    to reliably and effortlessly disburse payroll twice a month from its Primary Business Account.

3    Moreover, multiple accounts are necessary to maintain segregation between the Debtor's funds

4    and the funds that the Debtor holds in trust on behalf of its Employees and clients pursuant to

5    Internal Revenue Service and Social Security Administration guidelines.

6    143.    Requiring the Debtor to close these Accounts and open new ones would

7    significantly hinder the Debtor's ability to collect and disburse funds in the ordinary course of

8    operations.  Such a disruption would undermine the Debtor's ability to make a smooth transition

9    into chapter 11, by slowing payments to Employees, tax authorities, and important vendors, with

10    no discernable benefit.  Any interruption in the Debtor's cash flow could result in a potentially

11    harmful interruption of the Debtor's business and the provision of mental health services to its

12    clients.  Preserving a "business as usual" atmosphere and avoiding the unnecessary distractions

13    that inevitably would be associated with any substantial disruption of the existing Cash

14    Management System will facilitate the stabilization of the Debtor's business operations.

15    144.    Additionally, closing the Accounts and opening new ones will also increase the

16    work required of the Debtor's accounting personnel who are already preoccupied with the many

17    and varied issues related to the Chapter 11 Case and would needlessly cost the Debtor time and

18    money with no discernible benefit to its estate at a time when it is trying to conserve both.

19    145.    Because the Debtor's funds are primarily held in the Primary Business Account

20    and vendor disbursements are made from the Corporate Disbursement Account, which is funded

21    with cash from the Primary Business Account only in an amount sufficient to satisfy such

22    disbursements and otherwise maintains a near zero balance, transactions can be tracked with ease

23    and there will be no confusion among postpetition and prepetition transactions.  Additionally, to

24    the extent that a prepetition check is outstanding, the Debtor has the ability to monitor and, if

25    necessary, stop payment on such check or control the amount of funds that flow to the Corporate

26    Disbursement Account from the Primary Business Account.  The Debtor is thus able to ensure the

27    protections that would be achieved by opening new bank accounts are satisfied without seriously

28    jeopardizing its operations.  Requiring the Debtor to close its Accounts would serve no purpose

1    but would delay the Debtor's ability to utilize its funds, put further burdens on accounting

2    personnel dealing with the Debtor's many financial issues, and cost the Debtor time and money

3    better used in its efforts to further the best interests of its estate and its charitable mission.

4        146.   Additionally, numerous checks and other business forms are used by the Debtor in

5    the ordinary course of its business.  It is essential that the Debtor be authorized to continue using

6    its existing preprinted checks and business forms because such materials involve a large number

7    of vendors and clients, and changing business forms immediately as of the Petition Date would

8    impose a substantial burden with no corresponding benefit.  As discussed above, the Debtor's

9    present Cash Management System allows the Debtor to accurately monitor its prepetition and

10   postpetition payments and to block payment of all prepetition obligations.  This makes it

11   unnecessary to order immediately new checks and forms marked "Debtor in Possession" to

12   achieve the same result.  Accordingly, the Court should authorize the Debtor's continued use of

13   existing business forms as set forth above.

14       147.   The Debtor further seeks entry of an order permitting the Banks limited relief from

15   the automatic stay to charge back returned items, such as prepetition checks returned as unpaid,

16   against amounts on deposit in the Accounts, regardless of whether such amounts were deposited

17   before or after the Petition Date and regardless of whether the returned checks relate to pre- or

18   postpetition items.  The Debtor also requests authority to pay both pre- and postpetition service

19   and other fees, costs, charges and expenses to which such Banks may be entitled under their

20   contractual arrangements with the Debtor.  These protections will eliminate any justification for

21   the Banks to impose administrative freezes or holds on the Debtor's Accounts.  Any type of

22   administrative hold, freeze, or block on the Accounts or reduction in the Debtor's ability to

23   automatically move funds among the Accounts will effectively halt the Debtor's operations.

24   Thus, the Debtor also requests that the Court prohibit the Banks from imposing any

25   administrative freeze or hold on the Accounts.  To preserve business as usual and avoid a

26   destructive cessation in operations, the Banks must be required to allow the Debtor to continue in

27   all respects to use its Accounts and the Cash Management System in the ordinary course of

28   operations according to practices prior to the Petition Date.

148.    The Debtor requires this relief to minimize the disruption of the Cash Management System and to assist it in achieving a smooth transition to operating under chapter 11.

### III.

### CONCLUSION

149.    The Debtor's goal in the Chapter 11 Case is to continue operating and providing mental health services in order to seamlessly transition its operations to a new provider on a going-concern basis and thereafter efficiently winddown its estate.  I believe that, if the Court grants the relief requested in each First-Day Motion, the prospect of achieving these objectives will be substantially enhanced to the benefit of the estate, the Debtor's charitable mission and other parties in interest.

150.    I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct to the best of my information, knowledge, and belief.

By: _____
William J. Smith
Chief Executive Officer
Verdugo Mental Health