| | |
|---|---|
| 1 | EVAN M. JONES (S.B. #115827) |
| | ANDREW M. PARLEN (S.B. #230429) |
| 2 | JENNIFER M. TAYLOR (S.B. #241191) |
| | EVAN T. PICKERING (S.B. # 271634) |
| 3 | JAMIE OH (S.B. # 274419) |
| | O'MELVENY & MYERS LLP |
| 4 | 400 South Hope Street |
| | Los Angeles, CA  90071-2899 |
| 5 | Telephone:     (213) 430-6000 |
| | Facsimile:      (213) 430-6407 |
| 6 | Email: aparlen@omm.com |

Proposed Attorneys for Verdugo Mental Health, Debtor and Debtor in Possession

## UNITED STATES BANKRUPTCY COURT FOR

## THE CENTRAL DISTRICT OF CALIFORNIA

## LOS ANGELES DIVISION

| | |
|---|---|
| In re | Case No.  2:11-bk-XXXXX-XX |
| Verdugo Mental Health, | Chapter 11 |
| Debtor.[1] | **DEBTOR'S EMERGENCY MOTION FOR ORDER APPROVING (I) SALE PROCEDURES; (II) NOTICE PROCEDURES; (III) ASSUMPTION AND ASSIGNMENT PROCEDURES; (IV) DATE FOR SALE HEARING; AND (V) RELATED RELIEF; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF** |
| | [Declaration of William J. Smith in Support of Chapter 11 Petition and Request for First-Day Relief Filed Concurrently Herewith] |
| | Hearing Date:  To be set by the Court |

---

[1] The Debtor in this case, along with the last four digits of the federal tax identification number for the Debtor, is Verdugo Mental Health (0064).  The Debtor's corporate office is located at 1540 E. Colorado Street, Glendale, California 91205.

SF1:813563

# TABLE OF CONTENTS

**Page**

I.   JURISDICTION ..................................................................................................................2
II.  GENERAL BACKGROUND ............................................................................................2
    A.   The Debtor's Services..............................................................................................2
    B.   Events Leading to the Bankruptcy...........................................................................3
    C.   Efforts to Resolve Financial Difficulties .................................................................4
    D.   The Proposed Transaction .......................................................................................5
    E.   Description of Purchased Assets .............................................................................6
        i.    VMH Facility................................................................................................6
        ii.   Personal Property.........................................................................................7
    F.   Key Terms of Proposed Transaction .......................................................................7
III. RELIEF REQUESTED .......................................................................................................8
    A.   Sale Procedures........................................................................................................8
    B.   Assumption and Assignment Procedures ................................................................9
    C.   Notice Procedures ..................................................................................................11
IV.  BASIS FOR RELIEF REQUESTED ...............................................................................12
    A.   The Sale Procedures Are an Appropriate Means of Obtaining the Highest
        and Best Offer for the Debtor's Assets..................................................................12
    B.   The Assumption and Assignment Procedures Will Expedite the Sale
        Process and Should Be Approved..........................................................................13
    C.   The Notice Procedures and Schedule for the Bid Deadline, Auction and
        Sale Hearing Are Reasonable and Appropriate .....................................................14
V.   CONCLUSION..................................................................................................................15

**EXHIBITS**

A    PROPOSED ORDER .......................................................................................................18
B    SALE PROCEDURES ......................................................................................................25
C    ASSUMPTION AND ASSIGNMENT PROCEDURES .................................................32
D    SALE PROCEDURES NOTICE......................................................................................35
E    ASSUMPTION AND ASSIGNMENT NOTICE.............................................................38

# TABLE OF AUTHORITIES

**Page**

**CASES**

*Cello Bag Co. v. Champion Int'l Corp. (In re Atlanta Packaging Prods., Inc.)*,
  99 B.R. 124 (Bankr. N.D. Ga. 1988) ................................................................................ 12
*Doehring v. Crown Corp. (In re Crown Corp.)*,
  679 F.2d 774 (9th Cir. 1982) ............................................................................................ 13
*Four B. Corp. v. Food Barn Stores, Inc. (In re Food Barn Stores, Inc.)*,
  107 F.3d 558 (8th Cir. 1997) ............................................................................................ 12
*In re After Six, Inc.*,
  154 B.R. 876 (Bankr. E.D. Pa. 1993) ............................................................................... 12
*In re Brethren Care of S. Bend, Inc.*,
  98 B.R. 927 (N.D. Ind. 1989) ........................................................................................... 12
*In re Crowthers McCall Pattern, Inc.*,
  114 B.R. 877 (Bankr. S.D.N.Y. 1990) ............................................................................. 13
*In re Fin. News Network, Inc.*,
  126 B.R. 152 (Bankr. S.D.N.Y. 1991) ............................................................................. 13
*In re Integrated Res.*,
  147 B.R. 650 (S.D.N.Y. 1992) .................................................................................. 12, 13
In re *United Healthcare Sys., Inc.*,
  1997 U.S. Dist. LEXIS 5090 (D.N.J. Mar. 26, 1997) ..................................................... 12

