EVAN M. JONES (S.B. #115827)
ANDREW M. PARLEN (S.B. #230429)
JENNIFER M. TAYLOR (S.B. #241191)
EVAN T. PICKERING (S.B. # 271634)
JAMIE OH (S.B. # 274419)
O'MELVENY & MYERS LLP
400 South Hope Street
Los Angeles, CA  90071-2899
Telephone:     (213) 430-6000
Facsimile:     (213) 430-6407
Email: aparlen@omm.com

Proposed Attorneys for Verdugo Mental
Health, Debtor and Debtor in Possession

# UNITED STATES BANKRUPTCY COURT FOR

## THE CENTRAL DISTRICT OF CALIFORNIA

## LOS ANGELES DIVISION

| | |
|---|---|
| In re Verdugo Mental Health,<br><br>Debtor.[1] | Case No.  2:11-bk-XXXXX-XX<br><br>Chapter 11<br><br>**DEBTOR'S EMERGENCY MOTION FOR ORDER (I) AUTHORIZING INTERIM AND FINAL USE OF CASH COLLATERAL, (II) GRANTING ADEQUATE PROTECTION FOR USE OF PREPETITION COLLATERAL, AND (III) GRANTING RELATED RELIEF; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**<br><br>[Declaration of William J. Smith in Support of Chapter 11 Petition and Request for First-Day Relief Filed Concurrently Herewith]<br><br>Hearing Date:  To be set by the Court |

---

[1] The Debtor in this case, along with the last four digits of the federal tax identification number for the Debtor, is Verdugo Mental Health (0064).  The Debtor's corporate office is located at 1540 E. Colorado Street, Glendale, California 91205.

# TABLE OF CONTENTS

**Page**

I.    JURISDICTION ...................................................................................................3

II.   GENERAL BACKGROUND ..............................................................................3

    A.    The Debtor .................................................................................................3

    B.    The Debtor's Governance and Staff .........................................................4

    C.    The Debtor's Services...............................................................................5

    D.    The Debtor's Material Assets ...................................................................7

        i.    Real Property ................................................................................7

        ii.   Contracts .....................................................................................8

            a.    DMH Mental Health Services Contract.........................8

            b.    DMH Information Technology Contract .........................8

            c.    Department of Public Health Contract ...........................9

            d.    U.S. Pretrial Services Agency Purchase Agreement ......9

        iii.  The Debtor's Accounts ................................................................9

    E.    The Debtor's Material Liabilities .............................................................9

        i.    The VMH Financings ...................................................................9

        ii.   DMH Claims.................................................................................12

        iii.  The SELPA Judgment ..................................................................13

        iv.   The Verdugo Mental Health Foundation Note ...........................14

    F.    Events Leading to the Bankruptcy............................................................14

        i.    Overview......................................................................................14

        ii.   Specific Events and Factors........................................................15

            a.    Depletion of Debtor's Reserves and Foundation Funds ...............15

            b.    Substantial Decrease in Private Donations ...................15

            c.    Reduction in Funding, Programmatic Changes, and
               Recoupment ...................................................................16

    G.    Efforts to Resolve Financial Difficulties .................................................17

    H.    The Proposed Transaction ........................................................................17

III.  RELIEF REQUESTED .........................................................................................19

IV.   BASIS FOR RELIEF REQUESTED ....................................................................21

    A.    Applicable Authority for Approval to Use Cash Collateral .....................21

    B.    The Debtor Has an Immediate Need for Use of Cash Collateral..............22

    C.    The Secured Creditors Consent to the Use of Cash Collateral ................22

    D.    The Secured Creditors Are Adequately Protected for the Debtor's Use of
        Cash Collateral...........................................................................................23

        i.    General Standards of Adequate Protection................................23

- i -

**TABLE OF CONTENTS**
**(continued)**

                                                                                              **Page**

      ii.    The Debtor Will Provide Adequate Protection to the Secured
            Creditors Through the Granting of Replacement Liens ........................... 25

      iii.   The Preservation and Enhancement of the Collateral Resulting from
            the Debtor's Ongoing Operations Affords Further Adequate
            Protection to the Secured Creditors ............................................................ 25

  E.    Emergency Relief and Interim Approval of Debtor's Use of Cash
       Collateral Should Be Granted ................................................................................. 27

  F.    Notice of This Motion Complies with This  Court's Notice Requirements
       and Is Appropriate ................................................................................................. 28

V.    CONCLUSION .................................................................................................................. 29

**EXHIBITS**

A    BUDGET ........................................................................................................................ 31

B    PROPOSED ORDER ...................................................................................................... 33

1

# TABLE OF AUTHORITIES

2

**Page**

3

## CASES

*A&B Heating & Air Conditioning, Inc. v. United States (In re A&B Heating & Air
Conditioning, Inc.,*
    48 B.R. 401 (Bankr. N.D. Fla. 1985) ..........................................................................26
*Bonner Mall P'ship v. U.S. Bancorp Mortg. Co. (In re Bonner Mall P'ship),*
    2 F.3d 899 (9th Cir. 1993) ............................................................................................26
*First Fed. Bank of Cal. v. Weinstein (In re Weinstein),*
    227 B.R. 284 (B.A.P. 9th Cir. 1998) ..........................................................................24
*G.E. Mortg. Corp. v. South Village, Inc. (In re South Village, Inc.),*
    25 B.R. 987 (Bankr. D. Utah 1982) ............................................................................24
*Hoffman v. Portland Bank (In re Hoffman),*
    51 B.R. 42 (Bankr. W.D. Ark. 1985) ..........................................................................26
*In re 495 Cent. Park Ave. Corp.,*
    136 B.R. 626 (Bankr. S.D.N.Y. 1992) ........................................................................25
*In re Beker Indus. Corp.,*
    58 B.R. 725 (Bankr. S.D.N.Y. 1986) ..........................................................................25
*In re Columbia Gas Sys, Inc.,*
    146 B.R. 114 (Bankr. D. Del. 1992) ............................................................................24
*In re Dynaco Corp.,*
    162 B.R. 389 (Bankr. D.N.H. 1993) ............................................................................26
*In re Heatron, Inc.,*
    6 B.R. 493 (Bankr. W.D. Mo. 1980) ..........................................................................26
*In re McCormick,*
    354 B.R. 246 (Bankr. C.D. Ill. 2006) ..........................................................................21
*In re Mellor,*
    734 F.2d 1396 (9th Cir. 1984) ....................................................................................21
*In re Mickler,*
    9 B.R. 121 (Bankr. M.D. Fla. 1981) ............................................................................23
*In re Pine Lake Vill. Apt. Co.,*
    16 B.R. 750 (Bankr. S.D.N.Y. 1982) ..........................................................................27
*In re Stein,*
    19 B.R. 458 (Bankr. E.D. Penn. 1982) ........................................................................27
*Martin v. United States (In re Martin),*
    761 F.2d 472 (8th Cir. 1985) ......................................................................................24
*Mbank Dallas, N.A. v. O'Connor (In re O'Connor),*
    808 F.2d 1393 (10th Cir. 1987) ......................................................................24, 26, 27
*NLRB v. Bildisco & Bildisco,*
    465 U.S. 513 (1984) ....................................................................................................26
*Paccom Leasing Corp. v. Deico Elecs., Inc. (In re Deico Elecs., Inc.),*
    139 B.R. 945 (B.A.P. 9th Cir. 1992) ..........................................................................24
*Resolution Trust Corp. v. Swedeland Dev. Grp., Inc. (In re Swedeland Dev. Grp.,
Inc.),*
    16 F.3d 552 (3d Cir. 1994) ..........................................................................................24

28

- iii -

1

## TABLE OF AUTHORITIES
### (continued)

2

Page

3

*Shaw Indus., Inc. v. First Nat'l Bank of Pa.* (*In re Shaw Indus., Inc.*),
   300 B.R. 861 (Bankr. W.D. Pa. 2003) ....................................................................24

4

*Toibb v. Raelloff,*
   501 U.S. 157 (1991)...............................................................................................26

5

*United Savings Ass'n of Tex. v. Timbers of Inwood Forest Assocs., Ltd.,*
   484 U.S. 365 (1988).........................................................................................24, 27

6

7

## STATUTES

8

11 U.S.C. § 105......................................................................................................25

11 U.S.C. § 361...................................................................................3, 23, 24, 25

9

11 U.S.C. § 363..............................................................................................passim

11 U.S.C. § 506..............................................................................................24, 25

10

11 U.S.C. § 510......................................................................................................19

11 U.S.C. § 542......................................................................................................25

11

11 U.S.C. § 543......................................................................................................25

11 U.S.C. § 544................................................................................................19, 25

12

11 U.S.C. § 545................................................................................................19, 25

11 U.S.C. § 546......................................................................................................19

13

11 U.S.C. § 547................................................................................................19, 25

14

11 U.S.C. § 548................................................................................................19, 25

11 U.S.C. § 549................................................................................................19, 25

15

11 U.S.C. § 550......................................................................................................25

11 U.S.C. § 551......................................................................................................25

16

11 U.S.C. § 552......................................................................................................25

11 U.S.C. § 553......................................................................................................25

17

11 U.S.C. § 1107....................................................................................................21

18

28 U.S.C. § 157.......................................................................................................3

28 U.S.C. § 1334.....................................................................................................3

19

28 U.S.C. § 1408.....................................................................................................3

28 U.S.C. § 1409.....................................................................................................3

20

Cal. Health & Safety Code § 129052 ...................................................................10