**STATUTES**
11 U.S.C. § 105 ........................................................................................................... 1, 2, 14
11 U.S.C. § 363 ........................................................................................................ 1, 2, 5, 12
11 U.S.C. § 365 ................................................................................................................ 13, 14
28 U.S.C. § 1334 .................................................................................................................... 2
28 U.S.C. § 1409 .................................................................................................................... 2
28 U.S.C. § 157 ...................................................................................................................... 2

**RULES**
Fed. R. Bankr. P. 2002 ......................................................................................................... 14
Fed. R. Bankr. P. 6004 ....................................................................................................... 1, 2
Fed. R. Bankr. P. 6006 ................................................................................................... 14, 15
Local Bankruptcy Rule 6004-1 ..................................................................................... 11, 14

**TO THE HONORABLE UNITED STATES BANKRUPTCY JUDGE; OFFICE OF THE UNITED STATES TRUSTEE; TWENTY LARGEST UNSECURED CREDITORS; AND OTHER INTERESTED PARTIES:**

Verdugo Mental Health, as a debtor and debtor in possession (the "Debtor"), hereby moves the Court (the "Motion") on an emergency basis for entry of Exhibit A hereto (the "Sale Procedures Order"), pursuant to sections 105(a) and 363 of title 11 of the United States Code (the "Bankruptcy Code") and Rule 6004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") approving (i) sale procedures for the sale of substantially all assets related to the Debtor's provision of mental health services (the "Purchased Assets"), (ii) notice procedures, (iii) procedures for the assumption and assignment of executory contracts, and (iv) date for sale hearing.

The Debtor is in the process of finalizing an asset purchase agreement (the "APA") with a proposed purchaser, Didi Hirsch Psychiatric Service, a California non-profit public benefit corporation, dba Didi Hirsch Mental Health Services (the "Purchaser" or "Didi Hirsch"), pursuant to which the Debtor proposes to sell to the Purchaser the Purchased Assets to subject to higher and better bids at an auction to be held in advance of the Sale Hearing (as defined below). The APA will be attached as an exhibit to the Sale Motion (as defined below). When it becomes available, copies of the APA may be obtained by contacting counsel for the Debtor, O'Melveny & Myers LLP, attn: Andrew M. Parlen, via email at: aparlen@omm.com. By this Motion, the Debtor is seeking approval of sale procedures for sale of the Purchased Assets and related relief.

For all the foregoing reasons, the reasons set forth herein, and such additional reasons as may be advanced at or prior to the hearing on this Motion, the Debtor respectfully requests that this Court grant the relief requested herein and enter the Sale Procedures Order.

### **MEMORANDUM OF POINTS AND AUTHORITIES**

The Motion is based on this attached Memorandum of Points and Authorities and the *Declaration of William J. Smith in Support of Chapter 11 Petition and Request for First-Day Relief* (the "Smith Declaration") filed concurrently herewith, the arguments of counsel, and other admissible evidence properly brought before the Court at or before the hearing on this Motion. In

1  addition, the Debtor requests that the Court take judicial notice of all documents filed with the

2  Court in the above captioned chapter 11 case (the "Chapter 11 Case").

3  **I.**

4  **JURISDICTION**

5      1.    The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157(a) and

6  1334(b). This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2)(A).

7  Venue is proper pursuant to 28 U.S.C. § 1409(a).

8      2.    The statutory predicates for the relief requested herein are sections 105(a) and 363

9  of the Bankruptcy Code and Bankruptcy Rule 6004.

10  **II.**

11  **GENERAL BACKGROUND**

12      3.    On March 25, 2011 (the "Petition Date"), the Debtor filed its voluntary petition for

13  relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the

14  Central District of California (the "Court"), thereby commencing the Chapter 11 Case. Filed

15  concurrently herewith, and incorporated herein by reference, is the Smith Declaration, which

16  contains more detail on the Debtor's assets, liabilities, services and plans for the Chapter 11 Case.

17  **A.**    **The Debtor's Services**

18      4.    The Debtor, a California nonprofit public benefit corporation, is a stand-alone

19  outpatient behavioral healthcare clinic that provides mental health services within the Southern

20  California communities of Glendale, Burbank, Montrose, La Cañada-Flintridge, and Eagle Rock.

21  Established in 1957, the Debtor was the first private agency to contract with the Los Angeles

22  County Department of Mental Health ("DMH") under California's seminal community mental

23  health services legislation, the Short-Doyle Act of 1957. The Debtor since has evolved into a

24  multi-programmed behavioral healthcare organization, operating under the names Verdugo

25  Mental Health, Verdugo Mental Health Center, VMH Care, the Glen Roberts Child Study Center,

26  and Positive Directions. The Debtor's staff is committed to enhancing the quality of life of

27  individuals and families while helping to provide a stable future for those members of the

28  community afflicted with more severe and persistent mental illness. For 54 years, the Debtor has

been committed to providing accessible, affordable, and multicultural/multilingual behavioral healthcare treatment, with an emphasis on target populations in the lower socioeconomic status demographic whose ability to access care and advocate for themselves is limited. The Debtor provides an array of mental health services on a fiscal year budget of approximately $5,000,000 to approximately 2,000 clients annually, divided between adults with psychotic-spectrum, mood and substance abuse disorders, and children with severe emotional disturbances.