21

## RULES

22

Fed. R. Bankr. P. 4001...............................................................................2, 3, 20, 28

Local Bankruptcy Rule 2081-1.............................................................................2, 3

23

Local Bankruptcy Rule 4001-2.....................................................................1, 2, 3, 28

Local Bankruptcy Rule 9075-1...................................................................2, 3, 28

24

25

26

27

28

**TO THE HONORABLE UNITED STATES BANKRUPTCY JUDGE, THE OFFICE OF THE UNITED STATES TRUSTEE, CREDITORS HOLDING THE TWENTY LARGEST UNSECURED CLAIMS, ALL ALLEGED SECURED CREDITORS, PARTIES REQUESTING SPECIAL NOTICE AND OTHER PARTIES IN INTEREST:**

Verdugo Mental Health, as the debtor and debtor in possession in the above-referenced case (the "Debtor"), hereby moves the Court on an emergency basis for the entry of interim and final orders authorizing the Debtor to use cash collateral with the consent of the Secured Creditors (as defined below) and granting related relief (the "Motion").  By the Motion, the Debtor seeks entry of an order, in the form attached as Exhibit B, (1) approving the consensual use of cash collateral pursuant to the Budget (as defined below) on an emergency interim basis, pending a final hearing, in such amounts necessary to enable the Debtor to (i) continue to provide mental health services to the community in furtherance of its charitable mission pending the sale of the Debtor's assets to a new provider and (ii) facilitate an orderly transition to a new provider and wind down the Debtor; (2) granting adequate protection to the Secured Creditors (as defined below) on an emergency interim basis, pending a final hearing; and (3) scheduling and establishing deadlines regarding a final hearing on the Debtor's use of cash collateral.

A summary of the essential terms of Debtor's proposed cash collateral use (pursuant to Local Bankruptcy Rule 4001-2(c)) are as follows:

- The Motion does not request approval of any of the items cited in Local Bankruptcy Rule 4001-2(b).

- The Motion seeks authorization to use "cash collateral" within the meaning of section 363(a) of the Bankruptcy Code, including cash and funds in deposit accounts currently on hand in the Debtor's estate and cash and receipts generated in connection with the Debtor's provision of mental health services (the "Cash Collateral"), pursuant to the budget appended to the Motion as Exhibit A (as it may be amended from time to time in accordance with the terms of this Motion, the "Budget"), initially on an interim basis and thereafter on a final basis through the sale of the Debtor's assets and subsequent transition of services and wind down.

- The Motion proposes to grant each of the Office of Statewide Health Planning and Development of the State of California ("OSHPD"), U.S. Bank National Association, as Trustee ("U.S. Bank") under (i) that certain Indenture dated as of April 1, 2005 for $22,545,000 California Health Facilities Financing Authority Insured Refunding Revenue Bonds (Small Facilities Refinancing Program) 2005 Series A (the "2005 Indenture") and (ii) that certain Indenture dated as of March 1, 2007 for $5,505,000 California Health Facilities Financing Authority Insured Revenue Bonds (Verdugo

Mental Health) 2007 Series A (the "2007 Indenture" and together with the 2005 Indenture, the "Indentures"), and the Los Angeles County Department of Mental Health ("DMH" and collectively with OSHPD and U.S. Bank, the "Secured Creditors"), replacement liens on their existing collateral and the proceeds thereof, excluding avoidance causes of action, as adequate protection if and only to the extent that (a) its prepetition security interests are valid, enforceable, properly perfected and non-avoidable, and (b) the Debtor's use of cash collateral results in a diminution in cash collateral.

For all the foregoing reasons, and such additional reasons as may be advanced at or prior to the hearing on the Motion, the Debtor respectfully requests that this Court enter an order, pursuant to section 363(c) of title 11 of the United States Code (the "Bankruptcy Code"), Rule 4001(b) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), Rules 2081-1(9), 4001-2 and 9075-1 of the Local Bankruptcy Rules for the United States Bankruptcy Court for the Central District of California (the "Local Rules"), (1) approving the use of cash collateral pursuant to the Budget on an emergency interim basis, pending a final hearing, in such amounts necessary to enable the Debtor to (i) continue to provide mental health services to the community in furtherance of its charitable mission pending the sale of the Debtor's assets to a new provider and (ii) facilitate an orderly transition to a new provider and wind down the Debtor, (2) granting adequate protection to OSHPD, U.S. Bank, and DMH on an emergency interim basis to the extent provided in the Motion, pending a final hearing, (3) scheduling and establishing deadlines regarding a final hearing on the Debtor's use of cash collateral, and (4) granting such other and further relief as is just and proper under the circumstances.

## MEMORANDUM OF POINTS AND AUTHORITIES

The Motion is based on this attached Memorandum of Points and Authorities and the *Declaration of William J. Smith in Support of Chapter 11 Petition and Request for First-Day Relief* (the "Smith Declaration") filed concurrently herewith, the arguments of counsel, and other admissible evidence properly brought before the Court at or before the hearing on this Motion.  In addition, the Debtor requests that the Court take judicial notice of all documents filed with the Court in the Chapter 11 Case.

SF1:805853

- 2 -

# I.

## **JURISDICTION**

1.      This court has jurisdiction over the Motion pursuant to 28 U.S.C. §§ 157 and 1334. This proceeding is a core proceeding under 28 U.S.C. § 157(b)(2).  Venue is proper under 28 U.S.C. §§ 1408 and 1409.

2.      The statutory predicates for the relief requested herein are 11 U.S.C. §§ 361, 363(c)(2)(B) and (c)(3), Bankruptcy Rule 4001, and Local Rules 2081-1, 4001-2 and 9075-1.

# II.

## **GENERAL BACKGROUND**

**A.    The Debtor**

3.      On March 25, 2011 (the "Petition Date"), the Debtor filed its voluntary petition for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Central District of California (the "Court"), thereby commencing the above-captioned chapter 11 case (the "Chapter 11 Case").  Filed concurrently herewith, and incorporated herein by reference, is the Smith Declaration, which contains more detail on the Debtor's assets, liabilities, services and plans for this Chapter 11 Case.

4.      The Debtor, a California nonprofit public benefit corporation, is a stand-alone outpatient behavioral healthcare clinic that provides mental health services within the Southern California communities of Glendale, Burbank, Montrose, La Cañada-Flintridge, and Eagle Rock. Established in 1957, the Debtor was the first private agency to contract with the DMH under California's seminal community mental health services legislation, the Short-Doyle Act of 1957. The Debtor since has evolved into a multi-programmed behavioral healthcare organization, operating under the names Verdugo Mental Health, Verdugo Mental Health Center, VMH Care, the Glen Roberts Child Study Center, and Positive Directions.  The Debtor's staff is committed to enhancing the quality of life of individuals and families while helping to provide a stable future for those members of the community afflicted with more severe and persistent mental illness.  For 54 years, the Debtor has been committed to providing accessible, affordable, and multicultural/multilingual behavioral healthcare treatment, with an emphasis on target

EMERGENCY MOTION OF DEBTOR AND
DEBTOR IN POSSESSION FOR USE OF
CASH COLLATERAL

1   populations in the lower socioeconomic status demographic whose ability to access care and

2   advocate for themselves is limited.

3        5.     The Debtor, which is the largest nonprofit mental health services provider in the

4   Glendale area, plays a critical role in Los Angeles County's provision of mental health services

5   because of the unique socioeconomic and cultural attributes of Glendale and its surrounding

6   foothill communities.  Despite enclaves of relative affluence, 15.5% of the more than 200,000

7   people living in Glendale fall below the federal poverty level.  Adult clients often suffer from

8   severe and chronic mental illness, while children and adolescent clients tend to be in the severely

9   emotionally disturbed spectrum.  Clients are either uninsured or are insured through public

10  programs such as Medi-Cal/Medicare or Healthy Families.  Given its sizeable foreign-born

11  population, a large percentage of which has fled war and political turmoil, the community has a

12  substantial need for a nonprofit mental health provider.  Specifically, Glendale is home to one of

13  the largest concentrations of Armenian-Americans in the United States, with approximately one

14  in four residents of Armenian descent.  To provide mental health services for a community of

15  Glendale's diversity and complexity, the Debtor's employees possess specialized linguistic and

16  cultural expertise.  Indeed, the Debtor is the largest provider of Armenian and Russian language

17  mental health services in Los Angeles County and, as such, actively trains and recruits mental

18  health professionals who have the skills and desire to work with the population the Debtor serves.

19       6.     The Debtor takes great pride in rendering the highest level of service to its clients.

20  These efforts have been recognized at the federal, state, and local level, with the Debtor receiving

21  numerous commendations for the quality of its services, including, in 2009, DMH's "Best

22  Practices Award."

23  **B.**     <u>**The Debtor's Governance and Staff**</u>

24       7.     The Debtor is governed by a Board of Directors composed of seven members who

25  are leaders in the local community.  The Debtor's Chief Executive Officer is William J. Smith,

26  who has served in this position since 2009.  Among other degrees, Dr. Smith holds a doctorate in

27  clinical psychology and a master of business administration.  Dr. Smith has been affiliated with

28  the Debtor since 1994, previously serving as the Debtor's Chief Operating Officer and adult

EMERGENCY MOTION OF DEBTOR AND
DEBTOR IN POSSESSION FOR USE OF
CASH COLLATERAL

mental health and outpatient program director. The Debtor's Chief Financial Officer is Ellen

Park, who has served in this position since 1981.