5. The Debtor, which is the largest nonprofit mental health services provider in the Glendale area, plays a critical role in Los Angeles County's provision of mental health services because of the unique socioeconomic and cultural attributes of Glendale and its surrounding foothill communities. Despite enclaves of relative affluence, 15.5% of the more than 200,000 people living in Glendale fall below the federal poverty level. Adult clients often suffer from severe and chronic mental illness, while children and adolescent clients tend to be in the severely emotionally disturbed spectrum. Clients are either uninsured or are insured through public programs such as Medi-Cal/Medicare or Healthy Families. With a predominantly foreign-born population, a sizeable percentage of which has fled war and political turmoil, the community has a substantial need for a nonprofit mental health provider. Given its sizeable foreign-born population, a large percentage of which has fled war and political turmoil, the community has a substantial need for a nonprofit mental health provider. Specifically, Glendale is home to one of the largest concentrations of Armenian-Americans in the United States, with approximately one in four residents of Armenian descent. To provide mental health services for a community of Glendale's diversity and complexity, the Debtor's employees possess specialized linguistic and cultural expertise. Indeed, the Debtor is the largest provider of Armenian and Russian language mental health services in Los Angeles County and, as such, actively trains and recruits mental health professionals who have the skills and desire to work with the population the Debtor serves.

6. The Debtor takes great pride in rendering the highest level of service to its clients. These efforts have been recognized at the federal, state, and local level, with the Debtor receiving numerous commendations for the quality of its services, including, in 2009, DMH's "Best Practices Award."

**B.    Events Leading to the Bankruptcy**

7.    Shortly after completion of the VMH Facility (as defined below) and in the wake of the worldwide financial crisis, a series of events and factors began to threaten the Debtor's viability. These events and factors included substantial cost overruns on construction of and necessary improvements to the VMH Facility, cancellation of the Debtor's lines of credit, decreased private donations, and reduction in funding under government contracts due to both budget cuts and programmatic changes. As a result, in fiscal year 2009-10, the Debtor operated at a loss of $304,102. By fall 2010, the Debtor was experiencing liquidity pressure and, in turn, defaulted on the Foundation Note (as defined in the Smith Declaration) in September 2010 and then the Loans (as defined in the Smith Declaration) in December 2010. The Debtor estimates that for fiscal year 2010-11, its operating deficit will be minimal, but this is largely on account of the Debtor defaulting on the Loans in December 2010 and on the Foundation Note in September 2010. However, if the Debtor continues to operate through the end of its fiscal year (June 30, 2011), it projects that its cash will be depleted.

**C.    Efforts to Resolve Financial Difficulties**

8.    Recognizing that it could not survive as a going concern, the Debtor began exploring means by which to both maximize the value of its assets for creditors and ensure that its charitable mission would continue to be performed in the Glendale area without interruption. In determining how to meet this objective, the Debtor first analyzed the value of its assets and the security interests to which its assets are subject. The Debtor concluded that substantially all of its assets, including the VMH Facility, all of its personal property, and its cash and cash equivalents, comprise collateral securing the Debtor's obligations to the Office of Statewide Health Planning and Development of the State of California ("OSHPD") and U.S. Bank under the VMH Financings (as defined in the Smith Declaration). The Debtor's preliminary analysis indicated that the value of its assets is materially less than the amount owed under the Loans and, therefore, that OSHPD and U.S. Bank are undersecured.

9.    To confirm its initial conclusion that its assets are worth substantially less than the amount outstanding under the Loans, the Debtor retained Syn-Mar Associates, a real estate

appraisal firm, to conduct an appraisal of its primary saleable asset: its headquarters (defined below as the "VMH Facility" and described in detail below in paragraphs 16 through 19). In an appraisal prepared in conformity with the requirements of the Uniform Standards of Professional Appraisal Practice, Syn-Mar Associates formed the opinion that, as of February 28, 2011, the market value of the VMH Facility is $4,300,000 (or $229.79 per square foot) (the "Appraisal"). A true and correct copy of the Appraisal as furnished to the Debtor by Syn-Mar Associates is annexed to the Smith Declaration as Exhibit A.

10. The debt outstanding under the Loans is approximately $6.1 million. Because OSHPD and U.S. Bank are substantially undersecured, the Debtor sought input from OSHPD, which has authority to consent to the use and disposition of collateral in a bankruptcy proceeding on behalf of U.S. Bank, regarding disposition of the VMH Facility. OSHPD informed the Debtor that it preferred that VMH sell the VMH Facility on a short-sale basis over OSHPD foreclosing on the facility. OSHPD also informed the Debtor that OSHPD supported VMH's efforts to sell the VMH Facility to a nonprofit mental healthcare provider that would continue VMH's charitable mission.