8.      The Debtor's workforce consists of paid staff and volunteer interns/students from

various clinical disciplines.  As of the Petition Date, the Debtor employed 64 people, including

psychiatrists, psychologists, nurses, social workers, marriage and family therapists, and

administrative staff.  The Debtor is staffed to provide services to up to 200 clients on a typical

day.

## C.      The Debtor's Services

9.      The Debtor provides an array of mental health services on a fiscal year budget of

approximately $5,000,000 to approximately 2,000 clients annually, divided between adults with

psychotic-spectrum, mood and substance abuse disorders, and children with severe emotional

disturbances.  Services include crisis intervention and stabilization, psychiatric and psychological

assessment, medication management, cognitive-behavioral therapy, psychotherapy, play therapy,

individual rehabilitation, and case management.  Therapeutic and program goals include

improving school attendance and performance, maintenance of children in their family placement,

reduction in inpatient psychiatric hospitalizations, reduction in homelessness, reduction in jail

recidivism, acculturation of immigrant clients, increased employment, reduction in public benefit

subsidies, and training of future mental health professionals in the field of nonprofit mental

health.

10.      The Debtor's adult outpatient program is operated under contract with DMH, as

well as a blanket purchase agreement with the United States Pretrial Services agency of the

United States District Court for the Central District of California ("U.S. Pretrial Services").  The

program focuses on medication support and rehabilitation services for adults with serious and

chronic mental illness.  Services provided include medication evaluation and monitoring,

individual, group, and family therapy, consumer and family education, and other services aimed

at increasing community functioning and effective life management.  The program accepts

uninsured clients and clients with Medicare and/or Medi-Cal insurance.

EMERGENCY MOTION OF DEBTOR AND
DEBTOR IN POSSESSION FOR USE OF
CASH COLLATERAL

11.     The Glen Roberts Child Study Center is a nationally recognized program that treats children, adolescents, and families in a child-oriented setting.  It is also one of the largest professional training sites for masters and doctoral students in Los Angeles County.  The client population at the center includes the most economically disadvantaged children and families in the community, with more than 90% at or below the poverty level.  The program serves children with a range of issues, including serious mental illness, abuse, neglect, domestic violence, depression and school-related issues.  Services rendered at the Glen Roberts Child Study Center include individual, family, and group therapy, play therapy, psychological assessment and testing, medication support, state-mandated special education mental health services, and parent education.  These services are provided by a dedicated staff of licensed psychologists, marriage and family therapists and a psychiatrist, as well as postdoctoral fellows, psychology interns, and other interns and trainees.  The program accepts Medi-Cal, Medicare, Healthy Families, clients entitled to mental health services under California Assembly Bill 3632 (a bill mandating provision of mental health services to certain special education students) ("AB3632"), and uninsured clients.

12.     Under the Positive Directions name, the Debtor offers high-quality, low-fee counseling and psychotherapy conducted by marriage, family, and child therapist trainees and interns, all of whom are supervised by licensed clinicians.  Positive Directions' counseling services are for persons over eighteen and include individual and couples therapy, as well as alcohol and drug counseling, including court-mandated services.  Positive Directions does not accept insurance or Medi-Cal, but offers a low fee of $30 per session for clients who need counseling services and do not qualify for county-sponsored services.  Positive Directions also is under contract with the Los Angeles County Department of Public Health (Substance Abuse Prevention and Control Division) ("DPH"), from which it receives funding for court-ordered substance abuse counseling services and community education/support services.

13.     The Debtor's school-based program places mental health clinicians at local school campuses to provide services to more than 200 low-income children and their families.  Through this program, the Debtor provides services at six Glendale Unified School District campuses as

1    well as five campuses in the Alhambra Unified School District.  The school-based program

2    supports abused and emotionally disturbed children and adolescents.  This program accepts Medi-

3    Cal and Healthy Families.  The program also offers low-fee services to clients who do not meet

4    insurance coverage requirements.

5    **D.**    **The Debtor's Material Assets**

6        **i.**    **Real Property**

7        14.    The Debtor's headquarters is an 18,713 square foot facility on a 42,725 square foot

8    lot located at 1540 East Colorado Street, Glendale, California, 91205 (the "VMH Facility").  The

9    VMH Facility is the Debtor's largest physical asset, and other than the school-based program, all

10    of the Debtor's services are rendered at the VMH Facility.

11        15.    The VMH Facility is a two-part structure conjoined to function as one contiguous

12    facility. The facility utilizes a "zone" security concept with separate "public," "therapy office,"

13    and "staff" zones secured by key-card access.  The facility maintains 24 subterranean parking

14    spaces (for staff), and 54 above ground parking spaces for clients and visitors.

15        16.    The primary structure was built in 2008, largely with the proceeds of a 2007 loan

16    based on the sale of state-backed bonds (discussed in detail below).  This structure houses all

17    service provision functions including therapy and clinical staff offices.  It was uniquely designed

18    and configured to meet the service needs and demands of a community mental health agency.

19    The first floor of this two-story structure, houses adult service programs and community groups.

20    In addition to individual therapy offices and larger group therapy rooms, the first floor provides a

21    secured medical suite and reception area for medical staff.  The second story houses children and

22    family services with specifically-designed play therapy and group rooms to facilitate therapeutic

23    interactions in a safe and supportive environment.

24        17.    The secondary structure is an 18-year old building that was remodeled at the time

25    of construction of the new primary facility.  This two-story structure primarily serves as the

26    Debtor's administration, information technology, and finance offices.  In addition, this structure

27    includes space for a contracted pharmacy that dispenses medications to the Debtor's clients.

28

EMERGENCY MOTION OF DEBTOR AND
DEBTOR IN POSSESSION FOR USE OF
CASH COLLATERAL

ii.    **Contracts**

a.    **DMH Mental Health Services Contract**

18.    The primary source of the Debtor's revenue is its mental health services contract with DMH.  Under this contract, DMH has engaged the Debtor as a provider of public mental health services in the area designated as Service Area 2, encompassing Glendale, California and certain surrounding communities.  In return, DMH provides cash advance funding at provisional rates in accordance with the terms of the contract, up to the amount identified by each program.  The maximum funding amount under the DMH contract for fiscal year 2010-2011 (*i.e.*, July 1, 2010 through June 30, 2011) is $4,987,021.  Due to circumstances described below at Section II.E, however, the Debtor is on pace to receive 2010-11 fiscal year funding of $3,927,891.

19.    During the first five months of each fiscal year, DMH advances monthly an amount equal to one-twelfth of the total annual contract.  Following the five-month cash-flow advance period, the Debtor is paid in arrears for actual units of service provided up to the maximum funding amount.  A reconciliation/audited settlement with DMH occurs following the end of each fiscal year.  DMH does not reimburse the Debtor for amounts incurred by the Debtor in excess of the maximum funding amount or for costs that are not properly incurred or reported.  On the other hand, if the results of the reconciliation indicate that the funding advanced by DMH exceeded the actual costs incurred during the relevant period, the Debtor is required to return the excess to DMH.  In addition, approximately three to five years after the end of each fiscal year, the state Department of Mental Health issues its Countywide Audit Report to DMH.  Based on this audit report, DMH issues a State Audit Cost Report Settlement, which informs the provider of amounts, if any, owed by the provider to Los Angeles County or by Los Angeles County to the provider.

b.    **DMH Information Technology Contract**

20.    In September 2010, the Debtor and DMH entered into a three-year contract pursuant to which the Debtor may receive up to $235,071 for information technology advancement.  The funding under this contract is provided through the Mental Health Services Act with the goal of modernization/transformation of electronic billing and records systems.  The

Debtor directly invoices DMH for information technology-related services set forth in the contract. To date, the Debtor has received $29,432.76 under this contract.

### c. Department of Public Health Contract

21.    The Debtor also is party to contracts with the DPH pursuant to which the Debtor provides substance abuse counseling and prevention services. These contracts are "fee-for-service" in nature with DPH compensating the Debtor for service hours provided under the contracts with payments not to exceed the maximum contract amounts. For fiscal year 2010-11, the aggregate amount of funding under these contracts is $122,861.

### d. U.S. Pretrial Services Purchase Agreement

22.    In December 2009, U.S. Pretrial Services awarded the Debtor a blanket purchase agreement to provide mental health services to federal defendants. The purchase agreement binds the agency to a negotiated rate based on the type of service provided. Program revenue is directly tied to the number of service hours rendered. For the first two quarters of fiscal year 2010-11, the Debtor received $23,693 under this contract.

### iii. The Debtor's Accounts

23.    The Debtor maintains certain deposit accounts with Pacific Western Bank and a deposit account with BNY Mellon. As of the Petition Date, the aggregate balance of the Debtor's Pacific Western Bank accounts was $63,154.13, the balance of the BNY Mellon account was $269,194.16.

### E. The Debtor's Material Liabilities

### i. The VMH Financings

24.    In order to refinance certain existing indebtedness and finance the construction and remodeling of the VMH Facility, the Debtor entered into two separate financing transactions in 2005 and 2007 (the "VMH Financings"). Both financings involve the same parties and use similar documentation, and for that reason, are discussed together below.