**D.    The Proposed Transaction**

11. After consultation with DMH and OSHPD, the Debtor concluded that the best way for its clients to receive uninterrupted mental health services was for a third-party nonprofit entity already performing mental health services under a DMH contract to engage in a dual-prong transaction. One component of the transaction would be the third-party's acquisition of the Debtor's assets, including the VMH Facility, under terms acceptable to OSHPD. The other component would be the allocation to the third party of the Debtor's DMH funding in the form of amendment of the third-party's existing DMH contract.

12. To achieve this objective, the Debtor contacted six nonprofit mental health providers in Los Angeles County to determine whether any had interest in pursuing such a transaction. Four entities expressed interest in a potential transaction. The Debtor entered into nondisclosure agreements and held in-person meetings with each of these four entities. Three of the entities subsequently conducted diligence.

13.   Two of these entities expressed interest in attempting to negotiate a purchase of the Debtor's assets with the intent of continuing to provide mental health services at the VMH Facility. Given its status as an undersecured creditor, OSHPD also engaged in discussions with both entities.

14.   Ultimately, only one entity made an offer to purchase the VMH Facility and the Debtor's other assets: Didi Hirsch, which is one of the largest and most highly regarded nonprofit mental health service providers in Los Angeles County. Following negotiations, the Debtor and Didi Hirsch are in the process of finalizing the APA, which provides for the sale, pursuant to section 363 of the Bankruptcy Code, of all assets of the Debtor related to the Debtor's provision of mental health services.

**E.    Description of Purchased Assets**

15.   The Purchased Assets consist of the Debtor's headquarters, a building located at 1540 E. Colorado Street, Glendale, California 91205 (the "VMH Facility"), and all other personal property (other than expressly excluded assets) on site at the VMH Facility (regardless of whether such property is obsolete). Excluded assets include the Debtor's cash and the Debtor's contracts with government agencies, including the Debtor's contract with DMH.

  **i.    VMH Facility**

16.   A two-story, elevator-serviced, 18,713 square foot Class "C/D" office building located on a rectangular 42,725 square foot lot, the VMH Facility is the Debtor's largest physical asset, and other than the school-based program, all of the Debtor's services are rendered at the VMH Facility. The VMH Facility originally consisted of a 4,165 square foot building constructed in 1987, but largely with proceeds of the 2007 Loan (as defined in the Smith Declaration), the Debtor completed extensive renovations and addition of an adjoining structure in 2008. As renovated, the VMH Facility is a two-part structure conjoined to function as one contiguous facility. The facility utilizes a "zone" security concept with separate "public," "therapy office," and "staff" zones secured by key-card access. The facility maintains 24 subterranean parking spaces (for staff), and 54 above ground parking spaces for clients and visitors.

17.     The newer, now primary structure built in 2008 houses all service provision functions including therapy and clinical staff offices. It was uniquely designed and configured to meet the service needs and demands of a community mental health agency. The first floor of this two-story structure, houses adult service programs and community groups. In addition to individual therapy offices and larger group therapy rooms, the first floor provides a secured medical suite and reception area for medical staff. The second story houses children and family services with specifically-designed play therapy and group rooms to facilitate therapeutic interactions in a safe and supportive environment.

18.     The secondary structure — remodeled at the time of construction of the new primary facility — is a two-story structure that primarily serves as the Debtor's administration, information technology, and finance offices. In addition, this structure includes space for a contracted pharmacy that dispenses medications to the Debtor's clients.

19.     As noted above, the Debtor has obtained a recent appraisal of the VMH Facility that estimated its value as of February 28, 2011 at $4,300,000.

### ii.    **Personal Property**

20.     The bulk of the personal property to be purchased by Didi Hirsch consists of equipment, furniture, and supplies necessary to provide mental health services to the Debtor's clients and excludes cash, cash equivalents, deposit accounts, and other property excluded under the APA. The Debtor maintains a computer system, upgraded in 2006, with approximately 38 computers and printers and a telecommunication system that includes 107 phones and four fax machines. Additionally, the facility is furnished with approximately 32 cubicle work stations, 29 tables for the therapy room, 45 desks, 36 bookcases, 47 filing cabinets, and 300 chairs. The aggregate book value of all of the personal property on site at the VMH Facility does not exceed $250,000.

### F.    **Key Terms of Proposed Transaction**

21.     The Purchaser's proposed purchase price for the Purchased Assets is $5,000,000 ($700,000 more than the value set forth in the Appraisal). Didi Hirsch will pay purchase price through assumption of $5,000,000 of the Debtor's liability under the Loans, subject to refinancing

by OSHPD of such liability on an interest-only basis for three years at rates from 1.75% to 2.75% followed by amortization over 30 years at 3% and on such other terms and conditions that will be set forth in the APA. Subject to approval by the Court, Didi Hirsch will take the Purchased Assets free and clear of all liens other than the liens of OSHPD and U.S. Bank securing obligations under the Loans.

22. As a critical component of the proposed transaction, Didi Hirsch has conditioned the APA on DMH amending Didi Hirsch's existing DMH contract to include funding currently allocated to the Debtor. DMH has informed the Debtor that it supports the proposed transaction and that subject to Bankruptcy Court approval of the sale, it will amend its contract with Didi Hirsch to include funding currently allocated to the Debtor (although DMH informs the Debtor that this agreement is subject to any direction by the Los Angeles County Board of Supervisors not to proceed). Accordingly, upon consummation of the sale, Didi Hirsch will occupy the VMH Facility and provide uninterrupted services to the Debtor's clientele.