25.    In April 2005 and March 2007, respectively, the California Health Facilities Financing Authority ("CHFFA") and the Treasurer of the State of California issued the California Health Facilities Financing Authority Insured Refunding Revenue Bonds (Small Facilities

Refinancing Program), 2005 Series A (the "2005 Bonds") and the California Health Facilities

Financing Authority Insured Refunding Revenue Bonds (Verdugo Mental Health), 2007 Series A

(the "2007 Bonds" and collectively with the 2005 Bonds, the "Bonds").  The Bonds were issued

pursuant to the 2005 Indenture and 2007 Indenture, respectively.  Depending on the applicable

maturity date, the 2005 Bonds bear interest at an annual rate of 3.00% to 5.00%, while the 2007

Bonds bear interest at an annual rate of 3.625% to 4.40%.

26.    The proceeds of the sale of the 2005 Bonds in the amount of $1,025,000 were

loaned to the Debtor (the "2005 Loan") pursuant to a Loan Agreement dated as of April 1, 2005,

between CHFFA and the Debtor (the "2005 Loan Agreement").  Similarly, the proceeds of the

sale of the 2007 Bonds were loaned to the Debtor (the "2007 Loan" and collectively with the

2005 Loans, the "Loans") pursuant to a Loan Agreement dated as of March 1, 2007, between

CHFFA and the Debtor (the "2007 Loan Agreement" and collectively with the 2005 Loan

Agreement, the "Loan Agreements").

27.    In connection with the Bonds and the Loans, OSHPD issued a Contract of

Insurance in both 2005 and 2007 (the "Contracts of Insurance") to insure the repayment of the

Bonds, essentially guaranteeing payment of the Bonds and transferring credit risk under the

Loans to OSHPD.  To obligate the Debtor to repay any sums paid by OSHPD under the Contracts

of Insurance and to provide security to OSHPD, the Debtor entered into a Regulatory Agreement

in both 2005 and 2007 (the "Regulatory Agreements") with CHFFA and OSHPD under which the

Debtor granted CHFFA and OSHPD a security interest in substantially all of its assets, including

all revenues, moneys, accounts, accounts receivable, and other rights to payment.  The Regulatory

Agreements purport to create a perfected lien in such collateral pursuant to California Health and

Safety Code § 129052.[1]  The Debtor's obligations to CHFFA and OSHPD in connection with the

---

[1] The Regulatory Agreements excerpt the following language from California Health and Safety Code § 129052:  "The revenues, moneys, accounts, accounts, receivable, contract rights, general intangibles, documents, instruments, chattel paper, and other rights to payment of whatever kind pledged by or to the office of its assignees shall immediately be subject to the lien of the pledge without physical delivery or further act.  The lien of such pledge shall be valid and binding against all parties, irrespective of whether the parties have notice of the lien.  The indenture, trust agreement, resolution, or another instrument by which such pledge is created need not be recorded or the security interest other wise perfected."

EMERGENCY MOTION OF DEBTOR AND
DEBTOR IN POSSESSION FOR USE OF
CASH COLLATERAL

Loan Agreements and the Regulatory Agreements were further secured by a security interest in

substantially all assets of the Debtor pursuant to a Deed of Trust dated as of April 1, 2005,

between the Debtor and Stewart Title Guaranty Company, as trustee for the benefit of the

OSHPD and CHFFA (the "2005 Deed of Trust"), as amended by a First Supplemental Deed of

Trust dated as of March 1, 2007, between the Debtor and Stewart Title Guaranty Company, as

trustee for the benefit of OSHPD and CHFFA (the "2007 Deed of Trust").

28.    Although CHFFA, U.S. Bank, and OSHPD are parties to the various Loan

documents, OSHPD has sole authority to consent to use of the Debtor's cash collateral.  While

CHFFA is the nominal lender under the Loan Agreements, pursuant to section 5.01(b) of each

Indenture, CHFFA assigned certain rights, including all of its rights under the Loan Agreements,

the Regulatory Agreements, and the Deed of Trust, to U.S. Bank.  Similarly, both the Indentures

and the Regulatory Agreements provide that so long as OSHPD is not in default of its obligations

(which it is not), OSHPD represents the holders of the Bonds in the Debtor's bankruptcy

proceeding and may consent to any agreement on behalf of such holders.[2]

29.    The 2005 Loan matures on March 1, 2022, and the 2007 Loan matures on March

1, 2037.  During the life of the Loans, payments are due on the first day of each month, with the

payment amount calculated to service the annual payout of the bonds maturing that year and

interest due according to the varying rates of interest on the outstanding Bonds.  For the period

from April 1, 2010 through March 1, 2011, the Debtor was obligated to make a monthly payment

in the amount of $7,648.75 on the 2005 Loan and $29,713.96 on the 2007 Loan.  For the period

from April 1, 2011 through March 1, 2012, the monthly payment amount is $7,483.75 on the

2005 Loan and $29,385.83 on the 2007 Loan.  Of the proceeds loaned to the Debtor, $92,825

from the 2005 Loan and $356,750 from the 2007 Loan was deposited at the respective closings

into reserve accounts held by U.S. Bank on behalf of the holders of the Bonds (the "Reserve

---

[2] Section V of the each Regulatory Agreement provides: "So long as the Contract of Insurance is in full force and effect and [OSHPD] is not in default thereunder, [OSHPD] shall represent Bondholders in all bankruptcy proceedings and may take such action or consent to any agreement on behalf of Bondholders, provided that any such action or consent shall in no way impair the rights and benefits due Bondholders under the Contract of Insurance."  Section 7.06 of each Indenture includes nearly identical language.

EMERGENCY MOTION OF DEBTOR AND
DEBTOR IN POSSESSION FOR USE OF
CASH COLLATERAL

1    Accounts") for the purpose of making up any interest or principal deficiencies of the Debtor or

2    for the payment or redemption of the Bonds allocable to the Debtor.

3        30.    The Debtor ceased making monthly payments on the Loans beginning with the

4    payment due on December 1, 2010.  Accordingly, on December 9, 2010, OSHPD noticed an

5    event of default under the Regulatory Agreements.  To date, OSHPD has refrained from

6    exercising any remedies, and no amounts in the reserve account for the Loans have been used or

7    withdrawn.

8        31.    As of the Petition Date, the outstanding principal of the 2005 Loan was

9    approximately $773,336 and accrued and unpaid interest thereon was approximately $30,595, for

10   a total of approximately $803,931, while the outstanding principal of the 2007 Loan was

11   approximately $5,150,000 and accrued and unpaid interest thereon was approximately $118,85,

12   for a total of approximately $5,268,856.  The aggregate indebtedness under the Loans as of the

13   Petition Date is $6,072,787.

14       32.    OSHPD has informed the Debtor that the aggregate outstanding principal on the

15   2005 Bonds is $810,000 and that the aggregate outstanding principal balance on the 2007 Bonds

16   is $5,220,000.  On April 1, 2011, payments of $91,785 and $356,567.50 are due from U.S. Bank

17   in respect of the 2005 Bonds and 2007 Bonds, respectively.  I am informed that to make up for

18   the four unpaid monthly payments due under the Loans, U.S. Bank will use a portion of the funds

19   in the Reserve Accounts to pay the amounts due to holders of the Bonds on April 1, 2011.

20       33.    OSHPD further has informed the Debtor that it intends to defease the Bonds.  On

21   March 9, 2011, OSHPD issued a notice that, pursuant to the Contracts of Insurance, a payment in

22   the amount of $5,583,098.76 ($694,252.03 in respect of the 2005 Bonds and $$4,888,846.73 in

23   respect of the 2007 Bonds) will be made on April 4, 2011 from the Health Facility Construction

24   Loan Insurance Fund to U.S. Bank.  I understand that concurrently U.S. Bank will draw down of

25   the remainder of the funds in the Reserve Account., which, along with the payment under the

26   Contracts of Insurance, will defease the Bonds in full.  Accordingly, following defeasance of the

27   Bonds, the Debtor's outstanding indebtedness will be $694,252.03 under the 2005 Loan and 2005

28

1    Regulatory Agreement and $4,888,846.73 under the 2007 Loan and 2007 Regulatory Agreement,

2    for a total of $5,583,098.76.  Interest will accrue on that amount from an after April 4, 2011.

3    **ii.**    **DMH Claims**

4    34.    As noted above, DMH advance funds a portion, but not all, of the costs expected

5    to be incurred by the Debtor in connection with the provision of mental health services.  If the

6    results of the periodic audits conducted by the Debtor indicate that the actual costs incurred

7    during the relevant period are less than the projected costs for which DMH advanced funding, the

8    Debtor is required to return the excess to DMH.  In practice, DMH recovers such overpayments

9    by reducing the amount that it advances to the Debtor to cover future costs.  On December 21,

10    2010, DMH notified the Debtor that for fiscal year 2004-05, the Debtor owes Los Angeles

11    County $131,638.  The Debtor has appealed this audit finding.  In addition, the Debtor estimates

12    that $8,451 is due to the Debtor based upon prior fiscal year audits.  However, fiscal years

13    2005-06 through 2010-11 remain subject to state audit disallowances for Medi-Cal

14    reimbursements.  State audits for those years have yet to take place.