23. While no formal agreements have been reached, Didi Hirsch is likely to offer employment to a majority of the Debtor's employees. However, none of the board members or officers of the Debtor intend to be formally affiliated with Didi Hirsch either as board members or employees of the Purchaser after the sale is consummated.

## III.

## RELIEF REQUESTED

**A.    Sale Procedures**

24. In an effort to maximize the value of its assets for creditors and to ensure that its charitable mission would continue to be performed in the Glendale area and with the consent of OSHPD, the Debtor has marketed the Purchased Assets to non-profit mental health providers. Amongst the potential purchasers of the Purchased Assets, Didi Hirsch demonstrated the greatest interest, undertook the most diligence, and ultimately submitted the only offer for the Purchased Assets. The Debtor anticipates filing and serving the APA at the time it files its motion for approval of the sale of the Purchased Assets (the "Sale Motion"), which the Debtor currently anticipates will occur on or before March 31, 2011.

25. Pursuant to the APA, Didi Hirsch will purchase all real and personal property of the Debtor relating to the Debtor's provision of mental health services generally described as follows:

    i. The Debtor's real property located at 1540 E. Colorado Street, Glendale, California 91205 (*i.e.*, the VMH Facility).

    ii. All of the other assets (whether or not obsolete) related to the Debtor's provision of mental health services, including but not limited to furniture, computer systems, telephone systems, filing systems, signage, lighting, all brands and intellectual property, accounts receivable, inventory, machinery and equipment, IT assets, books and records.

    iii. Excluded assets include the Debtor's cash and the Debtor's contracts with government agencies, including the Debtor's contract with DMH.

    iv. The Purchaser will assume certain scheduled contracts as set forth in the APA.

    v. At closing, the Purchaser shall assume the Debtor's liability under the Loans in an amount equal to $5 million on terms to be agreed with the lender thereof.

    vi. The sale of the Purchased Assets to the Purchaser shall be free and clear of all liens other than the liens of OSHPD and U.S. Bank securing the obligations under the Loans.

26. The Debtor proposes and seeks approval of the Sale Procedures, attached as Exhibit B to this Motion, which are summarized below. In case of any conflicts or omissions, the Sale Procedures (if, and in the form, approved) shall govern, and the Debtor hereby refers all parties directly to the Sale Procedures. Capitalized terms used herein without definition, and not otherwise defined herein, have the meanings given to them in the Sale Procedures.

    i. In order to receive non-public information concerning the Purchased Assets, each interested party must deliver an executed confidentiality agreement to the Debtor and its proposed counsel, O'Melveny & Myers LLP, attention Andrew M. Parlen.

    ii. The Debtor shall thereafter provide access to information substantially similar to what the Purchaser has received. Each such party may present a Bid for the Purchased Assets in the manner described below.

    iii. To be deemed a Qualified Bid, a Bid must: (i) identify the Potential Bidder; (ii) contain written evidence of the approval of the contemplated transaction by the Potential Bidder's Board of Directors (or comparable governing body); (iii) be a good faith, non-conditional offer to purchase all or substantially all of the Purchased Assets on more favorable terms to the Debtor than those set forth in the APA; (iv) include evidence that the Potential Bidder is able to fulfill all other obligations in connection with the contemplated transactions; (v) not be not be conditioned on obtaining financing, shareholder approval or the outcome of due diligence, including environmental due diligence, by the Potential Bidder; (vi) be accompanied by a Good Faith Deposit in the amount of 10% of the amount of the

               Qualified Bid; and (vii) be submitted **no later than April 22, 2011 at 4:00 p.m. Pacific Time** (the "Bid Deadline").

   iv.   The consideration proposed by the Bid must be in cash, and must equal or exceed the sum of: (a) the Purchase Price; plus, (b) the Minimum Overbid Amount, which shall be $100,000.

   v.   If the Debtor receives more than one Qualified Bid (including the Bid of the Purchaser), it will hold an Auction on **April 27, 2011, at 10:00 a.m. Pacific Time** at a location designated by the Debtor. Only the Purchaser and the other Qualified Bidders will be permitted to participate in the Auction.

   vi.   Prior to the Auction, the Debtor will determine the Pre-Auction Successful Bid. Bidding at the Auction shall start at the purchase price stated in the Pre-Auction Successful Bid and continue, in one or more rounds of bidding, so long as at least one Overbid (i.e., an increment of at least $25,000 over the immediately preceding bid) is submitted.

   vii.   At the close of the Auction, the Debtor will, in its sole discretion and in the exercise of its business judgment, identify the Successful Bid and the Successful Bidder and the Alternate Bid and the Alternate Bidder.

   viii.   The Debtor shall be bound by the Successful Bid only when such Bid has been approved by the Court at the Sale Hearing.

   ix.   If for any reason the Successful Bidder fails to consummate the purchase of the Purchased Assets within the time permitted in the applicable asset purchase agreement, the Alternate Bidder will automatically be deemed to have submitted the highest and best bid.