15    35.    Additionally, in November 2010, DMH notified the Debtor that, as a result of an

16    audit of California's AB3632 funding, DMH intends to reduce future advances by an additional

17    $236,413.  As of the Petition Date, however, DMH has not provided the Debtor with an official

18    notice of intention to recoup these funds.  The Debtor understands that this adjustment results

19    from amounts that the State of California determined were owed it by DMH in connection with

20    overpayments for AB3632 services.  DMH, in turn, allocated these liabilities among its health

21    service providers that were providers of AB3632 services during prior fiscal years.  The liabilities

22    do not arise under the existing contract between DMH and the Debtor.

23    36.    DMH contends that it possesses certain rights of setoff and/or recoupment with

24    respect to the funds held by the Debtor and owed to DMH and that it holds a security interest in

25    the funds held by the Debtor.

26    **iii.**    **The SELPA Judgment**

27    37.    In 2010, the Debtor entered into arbitration with Foothill Special Education Local

28    Plan Area ("SELPA").  SELPA is a consortium among the Glendale, Burbank, and La Cañada

1    unified school districts for the purpose of providing special education services to students served

2    by those districts.  The parties entered into the arbitration to resolve a dispute concerning the

3    interpretation of certain agreements for the provision of the Debtor's services to the school

4    districts.

5           38.    On June 22, 2010, an arbitrator entered an award against the Debtor in favor of

6    SELPA in the amount of $631,029.12, plus post-award interest at the legal rate of 10% per

7    annum.  SELPA subsequently obtained entry of judgment in this amount against the Debtor on

8    December 13, 2010.  On February 14, 2011 (within the ninety-day period immediately prior to

9    the Petition Date), SELPA recorded a judgment lien against the Debtor's real property with the

10    County of Los Angeles Registrar-Recorder/County Clerk.

11          **iv.**    **The Verdugo Mental Health Foundation Note**

12           39.    The Debtor is the sole member of Verdugo Mental Health Foundation (the

13    "Foundation").  The Foundation is a nonprofit public benefit corporation formed in 1997 as a

14    supporting organization under Internal Revenue Code section 509(a)(3) for the specific purpose

15    of providing support for the Debtor.  The Foundation, which has its own board of directors,

16    currently holds approximately $388,057.26 in cash — all of which is subject to a charitable trust

17    and constitutes endowment funds to be used in perpetuity solely for the purposes specified by the

18    donors thereof.

19           40.    On September 30, 2009, the Debtor issued a Promissory Note Secured by Deed of

20    Trust to the Foundation in the amount of $1,200,000 (the "Foundation Note") as evidence of the

21    loans that had been extended to the Debtor by the Foundation in connection with construction of

22    the VMH Facility and support of the Debtor's operations.  Notwithstanding the title of the

23    Foundation Note, the Foundation Note is unsecured.  Interest and principal on the Foundation

24    Note are payable quarterly with the balance maturing on September 30, 2014.  In March 2010 and

25    June 2010, the Debtor made payments to the Foundation Note totaling $54,000.  The Debtor has

26    not made any payments to the Foundation in respect of the Foundation Note since June 2010.

27    The outstanding principal balance on the Foundation Note is approximately $1,146,000.

28

SF1:805853    - 14 -

**F.      Events Leading to the Bankruptcy**

      **i.      Overview**

          41.      Shortly after completion of the VMH Facility and in the wake of the worldwide financial crisis, a series of events and factors began to threaten the Debtor's viability.  These events and factors, which are discussed in detail below, included substantial cost overruns on construction of and necessary improvements to the VMH Facility, cancellation of the Debtor's lines of credit, decreased private donations, and reduction in funding under government contracts due to both budget cuts and programmatic changes.  As a result, in fiscal year 2009-10, the Debtor operated at a loss of $304,102.  By fall 2010, the Debtor was experiencing liquidity pressure and, in turn, defaulted on the Foundation Note in September 2010 and then the Loans in December 2010.  The Debtor estimates that for fiscal year 2010-11, its operating deficit will be minimal, but this is largely on account of the Debtor defaulting on the Loans in December 2010 and on the Foundation Note in September 2010.  However, if the Debtor continues to operate through the end of its fiscal year (June 30, 2011), it projects that its cash will be depleted.

      **ii.      Specific Events and Factors**

          **a.      Depletion of Debtor's Reserves and Foundation Funds**

          42.      While the proceeds of the 2007 Loan provided much of the funding necessary for the construction and remodeling of the VMH Facility, the funding was not sufficient to complete the project due to cost overruns and unforeseen additional expenses totaling approximately $1,900,000.  The Debtor had two primary sources for supplying the necessary incremental funding.  First, the Debtor accessed approximately $650,000 of availability on its secured lines of credit.  The Debtor subsequently retired this indebtedness using its own reserve funds as well as funds borrowed from the Foundation, at which time the creditor financial institutions then canceled the lines of credit, materially decreasing the Debtor's liquidity.  Second, the Debtor received contributions from the Foundation of approximately $1,200,000.  These contributions, coupled with the Foundation funds used to pay down the Debtor's lines of credit and the loans evidenced by the Foundation Note, exhausted all of the Foundation's funds other than the

1    approximately $388,057.26 remaining in the Foundation's accounts, all of which, as noted above,

2    are endowment funds.

3                    **b.        Substantial Decrease in Private Donations**

4            43.      The Debtor historically relied on private donations to support clinical and

5    operational expenses for which the Debtor did not receive reimbursement under its government

6    contracts.  The substantial majority — approximately 72% — of philanthropic donations to the

7    Debtor were in the form of bequests from individuals residing in the Glendale area.  Over the last

8    15 years, such bequests totaled more than $3,100,000.  In recent years, however, the frequency

9    and amount of these bequests have declined markedly.  Indeed, the Debtor most recently received

10   a bequest in 2009 and does not anticipate receiving any future bequests.  Because the Debtor is a

11   nonprofit entity that operates almost exclusively on a cost-reimbursement basis, these bequests

12   provided critical incremental funding to the Debtor, the absence of which has prevented the

13   Debtor from reestablishing its reserves and left the Debtor without any cushion in the event of

14   reduced funding on account of dips in production.

15                   **c.        Reduction in Funding, Programmatic Changes, and Recoupment**

16           44.      Beginning in 2009, the State of California and Los Angeles County implemented

17   budget cuts that substantially reduced the Debtor's funding.  In August 2009, DMH notified the

18   Debtor that budget shortfalls necessitated a material reduction in DMH's funding of the Debtor.

19   In addition, shortly thereafter, the Debtor's contract under DPH's Substance Abuse Prevention

20   and Control program was eliminated due to cessation of funding of that program, resulting in

21   further decreased funding of approximately $51,000 per year.  In the face of these cutbacks, the

22   Debtor terminated approximately 20% of its staff, instituted pay cuts and freezes, and otherwise

23   reduced expenditures.

24           45.      A programmatic change implemented by DMH for fiscal year 2010-11 also

25   adversely impacted the Debtor's funding.  Specifically, approximately $1,350,000 of the funding

26   for which the Debtor is eligible under the DMH Contract was reallocated for prevention and early

27   intervention services that may be provided only by certified clinicians who are trained in specific

28   counseling and therapy techniques.  Due to a number of circumstances, the Debtor expects to

1  produce only approximately $250,000 in prevention and early intervention services and, thus,

2  miss out on approximately $1,100,000 of funding allocated under the DMH Contract.

3        46.      In addition, funds owed by the Debtor to DMH on account of DMH overpayments

4  have and likely will continue to impair the Debtor's liquidity.  Since 2009, DMH has recouped

5  $463,322 from the Debtor.  And, as noted above, DMH asserts that the Debtor owes

6  approximately $368,000 for overpayments for fiscal year 2004-05 and in connection with

7  AB3632 funding.  Moreover, state audits for fiscal years 2005-06 through 2010-11 have yet to

8  occur, leaving open the possibility DMH recouping substantial amounts from the Debtor's future

9  funding.

10  **G.**      **Efforts to Resolve Financial Difficulties**

11        47.      Recognizing that it could not survive as a going concern, the Debtor began

12  exploring means by which to both maximize the value of its assets for creditors and ensure that its

13  charitable mission would continue to be performed in the Glendale area without interruption.  In

14  determining how to meet this objective, the Debtor first analyzed the value of its assets and the

15  security interests to which its assets are subject.  The Debtor concluded that substantially all of its

16  assets, including the VMH Facility, all of its personal property, and its cash and cash equivalents,

17  comprise collateral securing the Debtor's obligations to OSHPD and U.S. Bank under the VMH

18  Financings.  The Debtor's preliminary analysis indicated that the value of its assets is materially

19  less than the amount owed under the Loans and, therefore, that OSHPD and U.S. Bank are

20  undersecured.

21        48.      To confirm its initial determination that its assets are worth substantially less than

22  the amount outstanding under the Loans, the Debtor retained Syn-Mar Associates, a real estate

23  appraisal firm, to conduct an appraisal of the VMH Facility.  In an appraisal prepared in

24  conformity with the requirements of the Uniform Standards of Professional Appraisal Practice,

25  Syn-Mar Associates formed the opinion that, as of February 28, 2011, the market value of the

26  VMH Facility is $4,300,000 (or $229.79 per square foot).

27        49.      The debt outstanding under the Loans is approximately $6.1 million.  Because

28  OSHPD and U.S. Bank are substantially undersecured, the Debtor sought input from OSHPD

SF1:805853

- 17 -

1   (which I understand has authority to consent to the use and disposition of collateral in a

2   bankruptcy proceeding on behalf of U.S. Bank) regarding disposition of the VMH Facility.