27.    Notably, the Sale Procedures do not include a break-up fee, expense reimbursement, or any other bidder protections.

**B.**    **Assumption and Assignment Procedures**

28.    Pursuant to the APA, the Debtor will also be seeking to assume and assign certain executory contracts and unexpired leases (the "Assigned Contracts") to the Successful Bidder.

29.    The Debtor proposes and seeks approval of the Assumption and Assignment Procedures, attached as Exhibit C to this Motion, which are summarized below. In case of any conflicts or omissions, the Assumption and Assignment Procedures (if, and in the form, approved) shall govern, and the Debtor hereby refers all parties directly to the Assumption and Assignment Procedures. Capitalized terms used herein without definition, and not otherwise defined herein, have the meanings given to them in the Assumption and Assignment Procedures.

   i.   No later than April 14, 2011, the Debtor shall serve a Notice of Assumption and

        Assignment on each Non-Debtor Party under each Assigned Contract, which shall include, among other things, the Cure Amount for such Assigned Contract and a statement regarding Didi Hirsch's ability to perform the Assigned Contract. A copy of the order granting this Motion will be served with all Notices of Assumption and Assignment.

    ii.    The Successful Bidder shall pay the Cure Amounts to the extent necessary to consummate a sale of the Purchased Assets. If any Cure Amounts are disputed, the Debtor will segregate any disputed cure amounts pending the resolution of any such dispute.

    iii.    Any Non-Debtor Party will be deemed to have received adequate assurance of future performance if, after payment of any Cure Amounts, the Debtor would no longer have any payment or delivery obligations under the Assigned Contract.

    iv.    Prior to the Sale Hearing, a Successful Bidder other than Didi Hirsch shall provide adequate assurance of its future performance under each Assigned Contract to the Non-Debtor Parties thereto. The Non-Debtor Parties shall be permitted to object to such assurances at the Sale Hearing.

    v.    To the extent that any Non-Debtor Party wishes to object regarding (i) the proposed Cure Amount; (ii) the need to cure any Default other than a Default relating to the commencement of the Chapter 11 Case, or the insolvency or financial condition of the Debtor; or (iii) the assurances of Didi Hirsch's future performance, then such Non-Debtor Party must file with the Court and serve the Debtor and Didi Hirsch with a written objection so as to be actually received by no later than **5:00 p.m. Pacific time on April 28, 2011**.

    vi.    Upon the receipt of an objection by a Non-Debtor Party, the Debtor shall immediately initiate a conference with the objecting Non-Debtor Party. If the Debtor and the Non-Debtor Party are unable to consensually resolve any timely served objection before the Sale Hearing, then (i) the Bankruptcy Court may settle the dispute at the Sale Hearing; (ii) if the objection relates solely to the Cure Amount, the Debtor may pay any undisputed portion and upon any resolution of the Cure Amount dispute, the Non-Debtor Party will be entitled to payment of any disputed amount which the Court finds, or which the parties agree, is owed, together with the interest earned thereon; and/or (iii) the Debtor may elect not to assume and assign the Assigned Contract.

**C.**    **Notice Procedures**

30.    The Debtor also respectfully requests that the Court approve the form and manner of notice of the Sale Procedures, the Sale Procedures Order, the Auction, the Sale Hearing, and the Assumption and Assignment Procedures (collectively, as described in paragraphs 29-32 hereof, the "Notice Procedures"). The Debtor submits that this relief will facilitate the sale process and enable the Debtor to provide interested parties with adequate and sufficient notice of

the Auction and related matters. The Debtor and Didi Hirsch have agreed that the Sale Hearing be held on the scheduled omnibus hearing date of May 2, 2011, subject to the convenience of the Court.

31. The Debtor proposes to give notice of the Sale Motion, the Auction, Sale Hearing and the Sale Procedures Order in the following form and manner. On or before March 31, 2011, the Debtor will have served the Sale Motion, the APA, the proposed Sale Order, the *Notice of (I) Bid Solicitation; (II) Sale Procedures For Assets; (III) Auction; and (IV) Sale Hearing* substantially in the form attached as Exhibit D to the Motion (the "Sale Procedures Notice") by first-class mail upon all Limited Notice Parties;[1] (ii) all entities (or counsel thereof) known to the Debtor have asserted any lien, charge, claim or encumbrance on the Purchased Assets; (iii) all federal, state and local regulatory or taxing authorities which are reasonably ascertainable by the Debtor to have a known interest in the Purchased Assets; (iv) Non-Debtor Parties to the Assigned Contracts; (v) those parties whom the Debtor approached prior to the Petition Date regarding their interest in acquiring the Purchased Assets; and (vi) those parties who have requested notice pursuant to Bankruptcy Rule 2002.

32. In accordance with Local Bankruptcy Rule 6004-1(f), the Debtor further intends to submit notice of the proposed sale of the Purchased Assets, including the Bid Deadline, the date of the Auction, and the date of the Sale Hearing, using court-approved form F 6004-2, for purposes of publication by the Clerk on the Court's website.