3   OSHPD informed the Debtor that it preferred VMH sell the VMH Facility on a short-sale basis

4   over OSHPD foreclosing on the facility.  OSHPD also informed the Debtor that OSHPD

5   supported VMH's efforts to sell the VMH Facility to a nonprofit mental healthcare provider who

6   would continue VMH's charitable mission.

7   **H.     The Proposed Transaction**

8       50.     After consultation with DMH and OSHPD, the Debtor concluded that the best way

9   for its clients to receive uninterrupted mental health services was for a third-party nonprofit entity

10  already performing mental health services under a DMH contract to engage in a dual-prong

11  transaction.  One component of the transaction would be the third-party's acquisition of the

12  Debtor's assets, including the VMH Facility, on terms acceptable to OSHPD.  The other

13  component would be the allocation to the third party of the Debtor's DMH funding in the form of

14  amendment of the third-party's existing DMH contract.

15      51.     To achieve this objective, the Debtor contacted six nonprofit mental health

16  providers in Los Angeles County to determine whether any had interest in pursuing such a

17  transaction.  Four entities expressed interest in a potential transaction.  The Debtor entered into

18  nondisclosure agreements and held in-person meetings with each of these four entities.  Three of

19  the entities subsequently conducted diligence.

20      52.     Two of these entities expressed interest in attempting to negotiate a purchase of the

21  Debtor's assets with the intent of continuing to provide mental health services at the VMH

22  Facility.  Given its status as an undersecured creditor, OSHPD also engaged in discussions with

23  both entities.

24      53.     Ultimately, only one entity made an offer to purchase the VMH Facility and the

25  Debtor's other assets: Didi Hirsch Psychiatric Service, a California non-profit public benefit

26  corporation, dba Didi Hirsch Mental Health Services ("Didi Hirsch"), which is one of the largest

27  and most highly regarded nonprofit mental health service providers in Los Angeles County.

28  Following negotiations, the Debtor and Didi Hirsch are in the process of finalizing an asset sale

1  agreement (the "APA"), which provides for the sale, pursuant to section 363 of the Bankruptcy

2  Code, of the VMH Facility and all assets related to the Debtor's provision of mental health

3  services (the "Purchased Assets").

4      54.   As a critical component of the proposed transaction, Didi Hirsch has conditioned

5  the APA on DMH amending Didi Hirsch's existing DMH contract to include funding currently

6  allocated to the Debtor.  DMH has informed the Debtor that it supports the proposed transaction

7  and that subject to Bankruptcy Court approval of the sale, it will amend its contract with Didi

8  Hirsch to include funding currently allocated to the Debtor (although DMH informs the Debtor

9  that this agreement is subject to any direction by the Los Angeles County Board of Supervisors

10  not to proceed).  Upon consummation of the sale, Didi Hirsch will occupy the VMH Facility and

11  provide uninterrupted services to the Debtor's clientele.

12                          **III.**

13                     **RELIEF REQUESTED**

14      55.   In order to enable the Debtor to continue to provide mental health services to the

15  community in furtherance of its charitable mission pending the sale of the Debtor's assets to a

16  new provider and to facilitate an orderly transition of services and winding down, the Debtor

17  requires the use of what may be the Cash Collateral of the Secured Creditors in accordance with

18  the Budget, initially on an interim basis through the final hearing on the Motion, and on a final

19  basis through the wind down of the Debtor's services.  The use of Cash Collateral will provide

20  the Debtor with liquidity necessary to ensure a continuity of mental health services and pay its

21  employees, thereby maximizing value to both the community and the Debtor's creditors,

22  including the value of the Secured Creditors' existing collateral (the "Existing Collateral"), as

23  services are transitioned pursuant to a timely sale of the Debtor's assets.

24      56.   The Debtor seeks to use Cash Collateral and to grant to the Secured Creditors, as

25  adequate protection of their interests in the Cash Collateral, solely to the extent of (a) any valid,

26  enforceable, properly perfected and non-avoidable prepetition security interests and (b) any

27  diminution in value of the Cash Collateral, replacement security interests in and liens upon the

28  Existing Collateral and any proceeds (excluding, however, all claims, causes of action and

EMERGENCY MOTION OF DEBTOR AND
DEBTOR IN POSSESSION FOR USE OF
CASH COLLATERAL

proceeds thereof arising under sections 510, 544, 545, 546, 547, 548 and 549 of the Bankruptcy

Code (collectively, "Avoidance Actions")), as set forth below.

57.    In anticipation of the Chapter 11 Case, the Debtor has developed cash flow

projections reflecting anticipated revenue and expenditures through the end of June 2011,

contained in the Budget — a 13-week cash flow forecast attached hereto as Exhibit A, *provided*

that (i) the Debtor may use in any period amounts set forth for that period plus unused amount for

any prior period, and (ii) the Debtor's actual expenditures may exceed 15% of the aggregate of

the monthly expenditures reflected in the Budget (clauses (i) and (ii), collectively, the "Allowed

Variance"); *provided further* that the Debtor may amend the Budget at any time upon prior notice

to the Secured Creditors (a "Proposed Budget").  Unless a Secured Creditor provides written

notice to the Debtor within five days after receipt of the Proposed Budget that the Proposed

Budget has not been approved by the Secured Creditors, the Proposed Budget shall become the

"Budget" for the purposes hereof.  If a Proposed Budget is not approved by the Secured

Creditors, then the Debtor shall have the right to petition the Court for approval of the Proposed

Budget, which if approved by the Court shall become the "Budget" for the purposes hereof.  In

the event that the Secured Creditors (or, if applicable, this Court) fail to approve a Proposed

Budget, then the Debtor shall be permitted to continue to use Cash Collateral in accordance with

the last approved Budget.

58.    The Budget, which was reviewed and approved by the Debtor's Chief Executive

Officer, William J. Smith, sets forth the amount of cash necessary for the Debtor to continue to

provide mental health services to the community pending the sale of the Debtor's assets,

transition those services to a new provider and then begin winding down.  The Budget takes into

account the effect this bankruptcy filing may have on the Debtor's provision of services and the

expenses of the administration of the Chapter Case.

59.    As set forth in the Budget, the Debtor seeks authority to use cash on hand

(approximately $319,579 as of the Petition Date) and funds generated in connection with the

Debtor's provision of mental health services.  Such cash and receipts allegedly constitute the

1    Secured Creditors' "cash collateral" within the meaning of section 363(a) of the Bankruptcy

2    Code.

3        60.    Each of the Secured Creditors has consented to the Debtor's use of Cash Collateral

4    on the terms and conditions set forth in this Motion.

5        61.    The Debtor requests that the Court conduct an interim hearing, pursuant to

6    Bankruptcy Rule 4001(b), to consider the entry of the interim order in substantially the form of

7    the attached Exhibit B: (1) approving the use of Cash Collateral on an emergency interim basis,

8    pending a final hearing, in accordance with the Budget, necessary to (i) enable the Debtor to

9    continue to provide mental health services to the community in furtherance of its charitable

10   mission pending the sale of the Debtor's assets to a new provider and (ii) facilitate an orderly

11   transition to a new provider and wind down the Debtor, (2) granting adequate protection to the

12   Secured Creditors on an interim basis, and (3) scheduling and establishing deadlines regarding a

13   final hearing on the Debtor's use of Cash Collateral.

14                              **IV.**

15                    **BASIS FOR RELIEF REQUESTED**

16   **A.    Applicable Authority for Approval to Use Cash Collateral**

17       62.    The Debtor's use of property of its estate is governed by section 363 of the

18   Bankruptcy Code, which provides in pertinent part that:

19           If the business of the debtor is authorized to be operated under
             section . . . 1108 . . . of this title and unless the court orders
20           otherwise, the [debtor] may enter into transactions, including the
             sale or lease of property of the estate, in the ordinary course of
21           business, without notice or a hearing, and may use property of the
             estate in the ordinary course of business without notice or a hearing.
22
23   11 U.S.C. § 363(c)(1).

24       63.    A debtor in possession has all of the rights and powers of a trustee with respect to

25   property of the estate, including the right to use property of the estate in compliance with section

26   363 of the Bankruptcy Code.  *See* 11 U.S.C. § 1107(a).

27       64.    Section 363(c)(2) of the Bankruptcy Code establishes a special requirement with

28   respect to "cash collateral," by providing that a debtor may not use, sell or lease "cash collateral"

1    under subsection (c)(1) unless: each entity that has an interest in such cash collateral consents; or

2    the court, after notice and a hearing, authorizes such use, sale or lease in accordance with the

3    provisions of this section. "Cash Collateral" is defined as, "cash, negotiable instruments,

4    documents of title, securities, deposit accounts or other cash equivalents in which the estate and

5    an entity other than the estate have an interest." 11 U.S.C. § 363(a). Pursuant to section

6    363(c)(2) of the Bankruptcy Code, the Court may authorize the Debtor to use cash collateral as

7    long as the applicable secured creditors are adequately protected. *In re Mellor*, 734 F.2d 1396,

8    1400 (9th Cir. 1984); *see also In re McCormick*, 354 B.R. 246, 251 (Bankr. C.D. Ill. 2006) (to use

9    the cash collateral of a secured creditor, the debtor must have the consent of the secured creditor

10    or must establish to the court that the secured creditor's interest in the cash collateral is

11    adequately protected.).