33. In addition, the Debtor proposes to give notice of the Assumption and Assignment Procedures by serving, on or before April 14, 2011, the *Notice of (I) Debtor's Intention to Assume, Assign and Sell Certain Contracts, (II) Debtor's Proposed Cure Amounts, and (III) Objection Deadlines* substantially in the form attached as Exhibit E to the Motion by first-class mail upon the Non-Debtor Parties to the Assigned Contracts.

---

[1] The term Limited Notice Parties shall have the meaning given in the Debtor's *Emergency Motion for Order (I) Limiting Notice, (II) Establishing the Manner of Notice and (III) Granting Related Relief* filed concurrently herewith.

## IV.

## BASIS FOR RELIEF REQUESTED

**A.     The Sale Procedures Are an Appropriate Means of Obtaining the Highest and Best Offer for the Debtor's Assets**

34.     After notice and a hearing, a debtor may sell its assets outside the ordinary course of its business. 11 U.S.C. § 363. In order to obtain approval of a proposed sale of assets, a debtor usually must show that the proposed purchase price is the highest and best offer available under the circumstances of the case. *See, e.g.*, *Four B. Corp. v. Food Barn Stores, Inc. (In re Food Barn Stores, Inc.)*, 107 F.3d 558, 564–65 (8th Cir. 1997) (holding that in bankruptcy sales, "a primary objective of the Code [is] to enhance the value of the estate at hand"); *In re Integrated Res.*, 147 B.R. 650, 659 (S.D.N.Y. 1992) ("It is a well-established principle of bankruptcy law that the . . . Debtors' duty with respect to such sales is to obtain the highest price or greatest overall benefit possible for the estate.') (quoting *Cello Bag Co. v. Champion Int'l Corp. (In re Atlanta Packaging Prods., Inc.)*, 99 B.R. 124, 131 (Bankr. N.D. Ga. 1988)). And here, where the Debtor is a charitable institution, an additional factor comes into play. A "bankruptcy court must also take into consideration the fact that a debtor is a charitable institution." *In re United Healthcare Sys., Inc.*, 1997 U.S. Dist. LEXIS 5090, at *15 (D.N.J. Mar. 26, 1997). "Continuing satisfaction and ongoing beneficial treatment [of clients] is a good business reason for the sale assets as scheduled." *In re Brethren Care of S. Bend, Inc.*, 98 B.R. 927, 935 (N.D. Ind. 1989). Accordingly, the "highest and best" offer need not focus solely on price but may also give weight to societal needs. *United Healthcare*, 1997 U.S. Dist. LEXIS 5090, at *15; *In re After Six, Inc.*, 154 B.R. 876, 882 (Bankr. E.D. Pa. 1993).

35.     In connection with sales of assets outside of the ordinary course of business, bankruptcy courts frequently approve competitive bidding procedures as a means of ensuring that such sales will generate the highest and best offer for a debtor or debtors. *See, e.g., Doehring v. Crown Corp. (In re Crown Corp.)*, 679 F.2d 774, 775 (9th Cir. 1982) (district court required specific minimum overbid amounts, deposits, and comparable deal terms to be used by all overbidders); *In re Crowthers McCall Pattern, Inc.*, 114 B.R. 877, 879 (Bankr. S.D.N.Y. 1990)

(court entered order requiring that overbids be made in specified minimum increments with deposits).  Courts have uniformly recognized that procedures intended to enhance competitive bidding are consistent with the goal of ensuring the highest and best offer is received by the estate and are appropriate in the context of bankruptcy sales. *See, e.g.*, *Integrated Res.*, 147 B.R. at 659; *In re Fin. News Network, Inc.*, 126 B.R. 152, 157 (Bankr. S.D.N.Y. 1991).

36. The Debtor submits that the Sale Procedures summarized in the Notice of Motion and attached as <u>Exhibit B</u> to this Motion, and the opportunity for competitive bidding embodied therein, are reasonable and calculated to obtain the highest and best offer for the Debtor's assets, taking into consideration the Debtor's charitable mission and the public need.  For these reasons, the Court should approve the Sale Procedures.

**B.** **<u>The Assumption and Assignment Procedures Will Protect the Rights of Non-Debtor Parties and Expedite the Sale Process and Should Be Approved</u>**

37. Under section 365(a) of the Bankruptcy Code, a debtor, "subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor." 11 U.S.C. § 365(a).  Section 365(b)(1) of the Bankruptcy Code codifies the requirements for a debtor to assume an executory contract.  *See* 11 U.S.C. § 365(b)(1).  The Bankruptcy Code also provides that a debtor may assign an executory contract, subject to certain conditions.  *See* 11 U.S.C. § 365(f)(2).

38. In the Sale Motion, the Debtor will request the Court's permission to assume and assign the contracts that will be designated for assumption and assignment under the APA.  However, the Debtor has already formulated proposed procedures relating to the Assumption and Assignment Procedures, which the Debtor believes will expedite the sale of the Purchased Assets, and hereby requests the Court's approval of such procedures.