12    **B.    The Debtor Has an Immediate Need for Use of Cash Collateral**

13    65.    The Debtor has an immediate need for the use of Cash Collateral in order to

14    maintain continuity in its provision of mental health services to the community in furtherance of

15    its charitable mission pending the sale of the Debtor's assets to a new provider and to avoid

16    irreparable harm by facilitating an orderly transition and wind down. The Debtor's expected use

17    of Cash Collateral during the interim and final periods is reflected in the Budget. All payments

18    described in the Budget are necessary to maintain and continue the Debtor's provision of mental

19    health services in the community and to seamlessly transition these services to a purchaser of the

20    Debtor's assets in order to protect the Debtor's clients and to maximize value for the benefit of

21    the Debtor's creditors. Specifically, the Debtor must have access to Cash Collateral to make

22    payments to vendors for postpetition goods, employees, utilities, doctors, nurses, and other

23    pertinent, ordinary expenses incurred in connection with the provision of mental health services.

24    Failure to make payments in accordance with the Budget would result in the cessation of the

25    Debtor's services in the community, causing immediate and irreparable harm to the community

26    and to the Debtor's creditors. Because the value to the community and the Debtor's creditors of a

27    liquidation of the Debtor's assets is substantially less than the going concern transition of those

28    services to a new provider, creditors would likely receive substantially less (and clients are more

EMERGENCY MOTION OF DEBTOR AND
DEBTOR IN POSSESSION FOR USE OF
CASH COLLATERAL

1    likely to experience an interruption in much-needed healthcare) in liquidation than they would if

2    the Debtor is allowed to continue to provide services, sell its assets and conduct an orderly

3    transition of services and wind down.  Put simply, the Debtor cannot continue to provide crucial

4    mental health services on a charitable basis without the use of Cash Collateral, and if the Debtor

5    is unable to provide mental health services in the community, all parties will be harmed.

6    **C.**    **The Secured Creditors Consent to the Use of Cash Collateral**

7        66.    As noted, section 363(c)(2) of the Bankruptcy Code provides that a debtor in

8    possession may use cash collateral with the consent of each entity that has an interest in such cash

9    collateral.  The Secured Creditors have informed the Debtor that they consent to the use of Cash

10   Collateral on the terms and conditions set forth in this Motion.  The Debtor submits that the terms

11   of the proposed adequate protection arrangements (set forth below) and use of the Cash Collateral

12   are fair and reasonable, reflect the Debtor's prudent exercise of business judgment and constitute

13   provide adequate protection to the Secured Creditors.  Accordingly, the Court should approve the

14   Debtor's use of Cash Collateral as set forth herein.

15
16   **D.**    **The Secured Creditors Are Adequately Protected for the Debtor's Use of Cash
         Collateral**

17       **i.**    **General Standards of Adequate Protection**

18       67.    It is universally acknowledged that the debtor's cash "is the life blood of the

19   business" and the bankruptcy court must assure that such life blood "is available for use even if to

20   a limited extent."  *In re Mickler*, 9 B.R. 121, 123 (Bankr. M.D. Fla. 1981).  If a secured creditor

21   does not consent to the use of cash collateral, the Court can authorize the debtor in possession to

22   use said collateral under section 363(c)(2)(B) of the Bankruptcy Code if the Court determines that

23   the debtor has provided "adequate protection" of the secured creditor's interest in the cash

24   collateral.

25       68.    Section 363(e) of the Bankruptcy Code provides that, "on request of an entity that

26   has an interest in property used . . . or proposed to be used . . . by [a debtor in possession], the

27   court, with or without a hearing, shall prohibit or condition such use ... as is necessary to provide

28   adequate protection of such interest."  11 U.S.C. § 363(e). Although the term "adequate

protection" is not explicitly defined by the Bankruptcy Code, section 361 of the Bankruptcy Code

provides that when adequate protection is required, it may be provided by:

> (1)    Requiring the trustee to make a cash payment or periodic cash payments to
> such entity, to the extent that the use under section 363 of this title . . . results in a
> decrease in the value of such entity's interest in such property;
>
> (2)    providing to such entity an additional or replacement lien to the extent that
> such . . . use . . . results in a decrease in the value of such entity's interest in such
> property; or
>
> (3)    granting such other relief as will result in the realizing by such entity of the
> indubitable equivalent in such entity's interest in such property.

69.    Neither section 361 nor any other provision of the Bankruptcy Code defines the

nature and extent of the "interest in property" of which a secured creditor is entitled to adequate

protection under section 361. However, the statute plainly provides that a qualifying interest

demands protection only to the extent that the use of the creditor's collateral will result in a

decrease in the "value of such entity's interest in such property."  11 U.S.C. §§ 361, 363(e); *see*

*First Fed. Bank of Cal. v. Weinstein* (*In re Weinstein*), 227 B.R. 284, 296 (B.A.P. 9th Cir. 1998);

*Paccom Leasing Corp. v. Deico Elecs., Inc.* (*In re Deico Elecs., Inc.*), 139 B.R. 945, 947 (B.A.P.

9th Cir. 1992); *G.E. Mortg. Corp. v. South Village, Inc.* (*In re South Village, Inc.*), 25 B.R. 987,

989–90 n.4 (Bankr. D. Utah 1982).

70.    The phrase "value of such entity's interest" was addressed by the Supreme Court

in the landmark decision, *United Savings Ass'n of Texas v. Timbers of Inwood Forest Associates,*

*Ltd.*, 484 U.S. 365 (1988).  For the meaning of "value of such entity's interest," the Supreme

Court was guided by section 506(a) of the Bankruptcy Code which defines a secured creditor's

claim: "The phase 'value of such creditor's interest in § 506(a) means the value of the collateral.'

We think the phrase 'value of such entity's interest' in § 361(1) and (2), when applied to secured

creditors means the same."  *Id.* at 630 (internal citations omitted).  *Timbers* instructs that a

secured creditor is entitled to adequate protection only against the diminution in the value of the

collateral securing the creditor's allowed secured claim.  Under *Timbers*, therefore, where the

value of the collateral is not diminishing by its use, sale, or lease, the creditor's interest is

1  adequately protected. This conclusion flows from the notion that the "value of such entity's

2  interests" is the equivalent to "value of the collateral."

3       71.    What constitutes adequate protection must be decided on a case-by-case basis. *See*

4  *Resolution Trust Corp. v. Swedeland Dev. Grp., Inc.* (*In re Swedeland Dev. Grp., Inc.*), 16 F.3d

5  552, 564 (3d Cir. 1994); *Mbank Dallas, N.A. v. O'Connor* (*In re O'Connor*), 808 F.2d 1393, 1396

6  (10th Cir. 1987); *Martin v. United States* (*In re Martin*), 761 F.2d 472 (8th Cir. 1985); *Shaw*

7  *Indus., Inc. v. First Nat'l Bank of Pa.* (*In re Shaw Indus., Inc.*), 300 B.R. 861, 865 (Bankr. W.D.

8  Pa. 2003); *In re Columbia Gas Sys, Inc.*, 146 B.R. 114 (Bankr. D. Del. 1992). The focus of the

9  requirement is to protect a secured creditor from diminution in the value of its interest in the

10  particular collateral during the period of use. *See Swedeland*, 16 F.3d at 564 ("[T]he whole

11  purpose of adequate protection for a creditor is to insure that the creditor receives the value for

12  which he bargained pre-bankruptcy.") (internal quotation omitted); *In re 495 Cent. Park Ave.*

13  *Corp.*, 136 B.R. 626, 636 (Bankr. S.D.N.Y. 1992); *In re Beker Indus. Corp.*, 58 B.R. 725, 736

14  (Bankr. S.D.N.Y. 1986).

15      **ii.**    **The Debtor Will Provide Adequate Protection to the Secured Creditors
Through the Granting of Replacement Liens**

16

17       72.    Because the Secured Creditors assert a lien on the Cash Collateral, as adequate

18  protection for the use of such Cash Collateral, the Debtor proposes to grant each of the Secured

19  Creditors effective immediately and without the necessity of the execution by the Debtor of any

20  financing statements or other documentation, in accordance with section 361(2) of the

21  Bankruptcy Code, a valid, perfected, enforceable and non-avoidable replacement lien on its

22  existing collateral and the proceeds thereof, including cash flow generated from operations

23  ("Postpetition Collateral"), but only if and to the extent that (i) the Secured Creditors' prepetition

24  security interests are valid, enforceable, properly perfected, and unavoidable, and (ii) the Debtor's

25  use of Cash Collateral results in a diminution of value of the Secured Creditors' collateral. Any

26  replacement lien would exclude causes of action arising under section 105, 506(c), 542, 543, 544,

27  545, 547, 548, 549, 550, 551, 552, and 553 of the Bankruptcy Code. Such replacement liens will

28  have the same relative priority with respect to the Postpetition Collateral as the Secured

    - 25 -

EMERGENCY MOTION OF DEBTOR AND
DEBTOR IN POSSESSION FOR USE OF
CASH COLLATERAL

1   Creditors' existing prepetition liens on the Existing Collateral.  Granting the Secured Creditors

2   replacement liens in the Postpetition Collateral to the extent of any diminution in value of each

3   Secured Creditor's Existing Collateral adequately protects each Secured Creditor's position by

4   giving it an ongoing interest in postpetition cash generated from its Existing Collateral.