39. The Assumption and Assignment Procedures are reasonable and protect the rights of Non-Debtor Parties, and the Debtor believes that such procedures will facilitate a faster, smoother closing of the contemplated asset sale by establishing a process for resolving disputes regarding cure amounts and assurances of future performance by the Purchaser.  For these reasons, the Debtor requests the Court's approval of the Assumption and Assignment Procedures

SF1:813563 | 14 | MOTION FOR APPROVAL OF SALE PROCEDURES, ETC.

attached as Exhibit C to this Motion, and the form of Notice of Assumption and Assignment attached as Exhibit E to this Motion. The Court may approve the Assumption and Assignment Procedures and the form of notice thereof pursuant to section 365 of the Bankruptcy Code and its authority under section 105(a) of the Bankruptcy Code to "issue any order, process or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a).

40. The Court may permit the sale of multiple contracts in one motion pursuant to Bankruptcy Rule 6006(e). The Debtor therefore requests that the Court grant authorization, pursuant to Bankruptcy Rule 6006(f)(6), to treat the Sale Motion as an omnibus motion to assume and assign the Assigned Contracts.

**C.    The Notice Procedures and Schedule for the Bid Deadline, Auction and Sale Hearing Are Reasonable and Appropriate**

41. Concurrently with the filing of this Motion, the Debtor has filed its *Emergency Motion for Order (I) Limiting Notice, (II) Establishing the Manner of Notice and (III) Granting Related Relief* (the "Motion to Limit Notice"). Consistent with the relief sought in the Motion to Limit Notice, the Debtor requests that the notice of the Sale Motion be limited. In particular, although Bankruptcy Rule 2002 arguably requires that the Debtor give notice of the hearing on the Sale Motion to all creditors in the Chapter 11 Case, such notice would require mailing the notice of Motion to thousands of addresses (including the Debtor's clients and other creditors), at a significant expense. Instead, the Debtor proposes serving the Sale Procedures Notice only on the parties described in Section III.C. above. The Debtor also proposes to publish notice of the proposed sale on the Court's website in accordance with Local Bankruptcy Rule 6004-1(f).

42. The Debtor submits that the foregoing notice is reasonably calculated to provide timely and adequate notice to the Debtor's creditors and other parties in interest, and also to each party to whom the Debtor has marketed the Purchased Assets. Pursuant to the Motion to Limit Notice, each of the Debtor's creditors and clients will have been notified of the limited notice procedures and have had an opportunity to request special notice under Bankruptcy Rule 2002.

43. The Debtor also believes that the proposed notice procedures are appropriate in light of the nature of the Purchased Assets. The VMH Facility was uniquely designed and

1  configured to meet the service needs and demands of a community mental health agency. Among
2  other features, many of the VMH Facility's rooms are small spaces designed for one-on-one or
3  small group therapy, its pharmacy space is suited for that specific use only, and the administrative
4  section of the VMH Facility is partitioned such that there is limited access to treatment areas (and
5  none at all from the second floor). Thus, any party wishing to use the VMH Facility for any other
6  function would incur significant costs to remodel the building for another purpose. Because the
7  Debtor's other valuable assets, including its employees and its contract with DMH, are not assets
8  that be sold, an interested bidder would have to ascribe the majority of the value in the proposed
9  transaction to the VMH Facility. In light of its purpose-built character, the Debtor believes that
10 the only interested parties are likely to be other community mental health agencies, and the
11 Debtor has already spent a significant amount of time prior to the Petition Date attempting to
12 negotiate a possible sale to the other community mental health agencies in Los Angeles County.
13        44.    Accordingly, the Debtor submits that the Notice Procedures requested herein
14 constitute good and sufficient notice under the circumstances with respect to the Motion, the Sale
15 Motion, the Sale Procedures, the Assumption and Assignment Procedures, all proceedings to be
16 held thereon, and the entry of an order or orders granting all of the relief requested herein. The
17 Debtor further submits that no further notice need be given.

**V.**

**CONCLUSION**

20        45.    WHEREFORE, the Debtor respectfully requests that the Court enter an order,
21 substantially in the form attached as Exhibit A hereto, approving (i) the Sale Procedures described
22 in Exhibit B, (ii) the Notice Procedures, including the forms of notice attached hereto as
23 Exhibit D and Exhibit E, (iii) the Assumption and Assignment Procedures described in Exhibit C,
24 (iv) grant authorization, pursuant to Bankruptcy Rule 6006(f)(6), to treat the Sale Motion as an
25 omnibus motion to assume and assign the Assigned Contracts, and (v) the date of the Sale
26 Hearing, and that the Court grant such other and further relief as is just and proper.

| | |
|---|---|
| Dated: March 25, 2011 | EVAN M. JONES<br>ANDREW M. PARLEN<br>JENNIFER M. TAYLOR<br>EVAN T. PICKERING<br>JAMIE OH<br>O'MELVENY & MYERS LLP |
| | By: */s/ Andrew M. Parlen*<br>     Andrew M. Parlen |
| | Proposed Attorneys for Verdugo Mental Health, Debtor and Debtor in Possession |