5       **iii.     The Preservation and Enhancement of the Collateral Resulting from the
            Debtor's Ongoing Operations Affords Further Adequate Protection to the
6            Secured Creditors**

7           73.    Allowing the Debtor to use Cash Collateral to finance its ongoing provision of

8   services will preserve and enhance the Secured Creditors' existing collateral.  The value of the

9   Debtor's assets is enhanced by the value of the revenue generated by the Debtor as well as the

10  goodwill associated with the Debtor's business.  The Debtor's ability to maximize the value of its

11  assets is inextricably tied to maintaining the going concern value of the Debtor, which in turn is

12  dependent on having cash available to pay for operating expenses.  The Debtor is in the

13  healthcare business and without the continuity of services and an uninterrupted ability to operate,

14  the Debtor could face significant patient and employee loss, which would have an immediate and

15  devastating effect upon the Debtor's future revenues and opportunity for maximizing value

16  through a sale.  If the Debtor does not have access to cash to pay its operating expenses, even for

17  a short time, it would likely be forced to shut down and would be liquidated for far less than fair

18  value.  The use of Cash Collateral (including all cash existing on the Petition Date plus all

19  postpetition revenue generated) to provide the Debtor's services will not only preserve and

20  protect the value of the Secured Creditors' collateral generally—thus providing the Secured

21  Creditors with adequate protection of their interests— but also enhance and maximize the

22  potential recovery for all creditors of the estates.

23          74.    It is well established that a bankruptcy court, where possible, should resolve issues

24  presented to it in favor of maximizing the going value of the debtor's estate and reorganization

25  rather than force a piecemeal liquidation because the business cannot use cash or other property.

26  *See Bonner Mall P'ship v. U.S. Bancorp Mortg. Co.* (*In re Bonner Mall P'ship*), 2 F.3d 899, 915

27  (9th Cir. 1993) ("Chapter 11 has two major objectives: 1) to permit successful rehabilitation of

28  Debtor and 2) to maximize the value of the estate.") (citing *Toibb v. Raelloff*, 501 U.S. 157

1    (1991); *NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 527 (1984)); *In re Dynaco Corp.*, 162 B.R.

2    389 (Bankr. D.N.H. 1993); *Hoffman v. Portland Bank* (*In re Hoffman*), 51 B.R. 42, 47 (Bankr.

3    W.D. Ark. 1985); *A&B Heating & Air Conditioning, Inc. v. United States* (*In re A&B Heating &*

4    *Air Conditioning, Inc.*, 48 B.R. 401, 403-04 (Bankr. N.D. Fla. 1985); *In re Heatron, Inc.*, 6 B.R.

5    493, 496 (Bankr. W.D. Mo. 1980).  As the *Heatron* court stated in granting a debtor's motion to

6    use cash collateral:  "At the beginning of the reorganization process, the Court must work with

7    less evidence than might be desirable and should resolve issues in favor of the reorganization

8    where evidence is conflicting."  *Id*. at 496.

9        75.    In *Mbank Dallas, N.A. v. O'Connor* (*In re O'Connor*), 808 F.2d 1393, 1397–98

10    (10th Cir. 1987), the court summarized the foregoing principle as follows:

11            Because the ultimate benefit to be achieved by a successful
             reorganization inures to all the creditors of the estate, a fair
12            opportunity must be given to the Debtor to achieve that end. Thus,
             while interests of the secured creditor . . . are of concern to the
13            court, the interests of other creditors also have a bearing on whether
             the use of cash collateral should be permitted during the early
14            stages of the administration. The first effort of the court must be to
             insure the value of the collateral will be preserved. Yet, prior to
15            confirmation of a plan of reorganization, the test of that protection
             is not by the same measurements applied to the treatment of a
16            secured creditor in a proposed plan. In order to encourage the
             Debtor's efforts in the formative period prior to the proposal of
17            reorganization, the court must be flexible in applying the adequate
             protection standard.
18
      *Id*. at 1397-98.  This principle applies equally to efforts to realize the highest value through going
19
      concern value.
20
          76.    Applying the foregoing, courts have frequently allowed a debtor to use cash
21
      collateral in circumstances where such use would enhance or preserve the value of the collateral.
22
      Thus, for example, in *In re Stein*, 19 B.R. 458 (Bankr. E.D. Penn. 1982), the court allowed a
23
      debtor to use cash collateral even where the secured party was undersecured and had no cushion
24
      for protection.  The court in *Stein* found that the use of cash collateral, as here, was necessary to
25
      the continued operations of the debtor and the "creditor's secured position can only be enhanced
26
      by the continued operation of the [debtor's business]."  *Id*. at 460; *see also In re Pine Lake Vill.*
27

28

EMERGENCY MOTION OF DEBTOR AND
DEBTOR IN POSSESSION FOR USE OF
CASH COLLATERAL

*Apt. Co.*, 16 B.R. 750 (Bankr. S.D.N.Y. 1982) (debtor permitted to use cash collateral generated

from rental income to enhance value of real property and secured creditor's claim).

77.     The foregoing holdings arise from the more general principle discussed above that

a secured creditor is only entitled to adequate protection of the value of the collateral securing the

creditor's secured claim. *See Timbers*, 484 U.S. at 629-30. Where, as here, the continuation of

the debtor preserves the value of the creditor's collateral, the debtor's continued operations

constitute adequate protection of the secured creditor's interests in the collateral. Coupled with

the proposed replacement liens to the Secured Creditors and the Secured Creditors' consent, there

is no question that the Secured Creditors are adequately protected.

**E.**    **Emergency Relief and Interim Approval of Debtor's Use of Cash Collateral Should Be Granted**

78.     The authorization to use cash collateral pending a final hearing will preserve the

value of the Debtor's services to the community and its creditors only if authorization is granted

immediately. Section 363(c)(3) of the Bankruptcy Code and Bankruptcy Rule 4001(b)(2) require

the Court to schedule a cash collateral hearing in accordance with the needs of the debtor and

conduct a preliminary hearing for the purpose of authorizing the use of cash collateral to avoid

irreparable harm.

79.     The Motion and proposed Order thereon seek none of the provisions identified in

Local Bankruptcy Rule 4001-2(b).

80.     In the present case, emergency use of Cash Collateral by the Debtor, pending a

final hearing, is necessary to prevent irreparable harm to the Debtor. If there is any interruption

in the Debtor's operations, the Debtor's clients will suffer and the value of the Debtor's assets

will be significantly impaired to the serious detriment of the Debtor, its creditors, employees and

patients.

81.     On the other hand, the Secured Creditors will suffer little, if any, harm if interim

relief is granted. To the extent that a Secured Creditor has an interest in property of this estate

which is entitled to adequate protection, that interest is adequately protected by the preservation

EMERGENCY MOTION OF DEBTOR AND
DEBTOR IN POSSESSION FOR USE OF
CASH COLLATERAL

of the value of its collateral through the Debtor's continued business operations and the proposed

replacement liens.

82.   Moreover, as noted, the Secured Creditors have consented to the relief sought

herein by the Debtor.

**F.   Notice of This Motion Complies with This  Court's Notice Requirements and Is Appropriate**

83.   As required by the Local Bankruptcy Rules, the Debtor has provided Notice of the

Motion and the Motion itself on the Limited Notice Parties,[3] which include the United States

Trustee, the twenty largest unsecured creditors of the Debtor, all secured creditors whose

collateral includes cash collateral or whose lien(s) might be affected by the relief sought herein,

among others.  Pursuant to Local Bankruptcy Rule 9075-1(a)(4) and the Debtor's *Motion for

Order Setting An Expedited Hearing on First Day Pleadings and Related Relief*, service was

made by overnight, facsimile, personal service or other electronic means.

84.   Based upon the foregoing, and based on the existing exigent circumstances, the

Debtor respectfully requests that the Court find that no further notice is required for this

emergency Motion.

**V.**

**CONCLUSION**

WHEREFORE, for all the foregoing reasons, and such additional reasons as may be

addressed at the hearing on the Motion, the Debtor respectfully requests that this Court enter an

order, substantially in the form of the attached Exhibit B: (a) granting interim approval of the use

of Cash Collateral on an emergency basis, pending a final hearing, in accordance with the Budget;

(b) granting adequate protection to the Secured Creditors on an interim basis in the form of

replacement liens to the extent (i) that the Secured Creditors' prepetition security interests are

valid, enforceable, properly perfected, and unavoidable, and (ii) necessary to protect the Secured

Creditors from a diminution in value of their collateral; (c) scheduling and establishing deadlines

---

[3] The term Limited Notice Parties has the meaning given in the Debtor's *Emergency Motion for Order (I) Limiting Notice, (II) Establishing the Manner of Notice and (III) Granting Related Relief* filed concurrently herewith.

EMERGENCY MOTION OF DEBTOR AND
DEBTOR IN POSSESSION FOR USE OF
CASH COLLATERAL

1    regarding a final hearing on the Debtor's use of Cash Collateral; and (d) granting such other and

2    further relief as is just and proper under the circumstances.

3

4    Dated: March 25, 2011                   EVAN M. JONES
ANDREW M. PARLEN

5                                JENNIFER M. TAYLOR
EVAN T. PICKERING

6                                JAMIE OH
O'MELVENY & MYERS LLP

7

8                                By: _/s/ Andrew M. Parlen_

9                                    Andrew M. Parlen
Attorneys for Verdugo Mental Health,

10                                    Debtor and Debtor in Possession

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28