<u>**Exhibit A to Sale Order**</u>

**Amended and Restated Asset Sale Agreement**
**dated as of May 2, 2011 by and between**
**Verdugo Mental Health and Didi Hirsch Psychiatric Service**

See Attached

AMENDED AND RESTATED ASSET SALE AGREEMENT

Among

Verdugo Mental Health,

a California Non-Profit Public Benefit Corporation

and

Didi Hirsch Psychiatric Service,

a California Non-Profit Public Benefit Corporation

DATED:  May 2, 2011

SF1:817261.7

## AMENDED AND RESTATED ASSET SALE AGREEMENT

This Amended and Restated Asset Sale Agreement (the "**Agreement**") is made and entered into as of the 2nd day of May, 2011 (the "**Effective Date**") by and between VERDUGO MENTAL HEALTH, a California Non-Profit Public Benefit Corporation, dba VMHCare ("**Seller**"), on the one hand, and DIDI HIRSCH PSYCHIATRIC SERVICE, a California Non-Profit Public Benefit Corporation, dba Didi Hirsch Mental Health Services ("**Purchaser**"), on the other hand.

### R E C I T A L S:

A.    Seller engages in the business of delivering mental health services to the public through the operation of the mental health facility known as VMHCare located at 1540 E. Colorado Street, Glendale, California 91205-1514 (the "**Facility**").

B.    Purchaser desires to purchase from Seller, by assuming a portion of the debt owed by Seller to OSHPD, and Seller desires to sell to Purchaser substantially all of the assets owned by Seller and used with respect to the operation of the Facility, for the consideration and upon the terms and conditions contained in this Agreement.

C.    On March 25, 2011, Seller filed a voluntary petition for relief (the "**Petition**"), commencing a case (the "**Bankruptcy Case**") under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the Central District of California (the "**Bankruptcy Court**").

D.    Seller and Purchaser have previously entered into that certain Asset Sale Agreement dated March 31, 2011 (the "**Original Agreement**") and desire to amend and restate the Original Agreement as set forth herein.

E.    The Parties intend to effectuate the transactions contemplated by this Agreement through a sale of the Acquired Assets in the Bankruptcy Court, pursuant to section 363 of the Bankruptcy Code, free and clear of any security interest, lien, charge, mortgage, deed, assignment, pledge, hypothecation, claim, encumbrance, easement, restriction, or interest of another Person of any kind or nature (each a "**Lien**" and, collectively, "**Liens**") other than the Assumed Liens (as defined below).

NOW, THEREFORE, in consideration of the foregoing premises and the mutual promises and covenants contained in this Agreement, and for their mutual reliance, the parties hereto agree as follows:

### ARTICLE 1
### DEFINITIONS AND RULES OF CONSTRUCTION

1.1    <u>Definitions</u>.  The terms listed below are defined elsewhere in this Agreement and, for ease of reference, the section containing the definition of each such term is set forth opposite such term.

| Term | Section |
|------|---------|

Accounts Receivable ...................................................... § 2.1.2(c)
Acquired Assets ............................................................ § 2.1.1
Aggregate Damage ....................................................... § 2.11(a)
Agreement ................................................................... Preamble
Allocation ................................................................... § 2.2(b)
Assignment Election ..................................................... § 2.4
Assumed Contracts ...................................................... § 2.1.1(e)
Assumed Leases .......................................................... § 2.1.1(d)
Assumed Liens ............................................................ § 2.3.1(g)
Assumed Obligations .................................................... § 2.3.1
Bill of Sale ................................................................. § 2.8.1
Bankruptcy Case .......................................................... Recitals
Bankruptcy Code ......................................................... Recitals
Bankruptcy Court ........................................................ Recitals
Casualty Termination Notice .......................................... § 2.11(a)
Casualty Termination Notice Period ............................... § 2.11(a)
Client Records ............................................................. § 2.1.2(o)
Closing ...................................................................... § 2.5
Closing Date ............................................................... § 2.5
Contract and Lease Consents ........................................ § 3.5(d)
Cure Amount .............................................................. § 2.3.1(c)
Designation Deadline ................................................... § 2.4
Disapproval Notice ...................................................... § 9.10
DMH .......................................................................... § 8.5
Effective Date ............................................................. Preamble
Effective Time ............................................................ § 2.5
Environmental Laws ..................................................... § 3.5(c)
Environmental Permits ................................................. § 3.5(b)
Excluded Assets .......................................................... § 2.1.2
Excluded Contracts ...................................................... § 2.1.2(a)
Excluded Leases .......................................................... § 2.1.2(b)
Excluded Liabilities ..................................................... § 2.3.2
Facility ...................................................................... Recitals
Grant Deed ................................................................. § 2.8.2
Hazardous Substances .................................................. § 3.5(c)
Inventory .................................................................... § 2.1.1(g)
Licenses ..................................................................... § 2.1.1(c)
Liens ......................................................................... Recitals
Original Agreement ...................................................... Recitals
OSHPD ...................................................................... § 2.2(a)
Personal Property ........................................................ § 2.1.1(b)
Petition ...................................................................... Recitals
Prepaids ..................................................................... § 2.1.1(f)
Purchase Price ............................................................ § 2.2(a)
Purchaser ................................................................... Preamble
Real Property .............................................................. § 2.1.1(a)

| Term | Section |
|------|---------|
| Sale Motion | § 7.1(b) |
| Sale Order | § 7.1(b) |
| Seller | Preamble |
| Title Report | § 5.8 |
| Underlying Documents | § 5.8 |
| U.S. Bank | § 2.2(a) |

1.2    Certain Rules of Construction.

1.2.1    Any term defined herein in the singular form shall have a comparable meaning when used in the plural form and vice versa.

1.2.2    When used herein, the words "hereof," "herein" and "hereunder" and words of similar import shall refer to this Agreement as a whole and not to any particular provision of this Agreement.  References to the Preamble, Recitals, Sections, Schedules or Annexes shall refer respectively to the preamble, recitals, articles, sections, schedules or exhibits of this Agreement, unless otherwise expressly provided.

1.2.3    When used herein, the terms "include," "includes," and "including" are not limiting.

1.2.4    Unless the context requires otherwise, derivative forms of any term defined herein shall have a comparable meaning to that of such term.

1.2.5    When a Party's consent is required hereunder, such Party's consent may be granted or withheld in such Party's sole discretion, unless otherwise specified.

**ARTICLE 2**
**PURCHASE AND SALE OF ASSETS**

2.1    Acquired and Excluded Assets.

2.1.1    Acquired Assets.  On the Closing Date and subject to the terms and conditions of this Agreement, Seller shall sell, assign, transfer, convey and deliver to Purchaser, free and clear of all Liens other than the Assumed Liens, and Purchaser shall acquire, all of Seller's right, title and interest in and to only the following assets and properties, as such assets shall exist on the Closing Date with respect to the operation of the Facility, to the extent not included among the Excluded Assets, as existing on the Closing Date, such transfer being deemed to be effective at the Effective Time (collectively, the "**Acquired Assets**"):

(a)    all of the real property that is owned by Seller and used with respect to the operation of the Facility, including, without limitation, the real property that is described in **Schedule 2.1.1(a)** (such description to include a legal description and address), together with all buildings, improvements and fixtures located thereupon, and all landscaping, utility lines, roads, driveways, fences, parking areas, contiguous and adjacent entry rights, construction in progress, and all other improvements located

thereon and all rights, privileges and easements appurtenant to the foregoing (collectively, the "**Real Property**");

(b)     all of the tangible personal property owned by Seller and used by Seller in the operation of the Facility, including equipment, furniture, fixtures, machinery, vehicles, office furnishings, and leasehold improvements (the "**Personal Property**"), including the Personal Property described in **Schedule 2.1.1(b)**;

(c)     all of Seller's rights, to the extent assignable or transferable, to all licenses, permits, approvals, certificates of need, certificates of exemption, franchises, accreditations and registrations and other governmental licenses, permits or approvals issued to Seller for use in the operation of the Facility (the "**Licenses**"), including the Licenses described in **Schedule 2.1.1(c)**;

(d)     all of Seller's interest, to the extent assignable or transferable and subject to the payment by Purchaser of each Cure Amount with respect thereto, in and to all real property and personal property leases with respect to the operation of the Facility that have been designated by Purchaser as a lease to be assumed by Purchaser pursuant to Section 2.4 herein (the "**Assumed Leases**");

(e)     subject to Section 2.6, all of Seller's interest, to the extent assignable or transferable and subject to the payment by Purchaser of each Cure Amount with respect thereto, in and to all contracts and agreements (including, but not limited to, purchase orders) with respect to the operation of the Facility that have been designated by Purchaser as a contract to be assumed pursuant to Section 2.4 (the "**Assumed Contracts**");

(f)     all of those advance payments, prepayments, prepaid expenses, security deposits and the like which exist as of the Closing Date, which were made with respect to the operation of the Facility (the "**Prepaids**"), the current categories and amounts of which are set forth on **Schedule 2.1.1(f)**; *provided* that, for the avoidance of doubt, such advance payments, prepayments, prepaid expenses, security deposits and the like shall not include any amounts advanced to Seller in connection with any contract for provision of services by Seller;

(g)     all inventories of supplies, drugs, food, janitorial and office supplies and other disposables and consumables located at  the Facility or used with respect to the operation of the Facility (the "**Inventory**") which exist as of the Closing Date;

(h)     other than records of the type described in Section 2.1.2, all documents, records that are not proprietary to Seller, operating manuals, files and computer software with respect to the operation of the Facility, including all equipment records, construction plans, blueprints, and specifications, mechanical, electrical and plumbing drawings for the Facility and medical and administrative libraries;

(i)     to the extent assignable, all rights in all warranties of any manufacturer or vendor in connection with the Personal Property;

(j)    all goodwill of the Facility evidenced by the Acquired Assets;

(k)    Seller's website(s) together with certain content therein;

(l)    the telephone and facsimile numbers used with respect to the operation of the Facility;

(m)    the names and symbols of the Facility set forth on **Schedule 2.1.1(m)** except that Seller shall retain the limited right to use the names of the Facility for purposes of (i) administering the Bankruptcy Case, including complying with any applicable law, making any filings that are required or advisable to made with the Bankruptcy Court or any government agency, or communicating with the Bankruptcy Court, Seller's creditors, or government agencies, (ii) communicating with clients to the extent necessary or advisable to implement this Agreement and agreements ancillary hereto or to comply with requirements of applicable law, orders of the Bankruptcy Court, the Bankruptcy Code, or the Federal Rules of Bankruptcy Procedure, and (iii) as otherwise agreed to by Purchaser, in each case, through the earlier of (1) the date that the Bankruptcy Court enters a final decree in the Bankruptcy Case or (2) the date the Bankruptcy Case is converted to a case under chapter 7 of the Bankruptcy Code;

(n)    except as expressly excluded herein, all rights, claims and choses in action of Seller excluding all rights, claims and choses of action of Seller and its affiliates related to and/or arising out of the Accounts Receivable;

(o)    all claims, rights, interests and proceeds (whether received in cash or by credit to amounts otherwise due to a third party) with respect to amounts overpaid by Seller to any third party with respect to periods before the Effective Time (e.g. such overpaid amounts may be determined by billing audits undertaken by Purchaser or Purchaser's consultants);

(p)    any other assets of Seller with respect to the operation of the Facility (which are not otherwise specifically described in this Section) that are related to the operation of the Facility, including warranties made by third parties, and are not otherwise identified as an Excluded Asset in Section 2.1.2.

2.1.2    Excluded Assets.   Notwithstanding anything to the contrary in Section 2.1.1, Seller shall retain all assets owned directly or indirectly by it which are not among the Acquired Assets, including the following assets of Seller (collectively, the "**Excluded Assets**"):

(a)    all contracts that are not Assumed Contracts (the "**Excluded Contracts**");

(b)    all leases that are not Assumed Leases (the "**Excluded Leases**");

(c)    all receivables of Seller ("**Accounts Receivable**") and all rights, claims and choses of action of Seller and its affiliates related to and/or arising out of the Accounts Receivable;

(d)    the portions of Inventory, Prepaids and other assets disposed of, expended or canceled, as the case may be, by Seller after the Effective Date and before the Effective Time in the ordinary course of business;

(e)    all assets owned by vendors of services or goods to the Facility;

(f)    all claims, rights, interests and proceeds with respect to state or local tax refunds, if any, resulting from periods before the Effective Time, and the right to pursue appeals of same;

(g)    Seller's organizational or corporate record books and minute books;

(h)    all insurance proceeds arising in connection with the operation of the Seller's assets or the Facility before the Closing Date not assigned to or receivable by Purchaser under <u>Section 2.1.1</u> or otherwise in this Agreement;

(i)    all insurance proceeds arising in connection with the assets retained by the Seller after the Closing Date;

(j)    all unclaimed property of any third party as of the Closing Date, including, without limitation, property which is subject to applicable escheat laws;

(k)    all bank and deposit accounts of Seller, including accounts held in Seller's capacity as debtor-in-possession, and all cash and cash equivalents of Seller (whether or not held in bank or deposit accounts or trust or escrow accounts for the benefit of Seller);

(l)    all rights, claims and choses in action of Seller, other than as implicated in <u>Section 2.11</u>, with respect to periods before the Effective Time, and any payments, awards or other proceeds resulting therefrom;

(m)    all writings and other items that are protected from discovery by the attorney-client privilege, the attorney work product doctrine or any other cognizable privilege or protection;

(n)    all documents, records, operating manuals and film pertaining to the Facility which Seller is required by law to retain;

(o)    subject to <u>Section 2.6</u>, all medical, clinical, and other records directly associated with the care and treatment of Seller's clients ("**Client Records**");

(p)    the rights of Seller and its affiliates under this Agreement including the proceeds of the transactions contemplated by this Agreement;

(q)    any assets identified in **<u>Schedule 2.1.2(q)</u>**;

(r)    any claims under sections 502(d), 544, 545, 547, 548, 549, 550 and 553 of the Bankruptcy Code;

(s)      all Medicare Provider Numbers and agreements related thereto, including Medicare Enrollment Agreements;

(t)      any financial records; and

(u)      any personnel records.

For the avoidance of doubt, Seller contends that it does not have any rights or interests in Verdugo Mental Health Foundation or its assets (other than the right to appoint trustees or board members therefor), and it is the intent of the parties hereto that nothing in this Agreement shall be construed to implicate or affect the assets of Verdugo Mental Health Foundation.

2.2    Purchase Price.

(a)      Subject to the terms and conditions of this Agreement, the purchase price for the Acquired Assets is Five Million Dollars ($5,000,000.00) (the "**Purchase Price**") to be paid by Purchaser through the partial assumption of the debt owed by Seller to the Office of Statewide Health Planning and Development of the State of California ("**OSHPD**") and U.S. Bank National Association ("**U.S. Bank**") to the extent of the Purchase Price. Purchaser will enter into a new credit facility with OSHPD in an aggregate principal amount owing to OSHPD of Five Million Dollars ($5,000,000.00) to be secured by a lien on the Facility after the Closing.

(b)      Purchaser and Seller will allocate the Purchase Price among the Acquired Assets owned by Seller, in accordance with a schedule to be reasonably agreed upon by them before the Closing Date (the "**Allocation**"). If the parties are not able to agree upon the Allocation before the Closing Date, Purchaser's good faith allocation shall be the Allocation. The Allocation will be binding upon Purchaser and Seller and their respective successors and assigns. Purchaser and Seller will report the purchase and sale of the Acquired Assets on all tax returns, including, without limitation, Form 8594 as provided for in section 1060 of the Code, in accordance with the Allocation and will cooperate in timely filing with the Internal Revenue Service their respective Forms 8594.

2.3    Assumed Obligations and Excluded Liabilities.

2.3.1    Assumed Obligations.    On the Closing Date, Purchaser shall assume and agree to discharge, perform and satisfy fully, on and after the Effective Time, the following liabilities and obligations of Seller and only the following liabilities and obligations (collectively, the "**Assumed Obligations**"):

(a)      the Assumed Contracts and all liabilities of Seller under the Assumed Contracts, but only to the extent of the obligations arising thereunder with respect to events or periods on and after the Effective Time;

(b)      the Assumed Leases and all liabilities of Seller under the Assumed Leases, but only to the extent of the obligations arising thereunder with respect to events or periods on and after the Effective Time;

(c)      the amount, if any, that is necessary to be paid to cure any existing default under each Assumed Contract and each Assumed Lease as of the Closing Date as set forth on **Schedule 2.3.1(c)** (the "**Cure Amounts**");

(d)      all unpaid real and personal property taxes, if any, that are attributable to the Acquired Assets on and after the Effective Time;

(e)      all utilities being furnished to the Acquired Assets after the Effective Time;

(f)      the debt owed by Seller to OSHPD and U.S. Bank in the amount of the Purchase Price in accordance with Section 2.2;

(g)      the liens against the Facility in favor of OSHPD and U.S Bank, N.A. to the extent of the Purchase Price (the "**Assumed Liens**"); and

(h)      any other obligations and liabilities identified in **Schedule 2.3.1(h)**;

(i)      all liabilities with respect to the Acquired Assets arising after the Effective Time; and

(j)      all liabilities with respect to Client Records to the extent provided in Section 2.6.

2.3.2   Excluded Liabilities.   Notwithstanding anything to the contrary in Section 2.3.1, Purchaser shall not assume or become responsible for any of Seller's duties, obligations or liabilities that are not assumed by Purchaser pursuant to the terms of this Agreement, the Bills of Sale or the Real Estate Assignment(s) (the "**Excluded Liabilities**"), and Seller shall remain fully and solely responsible for all of Seller's debts, liabilities, contract obligations, expenses, obligations and claims of any nature whatsoever related to the Acquired Assets or the Facility unless assumed by Purchaser under this Agreement, in the Bill of Sale or in the Real Estate Assignment(s).  The Excluded Liabilities shall include:

(a)      any liabilities of Seller with respect to the operation of the Facility before the Effective Time that are not otherwise specifically included in the Assumed Obligations;

(b)      all liabilities of Seller arising out of or relating to any act, omission, event or occurrence connected with the use, ownership or operation by Seller of the Facility or any of the Acquired Assets before the Effective Time, other than as specifically included in the Assumed Obligations;

(c)      all liabilities of Seller in connection with claims of professional malpractice to the extent arising out of or relating to acts, omissions, events or occurrences before the Effective Time;

(d)      all liabilities of Seller to its present and former employees arising before the Effective Time, including unpaid wages, vacation or sick leave, and Seller's share of

contributions for eligible beneficiaries' 401(k) plans, 403(b) plans, section 125 plans and all administrative costs associated with such welfare benefit plans;

(e)    all liabilities of Seller for violations of any law, regulation or rule to the extent arising from acts or omissions of Seller, including those pertaining to Medicare and Medi-Cal fraud or abuse, and any and all liability or obligation, including claims of offset or recoupment, audit demands, or adverse findings, related to the Seller's performance or reporting of Seller's contracts with DMH or similar payor entities, and errors or oversights in connection with such performance or reporting;

(f)    all liabilities of Seller under the Excluded Contracts and under any contract that is among the Excluded Assets;

(g)    all liabilities of Seller under the Excluded Leases and under any contract that is among the Excluded Assets;

(h)    all liabilities of Seller for commissions or fees owed to any finder or broker in connection with the transactions contemplated hereunder;

(i)    all liabilities of Seller to the extent arising from (i) any Client Records concerning clients of Seller who have not expressly authorized in writing the transfer of such Client Records to Purchaser or (ii) the maintenance or other use of any Client Records prior to the Effective Time;

(j)    all liabilities of Seller, if any, for any non-accrued employee benefits; and

(k)    all liabilities of Seller and of any remaining employees to the extent incurred or arising after the Effective Time.

2.4    <u>Designation of Assumed Contracts and Assumed Leases</u>.  No later than April 13, 2011 (the "**Designation Deadline**"), Purchaser shall designate by written notice to Seller (such notice to be signed and dated by Purchaser) each of the contracts and leases to which Seller is a party that Purchaser elects to have assigned to it as an Assumed Contract or an Assumed Lease as of the Effective Time (each, an "**Assignment Election**").  Purchaser and Seller shall use reasonable commercial efforts to cause each of the contracts and leases for which Purchaser delivers an Assignment Election before the Designation Deadline to be assumed and assigned to Purchaser; *provided* that, in the case of a contract or lease that can be assigned under applicable law only with consent of third parties thereto, any failure to obtain such consent (the "**Contract and Lease Consents**") shall not constitute a breach of or failure to satisfy a condition under this Agreement.  Except for those contracts and leases identified in an Assignment Election, Purchaser shall not assume any leases or contracts.

2.5    <u>Closing Date</u>.  The consummation of the transactions contemplated by this Agreement (the "**Closing**") shall take place at 9:00 a.m. local time on May 20, 2011, at the office of counsel to Purchaser, or such other date, time and place prior to May 25, 2011 or as the parties shall mutually agree ("**Closing Date**"), subject to the completion on or before the Closing Date of all conditions precedent and other matters required to be completed as of the Closing Date. The Closing with respect to the Facility shall be deemed to have occurred and to be effective as

between the parties as of 12:00.01 a.m. Pacific time on the day after the Closing Date (the "**Effective Time**"), meaning that Seller will own, manage and operate the Facility until immediately before the Effective Time, and Purchaser will take possession of, own and operate the Facility beginning at the Effective Time.

2.6    Client Records.  Seller and Purchaser recognize that the Client Records may be confidential under applicable California and federal laws, and may not be released to any third party except as provided by law.  The Acquired Assets shall not include any Client Records, and no portion of the Purchase Price is in consideration of Client Records; provided, however, that Seller shall use commercially reasonable efforts to notify its clients of the transaction described in this Agreement and provide its clients with the opportunity either to authorize the transfer of their Client Records to Purchaser or request an alternative disposition, and Seller shall transfer to Purchaser all Client Records for which Seller has received an express written authorization from the applicable clients to transfer such Client Records to Purchaser.  Upon the delivery of any Client Record to Purchaser at the time Purchaser takes possession of the Facility or otherwise upon the mailing or personal delivery of any Client Record to Purchaser, such Client Record shall be deemed transferred to Purchaser, Purchaser shall assume any liabilities arising after the time of such transfer related to such Client Record, and the Debtor shall be deemed to have no further responsibility for or right in or to such Client Record and shall not retain any copies of such Client Record or portion thereof.  Seller will retain control, custody, and possession of any Client Records concerning clients of Seller who have not expressly authorized in writing the transfer of such Client Records to Purchaser.  Notwithstanding anything in this Agreement to the contrary, in no event shall the Assumed Contracts include any Client Records or other personal information of clients in the event that the applicable client has not expressly authorized in writing the transfer of such Client Record or personal information to Purchaser.

2.7    Reserved.

2.8    Items to be Delivered by Seller at Closing.  At or before the Closing, Seller shall deliver to Purchaser the following, duly executed by Seller where appropriate:

2.8.1    General Assignment, Bill of Sale and Assumption of Liabilities in substantially the form of Exhibit A attached hereto (the "**Bill of Sale**"), and any other documents reasonably requested by Purchaser so as to convey to Purchaser title, free and clear of all Liens other than the Assumed Liens, all of Seller's right, title and interest in and to the Acquired Assets;

2.8.2    Grant Deed(s) in substantially the form of Exhibit B attached hereto (the "**Grant Deed**");

2.8.3    evidence, reasonably satisfactory to Purchaser, that Seller has (i) provided any required notice of the transaction described in this Agreement to the Attorney General for the State of California, and (ii) obtained any required consent of the Attorney General for the State of California to the transaction described in this Agreement or a waiver to the requirement to obtain such consent;

2.8.4    a certificate of an officer of Seller certifying to Purchaser that to Seller's knowledge, as of the Closing Date, (a) there are no facts except as specifically disclosed in writing in such certificate which would cause Seller to be in material breach of its representations and warranties under this Agreement, (b) Seller is in compliance with Seller's covenants set forth in this Agreement and (c) that all of the conditions contained in <u>ARTICLE 8</u> have been satisfied except those, if any, waived in writing by Seller;

2.8.5    a certificate of the corporate secretary or other officer of Seller certifying to Purchaser (i) the incumbency of the officers of Seller on the Effective Date and on the Closing Date and bearing the authentic signatures of all such officers who shall execute this Agreement and any additional documents contemplated by this Agreement and (ii) the due adoption and text of the resolutions of (A) the Board of Directors of Seller authorizing (I) the transfer of the Acquired Assets and Assumed Obligations by Seller, as applicable, to Purchaser and (II) the due execution, delivery and performance of this Agreement and all ancillary documents and instruments by Seller, as applicable, and that such resolutions have not been amended or rescinded and remain in full force and effect on the Closing Date;

2.8.6    a copy of the Sale Order; and

2.8.7    such other instruments, certificates, consents or other documents which are reasonably necessary to carry out the transactions contemplated by this Agreement and to comply with the terms hereof.

2.9    <u>Items to be Delivered by Purchaser at Closing</u>.   At or before the Closing, Purchaser shall execute and deliver or cause to be delivered to Seller the following, duly executed by Purchaser where appropriate:

2.9.1    a certificate of an officer of Purchaser certifying to Seller (a) compliance with Purchaser's covenants set forth in this Agreement, (b) that Purchaser has obtained all material licenses, permits and authorizations from governmental agencies or governmental bodies that are necessary or required for completion of the transactions contemplated by this Agreement and (c) that all of the conditions contained in <u>ARTICLE 9</u> have been satisfied except those, if any, waived in writing by Purchaser;

2.9.2    a certificate of the Secretary of Purchaser certifying to Seller (a) the incumbency of the officers of Purchaser on the Effective Date and on the Closing Date and bearing the authentic signatures of all such officers who shall execute this Agreement and any additional documents contemplated by this Agreement and (b) the due adoption and text of the resolutions of the Board of Directors of Purchaser authorizing the execution, delivery and performance of this Agreement and all ancillary documents and instruments by Purchaser, and that such resolutions have not been amended or rescinded and remain in full force and effect on the Closing Date;

2.9.3    favorable original certificate of good standing, or comparable status, of Purchaser, issued by the state of California, dated no earlier than a date which is seven (7) calendar days before the Closing Date;

2.9.4    such other instruments, certificates, consents or other documents which are reasonably necessary to carry out the transactions contemplated by this Agreement and to comply with the terms hereof; and

2.9.5    an agreement or agreements reflecting the assumption by Purchaser of the obligation to pay the Purchase Price to OSHPD as set forth in <u>Section 2.3.1(e)</u>.

2.10    <u>Disclaimer of Warranties; Release</u>.

(a)    Except as expressly set forth in <u>ARTICLE 3</u> hereof, the Acquired Assets transferred to Purchaser will be sold by Seller and purchased by Purchaser in their physical condition at the Effective Time, "AS IS, WHERE IS AND WITH ALL FAULTS AND NONCOMPLIANCE WITH LAWS" WITH NO WARRANTY OF HABITABILITY OR FITNESS FOR HABITATION, with respect to the Real Property, including, without limitation, the land, the buildings and the improvements, and fixtures, and WITH NO WARRANTIES, INCLUDING, WITHOUT LIMITATION, THE WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE, with respect to the physical condition of the Real Property, the Personal Property and the Inventory, any and all of which warranties (both express and implied) Seller hereby disclaims.  All of the foregoing real and personal property shall be further subject to normal wear and tear on the land, buildings, improvements and equipment and normal and customary use of the Inventory and supplies in the ordinary course of business up to the Effective Time.  Nothing in this Agreement shall limit the transfer to Purchaser of warranties or guaranties made by third parties in connection with the Facility or the Acquired Assets before the Effective Time, including, but not limited to, for construction or equipment.

(b)    Purchaser acknowledges that Purchaser has examined, reviewed and inspected all matters which in Purchaser's judgment bear upon Seller's assets and their value and suitability for Purchaser's purposes and, except as affirmatively represented and warranted by Seller, is relying solely on its own examination, review and inspection of Seller's assets and Assumed Obligations.  Except to the extent of any representation made by Seller herein, Purchaser releases Seller from all responsibility and liability regarding the condition, valuation, salability or utility of Seller's assets, or their suitability for any purpose whatsoever.

2.11    <u>Risk of Loss</u>.  The risk of loss or damage to any of the Acquired Assets, the Personal Property, the Real Property, the Facility and all other property, transfer of which is contemplated by this Agreement, shall remain with Seller until the Effective Time and Seller shall maintain such insurance policies of Seller as are in effect at the Effective Date, or comparable policies of insurance or self-insurance covering the Acquired Assets, the Facility and all other property through the Effective Time.

(a)    If, after the Effective Date but before the Closing, all or any part of the Real Property is destroyed or damaged by fire, earthquake or the elements or by any other cause where the cost to repair such damage or destruction is in the aggregate (the "**Aggregate Damage**") less than or equal to fifteen percent (15%) of the Purchase Price as determined by replacement value, the parties' duties and obligations under this Agreement shall not be affected and the Closing shall proceed as scheduled; *provided, however,* Purchaser shall become entitled

to any and all insurance proceeds and other or similar third party recompense on accounts of such damage or destruction. If, after the Effective Date but before the Closing, all or any part of the Real Property is destroyed or damaged by fire, earthquake or the elements or by any other cause where the Aggregate Damage exceeds fifteen percent (15%) of the Purchase Price as determined by replacement value, then either of Seller or Purchaser, in the exercise of its respective sole discretion, may elect to terminate this Agreement by written notice to the other (the "**Casualty Termination Notice**") delivered after the date which is fifteen (15) calendar days after the occurrence of such damage or destruction but no later than the date which is thirty (30) calendar days after the occurrence of such damage or destruction (the "**Casualty Termination Notice Period**"). If Purchaser and Seller are unable to agree upon the amount of the Aggregate Damage by the earlier to occur of (I) the originally scheduled Closing Date or (II) the inception of the Casualty Termination Notice Period, the parties agree that the Bankruptcy Court shall determine the amount of the Aggregate Damage.

(b)    With respect to any Acquired Assets other than the Real Property that are destroyed or damaged by fire, earthquake or the elements or by any other cause after the Effective Date but before the Closing, Purchaser will be entitled to receive any and all insurance proceeds and other or similar third party recompense for such destruction or damage. Notwithstanding anything in this Agreement to the contrary, if such damage to the Acquired Assets other than the Real Property is greater than fifteen percent (15%) of the Purchase Price as determined by replacement value, then either of Seller or Purchaser, in the exercise of its respective sole discretion, may elect to terminate this Agreement by written notice to the other.

(c)    If, after the Effective Date but before the Closing, all or any part of a parcel of the Real Property is made subject to an eminent domain proceeding which would, in Purchaser's reasonable judgment, materially adversely impair access to the Real Property or be materially adverse to the operation of the Facility, Purchaser may elect to (i) purchase such affected Real Property and the Closing shall proceed as scheduled (*provided, however,* at the Closing, Seller shall assign, transfer and set over to Purchaser all of Seller's right, title and interest in and to any award in such eminent domain proceeding) or (ii) elect to terminate this Agreement by written notice to Seller within three business days of the date on which Purchaser received notice of such proceeding.

## ARTICLE 3

## REPRESENTATIONS AND WARRANTIES OF SELLER

As an inducement to Purchaser to enter into this Agreement and to consummate the transactions contemplated by this Agreement, Seller hereby represents, warrants and covenants to Purchaser as to the following matters, except as disclosed in the disclosure schedule as of the Effective Date, as may be amended pursuant to the terms of this Agreement (the "**Disclosure Schedule**") (**Schedule 3**) hereby delivered by Seller to Purchaser:

3.1    Authorization.    Seller has all necessary power and authority to enter into this Agreement and to carry out the transactions contemplated hereby, subject to the parties satisfying the terms and conditions of the required prior, written approval of the California Attorney General and the Sale Order of the Bankruptcy Court.

3.2    <u>Binding Agreement</u>.  All actions required to be taken by Seller to authorize the execution, delivery and performance of this Agreement, all documents executed by Seller which are necessary to give effect to this Agreement, and all transactions contemplated hereby, have been duly and properly taken or obtained by Seller.  No other corporate or other action on the part of Seller is necessary to authorize the execution, delivery and performance of this Agreement, all documents necessary to give effect to this Agreement and all transactions contemplated hereby.  This Agreement has been duly and validly executed and delivered by Seller and, assuming due and valid execution by Purchaser, this Agreement constitutes a valid and binding obligation of Seller enforceable in accordance with its terms subject to (a) applicable bankruptcy, reorganization, insolvency, moratorium and other laws affecting creditors' rights generally from time to time in effect and (b) limitations on the enforcement of equitable remedies.

3.3    <u>Organization and Good Standing; No Violation</u>.  Seller is a public benefit corporation duly organized, validly existing and in good standing under the laws of the State of California.  Seller has all necessary power and authority to own, operate and lease its properties and to carry on its businesses as now conducted.

3.4    <u>Compliance with Laws Regarding Condition of Facility</u>.  Except as set forth in **Schedule 3.4**, to Seller's knowledge, Seller has not been charged in writing with or been given written notice of, and is not under investigation with respect to, any violation of, or any obligation to take remedial action under, any applicable (i) law, statute, ordinance, rule, regulation, policy or guideline promulgated, or (ii) order, judgment or decree entered, by any federal, state, local or foreign court or governmental authority relating to the physical condition of the Facility or its physical suitability as a workplace or mental healthcare facility.  Notwithstanding the foregoing, no provision of this Section 3.4 shall be deemed a representation or warranty by Seller as to compliance with any Environmental Laws.

3.5    <u>Compliance With Environmental Laws</u>.

(a)    To Seller's knowledge, Seller's ownership and operation of the Facility and the Acquired Assets are and have been in compliance with all Environmental Laws, except where the failure to be in such compliance would not have a material adverse effect on the Acquired Assets or the business of the Facility.  To Seller's knowledge, Seller has obtained all material licenses, permits and approvals necessary or required under all applicable Environmental Laws (the "**Environmental Permits**") for the ownership and operation of the Facility and the Acquired Assets.  All such Environmental Permits are in effect and, to Seller's knowledge, no action to revoke or modify any of such Environmental Permits is pending. There is not now pending or, to Seller's knowledge, threatened, any claim, investigation or enforcement action by any governmental authority (whether judicial, executive or administrative) concerning Seller's potential liability under Environmental Laws in connection with the ownership or operation of the Facility or the Acquired Assets.  To Seller's knowledge, there has not been a release or threatened release of any Hazardous Substance at, upon, in, under or from the Facility or the Acquired Assets at any time.  To Seller's knowledge, no portion of the Real Property has been used as a dump or landfill or a storage, recycling or disposal facility for any Hazardous Substance, other than for the storage and disposal of medical waste in connection with the ordinary course operation of the Facility.

(b)    For the purposes of this Agreement, the term "**Environmental Laws**" shall mean all state, federal or local laws, ordinances, codes or regulations relating to Hazardous Substances or to the protection of the environment, including, without limitation, laws and regulations relating to the storage, treatment and disposal of medical and biological waste.  For purposes of this Agreement, the term "**Hazardous Substances**" shall mean (i) any hazardous or toxic waste, substance, or material defined as such in (or for the purposes of) any Environmental Laws, (ii) asbestos-containing material, (iii) medical and biological waste, (iv) polychlorinated biphenyls, (v) petroleum products, including gasoline, fuel oil, crude oil and other various constituents of such products, and (vi) any other chemicals, materials or substances, exposure to which is prohibited, limited or regulated by any Environmental Laws.

3.6    <u>Title; All Assets</u>.

(a)    Seller has good and marketable fee simple title to the Real Property, subject to the matters set forth in <u>Section 3.6(b)</u>.  Seller has good and valid title to the Personal Property, which individually or in the aggregate is material to the condition (financial or otherwise), operations or the business of the Facility.

(b)    The Real Property and the Personal Property is held by Seller free and clear of all liens, pledges, claims, charges, security interests or other encumbrances, and is not, in the case of the Real Property, subject to any rights-of-way, building or use restrictions, exceptions, variances, reservations or limitations of any nature whatsoever except for those liens, pledges, claims, charges, security interests or other encumbrances identified in the preliminary title report issued by First American Title Insurance Company on April 10, 2011.  None of the Real Property is subject to a pending, or to Seller's knowledge threatened, condemnation or similar proceeding.

(c)    The Inventory with respect to the Facility is, and at the Closing Date will be, maintained in such quantities as is consistent with Seller's historical practices, subject to Seller's need to draw down Inventory as a result of financial difficulties that have led to its need to commence bankruptcy proceedings and any impact on the Facility's ability to purchase Inventory from vendors during the bankruptcy proceedings.

(d)    The Acquired Assets and the Excluded Assets comprise substantially all of the property and assets used in the conduct of the operations of the Facility.  The Real Property comprises all of the real property used in the conduct of the operations of the Facility.

3.7    <u>Insurance</u>.  Seller maintains, and has maintained, without interruption, at all times during Seller's ownership of the Facility, self-insurance or policies or binders of insurance covering such risks and events, including personal injury, property damage, malpractice, workers' compensation, directors' and officers' and general liability, to provide adequate and sufficient insurance coverage for all the assets and operations of the Facility.  **Schedule 3.7** contains a list of all such insurance maintained by Seller with respect to the operation of the Facility as of the Effective Date.

3.8    <u>Seller Knowledge</u>.  References in this Agreement to "Seller's knowledge", "knowledge of Seller" or the "best knowledge of Seller" or words of substantially similar import,

mean the actual then current knowledge of the Chief Executive Officer of Seller as of the Closing, without any research, investigation or inquiry.  No constructive or imputed knowledge shall be attributed to any such individual by virtue of any position held, relationship to any other Person or for any other reason.

## ARTICLE 4

## REPRESENTATIONS AND WARRANTIES OF PURCHASER

As an inducement to Seller to enter into this Agreement and to consummate the transactions contemplated by this Agreement, Purchaser hereby represents, warrants and covenants to Seller as to the following matters as of the Effective Date and, except as otherwise provided herein, shall be deemed to remake all of the following representations, warranties and covenants as of the Closing Date:

4.1    <u>Authorization</u>.    Purchaser has full power and authority to enter into this Agreement and have full power and authority to perform their obligations hereunder and to carry out the transactions contemplated hereby.

4.2    <u>Binding Agreement</u>.  All legal and other actions required to be taken by Purchaser to authorize the execution, delivery and performance of this Agreement, all documents executed by Purchaser which are necessary to give effect to this Agreement, and all transactions contemplated hereby, have been duly and properly taken or obtained by Purchaser.  Except as otherwise provided above, no other legal or other action on the part of Purchaser is necessary to authorize the execution, delivery and performance of this Agreement, all documents necessary to give effect to this Agreement and all transactions contemplated hereby.  This Agreement has been duly and validly executed and delivered by Purchaser and, assuming due and valid execution by Seller, this Agreement constitutes a valid and binding obligation of Purchaser enforceable in accordance with its terms subject to (a) applicable bankruptcy, reorganization, insolvency, moratorium and other laws affecting creditors' rights generally from time to time in effect and (b) limitations on the enforcement of equitable remedies.

4.3    <u>Organization and Good Standing</u>.  Purchaser is a public benefit corporation duly organized, validly existing and in good standing under the laws of the State of California, is duly authorized to transact business in the State of California, and has full power and authority to own, operate and lease their properties and to carry on their businesses as now conducted.

4.4    <u>No Violation</u>.  Except as set forth in **Schedule 4.4**, neither the execution and delivery by Purchaser of this Agreement nor the consummation of the transactions contemplated hereby nor compliance with any of the material provisions hereof by Purchaser will (a) violate, conflict with or result in a breach of any material provision of the Articles of Incorporation, Bylaws or other organizational documents of Purchaser or any contract, lease or other instrument by which Purchaser are bound; (b) require any approval or consent of, or filing with, any governmental agency or authority, (c) violate any law, rule, regulation, or ordinance to which Purchaser is or may be subject, (d) violate any judgment, order or decree of any court or other governmental agency or authority to which Purchaser is subject.

4.5    <u>Representations of Seller</u>.    Purchaser acknowledge that it is purchasing the Acquired Assets on an "AS IS, WHERE IS" basis, and that Purchaser is not relying on any representation or warranty (expressed or implied, oral or otherwise) made on behalf of Seller other than as expressly set forth in this Agreement.  Purchaser further acknowledges that Seller is not making any representations or warranties herein relating to the operation of the Facility on and after the Effective Time.

4.6    <u>Legal Proceedings</u>.    Except as described on **<u>Schedule 4.6</u>**, there are no claims, proceedings or investigations pending or, to the best knowledge of Purchaser, threatened relating to or affecting Purchaser or any affiliate of Purchaser before any court or governmental body (whether judicial, executive or administrative) in which an adverse determination would materially adversely affect the properties, business condition (financial or otherwise) of Purchaser or which would adversely affect Purchaser's ability to consummate the transactions contemplated hereby.    Purchaser is not subject to any judgment, order, decree or other governmental restriction specifically (as distinct from generically) applicable to Purchaser which materially adversely affects the condition (financial or otherwise), operations or business of Purchaser or which would adversely affect Purchaser's ability to consummate the transactions contemplated hereby.

4.7    <u>No Knowledge of Seller's Breach</u>.    Purchaser has no knowledge of any breach of any representation or warranty by Seller or of any other condition or circumstance that would excuse Purchaser from its timely performance of their obligations hereunder.  If information comes to Purchaser's attention on or before the Closing Date (whether through Seller or otherwise, including through updated schedules, and whether before or after the Effective Date) which would excuse Purchaser from its timely performance of its obligations hereunder, Purchaser must immediately notify Seller on or before the Closing Date.

4.8    <u>Purchaser Knowledge</u>.    References in this Agreement to "Purchaser's knowledge or "the best knowledge of Purchaser's or words of substantially similar import means the actual then current knowledge of the Chief Executive Officer and Vice President of Finance and Administration of Purchaser, without any research, investigation or inquiry. No constructive or imputed knowledge shall be attributed to any such individual by virtue of any position held, relationship to any other Person or for any other reason.

## ARTICLE 5

## COVENANTS OF SELLER

5.1    <u>Access and Information; Inspections</u>.    From the Effective Date through the Effective Time, (a) Seller shall afford to the officers and agents of Purchaser (which shall include accountants, attorneys, bankers and other consultants and authorized agents of Purchaser) reasonably full and complete access during normal business hours upon reasonable prior request to and the right to inspect the plants, properties, books, accounts, records and all other relevant documents and information with respect to the assets, liabilities and business of the Facility, and (b) Seller shall furnish Purchaser with such additional financial and operating data and other information in Seller's possession as to businesses and properties of the Facility as Purchaser or its representatives may from time to time reasonably request, without regard to where such

information may be located.  Purchaser's right of access and inspection shall be exercised in such a manner as not to interfere unreasonably with the operations of the Facility.  Such access may include consultations with the personnel of Seller.  After the Effective Time, Seller shall afford to the officers and agents of Purchaser reasonably full and complete access upon reasonable prior request to, and the right to inspect or copy, all financial records with respect to the operation of the Facility.  Notwithstanding anything in this Section 5.1 to the contrary, Seller shall not be required to provide Purchaser with access to any Client Record or other protected health information unless specifically authorized to provide such access by the relevant client.

5.2    Conduct of Business.  On and after the Effective Date and before the Effective Time, and except as otherwise consented to or approved by an authorized officer of Purchaser, required by this Agreement, required or necessary in connection with Seller's bankruptcy proceedings, or occasioned by Seller's bankruptcy proceedings, Seller shall, with respect to the operation of the Facility:

(a)    carry on its businesses with respect to the operation of the Facility in substantially the same manner as presently conducted and not make any material adverse change in operations, finance, accounting policies (unless Seller is required to adopt such changes under this Agreement, for example, with respect to requesting direction from clients concerning the disposition of Client Records), or real or personal property;

(b)    maintain the Facility and all parts thereof and all other Acquired Assets, including its electronic billing and records system, in operating condition in a manner consistent with past practices, ordinary wear and tear excepted, inclusive of substitutions and retirements in the ordinary course of business;

(c)    perform all of its material obligations under the Assumed Contracts and Assumed Leases, *provided, however* that Seller may be, as of the Effective Date, in material breach under such contracts or other material contracts and Seller has no obligation to cure such breaches or defaults unless in the context of assuming and assigning contracts under the terms of this Agreement or in the Bankruptcy Court;

(d)    keep in full force and effect insurance coverage consistent with past practices;

(e)    use its reasonable efforts to maintain and preserve its business organization intact, and maintain its respective relationships with employees, clients, and others having business relationships with the Facility; and

(f)    use its reasonable efforts to effect the assignment of all contracts related to its electronic billing and records system to Purchaser.

5.3    Negative Covenants.  From the Effective Date until the Effective Time, with respect to the operation of the Facility, Seller shall not, without the prior written consent of Purchaser or except as may be required by law or required or necessary in connection with Seller's bankruptcy proceedings:

18

(a)    create, assume or permit to exist any new debt, mortgage, deed of trust, pledge or other material lien or encumbrance upon any of the Acquired Assets;

(b)    acquire (whether by purchase or lease) or sell, assign, lease, or otherwise transfer or dispose of any property, plant or equipment, except in the ordinary course of business consistent with historical practices;

(c)    except with respect to previously budgeted expenditures, purchase capital assets or incur costs in respect of material construction in progress;

(d)    take any action outside the ordinary course of business that would have a material adverse effect on the Acquired Assets or the Facility, except at Seller's discretion in connection with the rejection of executory contracts in proceedings before the Bankruptcy Court; or

(e)    materially reduce Inventory except in the ordinary course of business, subject to Seller's need to draw down Inventory as a result of financial difficulties that have led to its need to commence bankruptcy proceedings and any impact on Seller's ability to purchase Inventory from vendors during the bankruptcy proceedings.

For purposes of this Section 5.3, Seller shall be deemed to have obtained Purchaser's prior written consent to undertake the actions otherwise prohibited by this Section 5.3 if Seller gives Purchaser written notice of a proposed action and Seller does not receive from Purchaser a written notice of objection to such action within five (5) business days after Purchaser receives Seller's written notice. Notwithstanding any provision to the contrary contained in this Agreement, neither Section 5.2 nor this Section 5.3 shall be construed to prohibit Seller from engaging in any act which Seller reasonably believes is necessary to preserve and protect the condition or continued operations of the Facility, to comply with contractual obligations or the requirements of governmental or regulatory authorities, or to comply with requirements under the Bankruptcy Code or of the Bankruptcy Court. Seller shall give Purchaser prompt written notice subsequent to taking any act described in the immediately preceding sentence.

5.4    Cooperation. Seller shall reasonably cooperate with Purchaser and its authorized representatives and attorneys:  (a) in Purchaser's efforts to obtain all consents, approvals, authorizations, clearances and licenses required to carry out the transactions contemplated by this Agreement (including, without limitation, those of governmental and regulatory authorities) or which Purchaser reasonably deems necessary or appropriate, (b) in the preparation of any document or other material which may be required by any governmental agency as a predicate to or result of the transactions contemplated in this Agreement, and (c) in Purchaser's efforts to effectuate the assignment of Assumed Contracts to Purchaser as of the Closing Date.

5.5    Additional Financial Information. Upon Purchaser's reasonable request, Seller shall deliver to Purchaser complete copies of the unaudited balance sheet and related unaudited statements of income or costs relating to Seller with respect to the operation of the Facility.

5.6    Disclosure of Cure Amounts. By no later than April 6, 2011, Seller shall provide Purchaser with a list of executory contracts and unexpired leases of Seller, setting forth the Cure Amounts anticipated by Seller to be owing as of May 13, 2011.

5.7    Seller's Efforts to Close.  Seller shall use its reasonable commercial efforts to satisfy all of the conditions precedent set forth in ARTICLE 8 and ARTICLE 9 to its or Purchaser's obligations under this Agreement to the extent that Seller's action or inaction can control or influence the satisfaction of such conditions.

5.8    Title Matters.  By no later than fourteen days before the Closing Date, Seller shall provide Purchaser with a copy of a preliminary title report with respect to the Real Property (the "**Title Report**"), issued by a title company to be selected by mutual agreement, together with true, correct and legible (or, if not legible, the best available) copies of all instruments referred to therein as conditions or exceptions to title (the "**Underlying Documents**").

5.9    Termination of Employees.  Seller shall terminate, effective as of the Effective Time, all of its employees other than those Seller reasonably deems necessary, including for the winding down of its operations, consummation of the transactions contemplated under this Agreement, and carrying out its duties as a debtor in possession under the Bankruptcy Code or any order of the Bankruptcy Court.

5.10    Required Governmental Approvals.    Except as otherwise set forth in this Agreement, Seller (a) will use its reasonable efforts to secure such consents, approvals (or exemptions therefrom) and authorizations from governmental and regulatory authorities as are necessary to enable Seller lawfully to sell the Acquired Assets to Purchaser, (b) will reasonably cooperate with Purchaser in Purchaser's efforts to obtain such consents, approvals (or exemptions therefrom) and authorizations from governmental and regulatory authorities as are necessary to enable Purchaser to operate the Facility after the Effective Time, and (c) will provide such information and communications to governmental and regulatory authorities as Purchaser or such authorities may reasonably request.

5.11    Insurance.  Seller shall purchase a one-year extended reporting period endorsement ("reporting tail coverage") under Seller's existing directors' and officers' liability insurance and professional negligence coverage, provided that such reporting tail coverage shall extend the relevant liability coverage in force as of the date hereof from the Closing Date on terms that in all material respects are no less advantageous to the intended beneficiaries thereof than the existing liability insurance.

## ARTICLE 6

## COVENANTS OF PURCHASER

6.1    Purchaser's Efforts to Close.  Purchaser shall use its reasonable commercial efforts to satisfy all of the conditions precedent set forth in ARTICLE 8 and ARTICLE 9 to its or Seller's obligations under this Agreement to the extent that Purchaser's action or inaction can control or influence the satisfaction of such conditions.

6.2    Required Governmental Approvals.  Purchaser (a) shall use its best efforts to secure, as promptly as practicable before the Closing Date, all consents, approvals (or exemptions therefrom), authorizations, clearances and licenses required to be obtained from governmental and regulatory authorities in order to carry out the transactions contemplated by

this Agreement and to cause all of its covenants and agreements to be performed, satisfied and fulfilled, and (b) will provide such other information and communications to governmental and regulatory authorities as Seller or such authorities may reasonably request.  Purchaser shall be entitled, but not obligated, to obtain Contract and Lease Consents.

6.3    Excluded Assets.  As soon as practicable after the Closing Date, Purchaser shall deliver to Seller or Seller's designee any Excluded Assets found at the Facility on and after the Effective Time, without imposing any charge on Seller for Purchaser's storage or holding of same on and after the Effective Time.

6.4    Waiver of Bulk Sales Law Compliance.  Purchaser hereby waives compliance by Seller with the requirements, if any, of Article 6 of the Uniform Commercial Code as in force in any state in which the Acquired Assets are located and all other similar laws applicable to bulk sales and transfers.

6.5    Cure Amount.  At Closing and pursuant to Section 365 of the Bankruptcy Code, Seller shall assume and assign to Purchaser and Purchaser shall assume from Seller, the Assumed Contracts.  The Cure Amounts, as determined by the Bankruptcy Court, if any, necessary to cure all defaults, if any, and to pay all actual or pecuniary losses that have resulted from such defaults under the Assumed Contracts shall be paid by Purchaser, on or before Closing, and not by Seller, and Seller shall have no liability therefor.

## ARTICLE 7

## SELLER'S BANKRUPTCY AND BANKRUPTCY COURT APPROVAL

7.1    Bankruptcy Court Approval.

(a)    Seller and Purchaser acknowledge that this Agreement and the sale of the Acquired Assets and the assumption and assignment of the Assumed Contracts and Assumed Leases are subject to Bankruptcy Court approval.

(b)    No later than March 31, 2011, Seller shall file a motion pursuant to section 363 of title 11 of the United States Code seeking approval of this Agreement ("**Sale Motion**") and shall exercise good faith and use reasonable efforts to obtain entry of the Sale Order.  For purposes of this Agreement, the term "**Sale Order**" shall mean an order of the Bankruptcy Court authorizing the sale of the Acquired Assets (including the assumption and assignment of the Assumed Contracts and Assumed Leases) to Purchaser free and clear of Liens other than the Assumed Liens consistent with this Agreement and in a form satisfactory to Purchaser.

(c)    Seller agrees to proceed in good faith to obtain, and Purchaser agrees to cooperate in good faith with Seller to obtain, Bankruptcy Court approval of the sale contemplated herein with a determination that Purchaser is in good faith pursuant to Bankruptcy Code section 363(m) and to file such declarations and other evidence as may be required to support a finding of good faith.

(d)    From and after the Effective Date and before the Closing or the termination of this Agreement, Seller shall not take any action which is intended to (or is

reasonably likely to), or fail to take any action the intent (or the reasonably likely result) of which failure to act is to, result in the reversal, voiding, modification or staying of this Agreement.

      7.2    <u>Appeal of Sale Order</u>.

      In the event an appeal is taken or a stay pending appeal is requested from the Sale Order, Seller shall immediately notify Purchaser of such appeal or stay request and shall provide to Purchaser promptly a copy of the related notice of appeal or order of stay.  Seller shall also provide Purchaser with written notice of any motion or application filed in connection with any appeal from either of such orders.

# ARTICLE 8

## CONDITIONS PRECEDENT TO OBLIGATIONS OF SELLER

      Seller's obligation to sell the Acquired Assets and to close the transactions as contemplated by this Agreement shall be subject to the satisfaction of each of the following conditions on or before the Closing Date unless specifically waived in writing by Seller in whole or in part at or before the Closing:

      8.1    <u>Signing and Delivery of Instruments</u>.  Purchaser shall have executed and delivered all documents, instruments and certificates required to be executed and delivered pursuant to the provisions of this Agreement.

      8.2    <u>No Restraints</u>.  No temporary restraining order, preliminary or permanent injunction or other order preventing the consummation of the transactions contemplated in this Agreement shall have been issued by any court of competent jurisdiction or any other governmental body and shall remain in effect on the Closing Date, and further, no governmental entity shall have commenced any action or suit before any court of competent jurisdiction or other governmental authority that seeks to restrain or prohibit the consummation of the transactions contemplated hereby.

      8.3    <u>Performance of Covenants</u>.  Purchaser shall have in all respects performed or complied with each and all of the obligations, covenants, agreements and conditions required to be performed or complied with by it on or before the Closing Date.

      8.4    <u>Board Approval</u>.  Seller's Board of Directors shall have approved the transactions contemplated by this Agreement.

      8.5    <u>Department of Mental Health Approval</u>.  The Department of Mental Health for the County of Los Angeles ("**DMH**") shall have approved the transactions contemplated by this Agreement.

      8.6    <u>Bankruptcy Court Approval</u>.  The Bankruptcy Court shall have entered the Sale Order, such order shall contain an express finding of good faith under Bankruptcy Code section 363(m), and such order shall be in full effect and unstayed.

# ARTICLE 9

## CONDITIONS PRECEDENT TO OBLIGATIONS OF PURCHASER

Purchaser's obligation to purchase the Acquired Assets and to close the transactions contemplated by this Agreement shall be subject to the satisfaction of each of the following conditions on or before the Closing Date unless specifically waived in writing by Purchaser in whole or in part at or before the Closing.

9.1     Governmental Authorizations.    Purchaser shall have obtained licenses, permits and authorizations from governmental agencies or governmental bodies that are required for operation of the Facility, except in such case where failure to obtain such license, permit or authorizations from a governmental agency or governmental body does not have a material adverse effect.    Seller shall have obtained the written consent of the California Attorney General to the transactions contemplated in this Agreement.

9.2     Bankruptcy Court Approval.    The Bankruptcy Court shall have entered the Sale Order and made a finding that Purchaser is a "good faith" purchaser under section 363(m) of the Bankruptcy Code, and such order shall be in full effect and unstayed.

9.3     DMH Sole Source Contract. DMH shall have amended its contract with Purchaser to account for the services that Purchaser will render at the Facility, or otherwise entered into the equivalent of a sole source contract for the provision of services at the Facility, on terms acceptable to Purchaser in its sole discretion.

9.4     OSHPD Refinancing. OSHPD and Purchaser shall have entered into an agreement or agreements providing for the assumption of the obligations owed by Seller to OSHPD and U.S. Bank in the amount of, and the Assumed Liens to the extent of, the Purchase Price consistent with this Agreement on terms acceptable to Purchaser in its sole discretion.

9.5     Signing and Delivery of Instruments.    Seller shall have executed and delivered all documents, instruments and certificates required to be executed and delivered pursuant to all of the provisions of this Agreement.

9.6     Performance of Covenants.    Seller shall have in all material respects performed or complied with each and all of the obligations, covenants, agreements and conditions required to be performed or complied with by Seller on or before the Closing Date.

9.7     No Restraints.    No temporary restraining order, preliminary or permanent injunction or other order preventing the consummation of the transactions contemplated in this Agreement shall have been issued by any court of competent jurisdiction or any governmental body and shall remain in effect on the Closing Date, and further, no governmental entity shall have commenced any action or suit before any court of competent jurisdiction or other governmental authority that seeks to restrain or prohibit the consummation of the transactions contemplated hereby.

9.8     Title Contingency. Purchaser shall have seven days from the receipt of the Preliminary Report and the Underlying Documents to provide notice to Seller of any exception

to title reasonably disapproved by Purchaser (a "**Disapproval Notice**").  In the event that, at or before the Closing, Seller fails to remove or otherwise address to Purchaser's reasonable satisfaction any exception to title set forth in a timely Disapproval Notice, this contingency will be deemed unsatisfied, and Purchaser may terminate this Agreement by no later than the Closing Date.  Notwithstanding anything to the contrary herein, the inclusion in a timely Disapproval Notice of any exception to title of which the Real Property shall be sold free and clear pursuant to the Sale Order shall not entitle the Purchaser to terminate this Agreement.

9.9    <u>Irreplaceable Contracts and Leases</u>.  The Cure Amount, with respect to any individual Assumed Contract that is essential to the operation of the Facility and for which there is no reasonably acceptable alternative provider of the goods or services provided thereunder, shall not exceed $3,000 for such Assumed Contract.

## ARTICLE 10

## <u>TERMINATION</u>

10.1    <u>Termination</u>.  This Agreement may be terminated at any time before Closing:

(a)    by the mutual written consent of the parties;

(b)    by Seller if a material breach of this Agreement has been committed by Purchaser and such breach has not been (i) waived in writing by Seller or (ii) cured by Purchaser to the reasonable satisfaction of Seller within fifteen (15) business days after service by Seller upon Purchaser of a written notice which describes the nature of such breach; *provided, however,* Seller shall not be permitted to terminate this Agreement pursuant to this <u>Section 10.1(b)</u> if such material breach was caused by Seller or if Seller is also in material breach of this Agreement;

(c)    by Purchaser if a material breach of this Agreement has been committed by Seller and such breach has not been (i) waived in writing by Purchaser or (ii) cured by Seller to the reasonable satisfaction of Purchaser within fifteen (15) business days after service by Purchaser upon Seller of a written notice which describes the nature of such breach; *provided, however,* Purchaser shall not be permitted to terminate this Agreement pursuant to this <u>Section 10.1(c)</u> if such material breach was caused by Purchaser or if Purchaser is also in material breach of this Agreement;

(d)    by Purchaser if any of the conditions in <u>ARTICLE 9</u> have not been satisfied as of the Closing Date and Purchaser has not waived such condition in writing on or before the Closing Date (provided that the failure to satisfy the applicable condition or conditions has occurred by reason other than (i) through the failure of Purchaser to comply with its obligations under this Agreement or (ii) Seller's failure to provide its closing deliveries on the Closing Date as a result of Purchaser not being ready, willing and able to close the transaction on the Closing Date);

(e)    by Seller if any of the conditions in <u>ARTICLE 8</u> have not been satisfied as of the Closing Date and Seller has not waived such condition in writing on or before the Closing Date (provided that the failure to satisfy the applicable condition or conditions has occurred by reason other than (i)  through the failure of Seller to comply with its obligations under this

Agreement or (ii) Purchaser's failure to provide its closing deliveries on the Closing Date as a result of Seller not being ready, willing and able to close the transaction on the Closing Date);

   (f) by either Purchaser or Seller if the Bankruptcy Court enters an order dismissing the Bankruptcy Case or rejects, pursuant to a final order, approval the sale of the Acquired Assets to Purchaser; or

   (g) by Purchaser or Seller, upon the delivery of a Casualty Termination Notice in accordance with Section 2.11(a).

  10.2 <u>Termination Consequences</u>.  If this Agreement is terminated for any reason under <u>Article 10</u>, each party shall pay the costs and expenses incurred by it in connection with this Agreement.

## ARTICLE 11

## MISCELLANEOUS PROVISIONS

  11.1 <u>Further Assurances and Cooperation</u>.  Seller shall execute, acknowledge and deliver to Purchaser any and all other assignments, consents, approvals, conveyances, assurances, documents and instruments reasonably requested by Purchaser at any time and shall take any and all other actions reasonably requested by Purchaser at any time for the purpose of more effectively assigning, transferring, granting, conveying and confirming to Purchaser, the Acquired Assets.  After consummation of the transaction contemplated in this Agreement, the parties agree to cooperate with each other and take such further actions as may be necessary or appropriate to effectuate, carry out and comply with all of the terms of this Agreement, the documents referred to in this Agreement and the transactions contemplated hereby.

  11.2 <u>Successors and Assigns</u>.  All of the terms and provisions of this Agreement shall be binding upon and shall inure to the benefit of and be enforceable by the respective successors and assigns of the parties hereto; *provided, however,* that no party hereto may assign any of its rights or delegate any of its duties under this Agreement without the prior written consent of the other parties.

  11.3 <u>Governing Law; Venue</u>.  This Agreement shall be governed by and construed and enforced in accordance with title 11 of the United States Code and the laws of the State of California as applied to contracts made and performed within the State of California. The parties hereby waive their right to claim in any proceeding involving this Agreement that the law of any jurisdiction other than the State of California shall apply to such dispute.  Any proceeding which arises out of or relates in any way to the subject matter of this Agreement shall be brought in the Bankruptcy Court.

  11.4 <u>Amendments</u>.  This Agreement may not be amended other than by written instrument signed by the parties hereto.

  11.5 <u>Exhibits, Schedules and Disclosure Schedule</u>.  All exhibits and schedules referred to in this Agreement shall be attached hereto and are incorporated by reference herein. From the Effective Date until the Closing, the parties agree that Seller may update any schedule

as necessary upon written notice to Purchaser, which update shall be acceptable to Purchaser in its reasonable discretion.  Notwithstanding the foregoing, should any exhibit or schedule not be completed and attached hereto as of the Effective Date, Seller and Purchaser shall promptly negotiate in good faith any such exhibit or schedule, which exhibit or schedule must be acceptable to each of Seller and Purchaser in their reasonable discretion before being attached hereto.

      11.6      <u>Publicity</u>.  Before the Closing Date, Seller and Purchaser shall consult with each other as to the form and substance of any press release or other public disclosure materially related to this Agreement or the transactions contemplated hereby and each shall have the right to review and comment on the other's press releases before issuance; provided, however, that nothing in this <u>Section 11.6</u> shall be deemed to prohibit either Seller or Purchaser from making any disclosure it deems necessary to comply with its legal obligations, its obligations under this Agreement, its ability to satisfy the closing conditions, and/or Seller's obligations under the Bankruptcy Code.

      11.7      <u>Notices</u>.  Any notice, demand or communication required, permitted, or desired to be given hereunder shall be deemed effectively given when personally delivered, when received by telegraphic or other electronic means (including facsimile) or overnight courier, or five (5) calendar days after being deposited in the United States mail, with postage prepaid thereon, certified or registered mail, return receipt requested, addressed as follows:

| | |
|---|---|
| If to Seller before the Effective Time: | Verdugo Mental Health<br>1540 East Colorado Street<br>Glendale, CA  91205<br>Attention: William J. Smith, Psy.D, MBA |
| With a copies to:<br>(which copies shall<br>not constitute notice) | O'Melveny & Myers LLP<br>400 South Hope Street<br>Los Angeles, CA 90071<br>Attention: Andrew M. Parlen<br>Facsimile: (213) 430-6407 |
| If to Seller at or after the Effective Time: | Verdugo Mental Health<br>P.O. Box 6061-479<br>Sherman Oaks, CA 91413<br>Attention: William J. Smith, Psy.D, MBA |
| With a copies to:<br>(which copies shall<br>not constitute notice) | O'Melveny & Myers LLP<br>400 South Hope Street<br>Los Angeles, CA 90071<br>Attention: Andrew M. Parlen<br>Facsimile: (213) 430-6407 |
| If to Purchaser: | Didi Hirsch Mental Health Services |

SF1:817261.7

<table>
<tr><td></td><td>Kita S. Curry, Ph.D.<br>President/CEO<br>4760 S. Sepulveda Boulevard<br>Culver City, CA 90230<br>Facsimile: (310) 390-2852</td></tr>
<tr><td>With a copy to:<br>(which copy shall<br>not constitute notice)</td><td>Stutman, Treister & Glatt PC<br>1901 Avenue of the Stars, 12th Floor<br>Los Angeles, California 90067<br>Attention: Alex Fisch<br>Facsimile No.: (310) 228-5788</td></tr>
</table>

or at such other address as one party may designate by notice hereunder to the other parties.

11.8     Headings.  The section and other headings contained in this Agreement and in the Disclosure Schedule, exhibits and schedules to this Agreement are included for the purpose of convenient reference only and shall not restrict, amplify, modify or otherwise affect in any way the meaning or interpretation of this Agreement or the Disclosure Schedule, exhibits and schedules hereto.

11.9     Fair Meaning.  This Agreement shall be construed according to its fair meaning and as if prepared by all parties hereto.

11.10     Third Party Beneficiary.  None of the provisions contained in this Agreement are intended by the parties, nor shall they be deemed, to confer any benefit on any person not a party to this Agreement.

11.11     Expenses and Attorneys' Fees.  Except as otherwise provided in this Agreement, each party shall bear and pay its own costs and expenses relating to the preparation of this Agreement and to the transactions contemplated by, or the performance of or compliance with any condition or covenant set forth in, this Agreement, including without limitation, the disbursements and fees of their respective attorneys, accountants, advisors, agents and other representatives, incidental to the preparation and carrying out of this Agreement, whether or not the transactions contemplated hereby are consummated.  The parties expressly agree that (a) any sales, transfer, documentary transfer and similar taxes, fees, surcharges and the like in connection with the sale of the Acquired Assets shall be borne by Purchaser to the extent of $5,000 and by Seller for any amount in excess thereof; and (b) Purchaser shall bear any recording fees or similar charges in connection with the sale of the Acquired Assets.  If any action is brought by any party to enforce any provision of this Agreement, the prevailing party shall be entitled to recover its court costs and reasonable attorneys' fees.

11.12     Counterparts.  This Agreement may be executed in any number of counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same Agreement, binding on all of the parties hereto.  The parties agree that facsimile copies of signatures shall be deemed originals for all purposes hereof and that a party may produce such copies, without the need to produce original signatures, to prove the existence of this Agreement in any proceeding brought hereunder.

11.13    Entire Agreement.  This Agreement, the Disclosure Schedule, the exhibits and schedules, and the documents referred to in this Agreement contain the entire understanding between the parties with respect to the transactions contemplated hereby and supersede all prior or contemporaneous agreements, understandings, representations and statements, oral or written, between the parties on the subject matter hereof (the "**Superseded Agreements**"), which Superseded Agreements shall be of no further force or effect.

11.14    No Waiver.  Any term, covenant or condition of this Agreement may be waived at any time by the party which is entitled to the benefit thereof but only by a written notice signed by the party expressly waiving such term or condition.  The subsequent acceptance of performance hereunder by a party shall not be deemed to be a waiver of any preceding breach by any other party of any term, covenant or condition of this Agreement, other than the failure of such other party to perform the particular duties so accepted, regardless of the accepting party's knowledge of such preceding breach at the time of acceptance of such performance.  The waiver of any term, covenant or condition shall not be construed as a waiver of any other term, covenant or condition of this Agreement.

11.15    Severability.  If any term, provision, condition or covenant of this Agreement or the application thereof to any party or circumstance shall be held to be invalid or unenforceable to any extent in any jurisdiction, then the remainder of this Agreement and the application of such term, provision, condition or covenant in any other jurisdiction or to persons or circumstances other than those as to whom or which it is held to be invalid or unenforceable, shall not be affected thereby, and each term, provision, condition and covenant of this Agreement shall be valid and enforceable to the fullest extent permitted by law.

11.16    Time is of the Essence.  Time is of the essence for all dates and time periods set forth in this Agreement and each performance called for in this Agreement.

*[REMAINDER OF PAGE IS BLANK]*

IN WITNESS WHEREOF, this Agreement has been entered into as of the day and year first above written.

**PURCHASER:**

**DIDI HIRSCH PSYCHIATRIC SERVICE**

By: _____

Name:  John McGann

Title:  Vice President of Finance and Administration

*Signature Page to Asset Sale Agreement*

**SELLER:**

**VERDUGO MENTAL HEALTH**

By:

Name:  William J. Smith, Psy.D., MBA
Title:   Chief Executive Officer

SF1:817261.7

*Signature Page to Asset Sale Agreement*

**LIST OF SCHEDULES**

| SCHEDULE | DESCRIPTION |
|---|---|

Those disclosures provided in the Disclosure Schedule; and

| | |
|---|---|
| 2.1.1(a) | Real Property |
| 2.1.1(b) | Personal Property |
| 2.1.1(c) | Licenses |
| 2.1.1(f) | Prepaids |
| 2.1.1(m) | Names |
| 2.1.2(q) | Excluded Assets |
| 2.3.1(c) | Cure Amounts |
| 2.3.1(h) | Obligations and Liabilities |
| 3.4 | Compliance with Laws Regarding Condition of Facility |
| 3.7 | Insurance |
| 4.4 | No Violation |
| 4.6 | Legal Proceedings |

## LIST OF EXHIBITS

| EXHIBIT | DESCRIPTION |
|---------|-------------|
| A | Bill of Sale |
| B | Grant Deed |

## Schedule 2.1.1(a)

## Real Property

The real property is located at 1540 East Colorado Street, Glendale, CA 91205.  The legal description is as follows:

Parcel 1:

Lots 23, 24 and 25 of Eagle Dale, in the City of Glendale, County of Los Angeles, State of California, as per Map recorded in Book 16 Page 185 of Maps, in the Office of the County Recorder of said county.

Except the northerly 105 feet of said land.

Parcel 2:

The northerly 105 feet of Lots 23, 24, and 25 of Eagle Dale, in the City of Glendale, County of Los Angeles, State of California, as per Map recorded in Book 16, Page 185 of Maps, in the Office of the County Recorder of said county.

Also except the westerly 40 feet of the northerly 105 feet of said Lot 23.

Parcel 3:

The east 53 feet of the northerly 105 feet of Lot 25 of Eagle Dale, in the City of Glendale, County of Los Angeles, State of California, as per Map recorded in Book 16, Page 185 of Maps, in the Office of the County Recorder of said county.

Parcel 4:

The northerly 105 feet of the westerly 40 feet of Lot 23 of Eagle Dale, in the City of Glendale, County of Los Angeles, State of California, as per Map recorded in Book 16, Page 185 of Maps, in the Office of the County Recorder of said county.

Parcel 5:

The east 80 feet of that portion of Lot 71 of Watts Subdivision, in the City of Glendale, County of Los Angeles, State of California, as per Map recorded in Book 5, Page(s) 200 & 201 of Miscellaneous Records, in the Office of the County Recorder of said county, lying north of a line parallel with and distant southerly 145 feet, measured along the east line of said Lot, from the south line of Colorado Boulevard, 80 feet wide as established by condemnation in Case No. 118998, Superior Court, in the Office of the County Recorder of said county.

**Schedule 2.1.1(b)**

**Personal Property**

| ITEM | NUMBER |
|------|--------|
| Computers & accessories | 38 |
| Printers | 39 |
| Fax machines | 4 |
| Copiers | 2 |
| Television | 4 |
| DVD Player | 3 |
| VCR | 2 |
| TV/VCR Combo | 3 |
| Digital Projectors | 2 |
| Overhead Projector | 1 |
| Projector Screen | 1 |
| Desks | 45 |
| Cubicles | 32 |
| Chairs | 312 |
| Tables | 71 |
| Bookcases | 36 |
| Cabinets | 2 |
| Filing Cabinets | 47 |
| Sofa | 4 |
| Refrigerator | 6 |
| Microwave | 5 |
| Dishwasher | 3 |
| Benches | 7 |
| Foosball Table | 1 |

### Schedule 2.1.1(c)

**Licenses**

City of Glendale Fire Clearance and Occupancy Permit

### Schedule 2.1.1(f)

**Prepaids**

| Description | Amount |
|---|---|
| PAETEC (telephone system and cable deposit) | $2,075.00 |
| Verizon Wireless (cell phone deposit) | $310.00 |
| AT&T (voicemail deposit) | $16.69 |
| C.W. Communication (answering service deposit) | $143.90 |
| Village Domain (web hosting deposit) | $64.00 |
| City of Glendale Water & Power (electric, water and sewer deposit) | $1,735.57 |
| The Gas Company (gas deposit) | $161.25 |
| Waste Management of Sun Valley (waste removal deposit) | $191.21 |

## Schedule 2.1.1(m)

### Names

Verdugo Mental Health
Verdugo Mental Health Center
VMHCare
The Glen Roberts Child Study Center
Positive Directions

**<u>Schedule 2.1.2(q)</u>**

**Excluded Assets**

LocumTenens.com deposit for temporary psychiatrist in the amount of $15,000.00

**Schedule 2.3.1(c)**

**Cure Amounts**

| Type of Contract | Non-Debtor Counterparty | Cure Amount |
|---|---|---|
| Master Maintenance Agreement dated December 2, 2008 | Amtech Elevator Services | $0.00 |
| Lease Contract Number 250-0048977 dated as of April 17, 2010, as modified by the Extension Agreement dated April 2, 2010 | Chrysler Financial Services Americas, LLC | $435.05 |
| License Agreement | Exym, Inc. | $0.00 |
| Preventative Maintenance Agreement dated as of November 21, 2008 | Integrated Mechanical Systems Inc. | $162.50 |
| Business Internet, Video and Music Service Agreement; Commercial Account Right of Entry Agreement | Marcus Cable Associates, L.L.C. (dba Charter Business) | $0.00 |
| Lease agreement | Verdugo Clinic Pharmacy | $0.00 |

**<u>Schedule 2.3.1(h)</u>**

**Obligations and Liabilities**

None

## Schedule 3.4

### Compliance with Laws Regarding Condition of Facility

None

**Schedule 3.7**

**Insurance**

| Carrier/Policy # | Coverage | Policy Term | Annual Premium |
|---|---|---|---|
| **Philadelphia Insurance Companies** | | | |
| **PHSD541253** | **Directors and Officers Protection** | **7/30/2010 - 7/30/11** | **$10,071.00** |
| **PHPK649164** | **Commercial Line Policy** | **12/06/2010 - 12/06/2011** | |
| | Commercial Property Coverage | | $9,065.00 |
| | Commercial General Liability | | $4,420.00 |
| | Commercial Crime Coverage | | $542.00 |
| | Commercial Inland Marine Coverage | | $402.00 |
| | Commercial Auto Coverage | | $2,351.80 |
| | Professional Liability | | $74,354.00 |
| | Federal Terrorism Risk Insurance Act Coverage | | $86.00 |
| | Fees and Surcharges | | $1.80 |
| | **Total:** | | **$91,134.80** |
| **PHUB326811** | **Commercial Excess Umbrella Liability** | **12/06/2010 - 12/06/2011** | |
| | Automobile, Building, Employee Dishonesty, Professional, and General Liability | | **$11,323.00** |
| **State Compensation Insurance Fund** | **Workers' Compensation Policy** | **4/1/2011- 4/1/2012** | **$21,555.00** |

## **Schedule 4.4**

**No Violation**

To be provided by Purchaser

## <u>Schedule 4.6</u>

### Legal Proceedings

To be provided by Purchaser

**<u>Exhibit A</u>**
**Bill of Sale**

See Attached

## BILL OF SALE

This Bill Of Sale ("**Bill of Sale**"), dated as of May __, 2011, is executed and delivered by VERDUGO MENTAL HEALTH, a California non-profit public benefit corporation (the "Seller"), to DIDI HIRSCH PSYCHIATRIC SERVICE, a California non-profit public benefit corporation, dba Didi Hirsch Mental Health Services (the "**Purchaser**").

All capitalized words and terms used in this Bill of Sale and not defined herein shall have the respective meanings ascribed to them in the Amended and Restated Asset Sale Agreement, dated as of May __, 2011, by and among Seller and Purchaser (the "**Sale Agreement**").

## RECITALS

WHEREAS, pursuant to the Sale Agreement, Seller has agreed to sell, transfer, convey, assign and deliver to Purchaser the Acquired Assets.

NOW, THEREFORE, for and in consideration of the consideration set forth in the Sale Agreement, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Seller hereby covenants and agrees as follows:

1.  <u>Conveyance of Assets</u>.  Seller, on behalf of itself, its successors and assigns, hereby sells, transfers, conveys, assigns and delivers to Purchaser, its successors and assigns, to have and to hold forever, free and clear of all Liens other than the Assumed Liens as provided in the Sale Agreement, all of the Acquired Assets.

2.  <u>Further Assurances</u>.  Seller agrees to duly execute and deliver or cause to be delivered all instruments of title, sale, conveyance, transfer and assignment, and all notices, releases, acquittances and other and other documents, and to do and cause to be done all such further acts that may be necessary to more fully grant, convey, transfer, assign and deliver to and vest in Purchaser all right and title in the Acquired Assets hereby granted, conveyed, transferred, assigned and delivered.  Purchaser agrees to duly execute and deliver or cause to be executed and delivered all instruments of delegation, assumption and release, and all notices, acknowledgements, releases, acquittances and other documents, and to do and cause to be done all such further acts that may be necessary more fully to evidence Purchaser's assumption of the Acquired Assets and to release Seller from same.

3.  <u>Conflict</u>.  Nothing in this Bill of Sale, modifies, supercedes, expands or extinguishes any of the obligations, agreements, covenants or warranties of the Seller contained in the Sale Agreement.  If any conflict exists between this Bill of Sale and the Sale Agreement, the terms of the Sale Agreement shall govern and control.

4.  <u>Miscellaneous</u>.  The provisions of <u>Sections 11.2</u> (Successors and Assigns), <u>11.3</u> (Governing Law; Venue), <u>11.4</u> (Amendments), <u>11.7</u> (Notices), <u>11.8</u> (Headings), <u>11.9</u> (Fair Meaning), <u>11.10</u> (Third Party Beneficiary), <u>11.11</u> (Expenses and Attorneys' Fees), <u>11.12</u> (Counterparts), <u>11.13</u> (Entire Agreement), <u>11.14</u> (No Waiver), and <u>11.15</u> (Severability) of the Sale Agreement are hereby incorporated by reference as if set forth in full herein, *mutatis mutandis*.

[Signature Page Follows]

1

IN WITNESS WHEREOF, Seller has caused this instrument to be duly executed as of the date first above written.

SELLER:

VERDUGO MENTAL HEALTH,
a California non-profit public benefit
corporation

By:_____
Name:  William J. Smith
Title: Chief Executive Officer

## **<u>Exhibit B</u>**
## **Grant Deed**

See Attached

**RECORDING REQUESTED BY**

**AND WHEN RECORDED MAIL TO:**
Andrew M. Parlen
O'Melveny & Myers LLP
400 South Hope Street
Los Angeles, California 90071-2899

---

### GRANT DEED

     The undersigned grantor declares that the amount of documentary tax is _____ _____ Dollars ($_____), computed on [___] the full value of the property conveyed or [___] the full value of the property conveyed less liens and encumbrances remaining at time of sale.

     **FOR VALUE RECEIVED**, the receipt and sufficiency of which is hereby acknowledged, **Verdugo Mental Health**, a California non-profit public benefit corporation ("**Grantor**"), hereby grants to **Didi Hirsch Psychiatric Service**, a California non-profit public benefit corporation, dba Didi Hirsch Mental Health, all of that certain real property located in the County of Los Angeles, State of California, and more particularly described in <u>Exhibit A</u> attached hereto and incorporated herein by this reference (the "**Property**"), together with (i) all improvements owned by Grantor (if any) and located thereon, (ii) all rights, privileges, easements and appurtenances owned by Grantor (if any) appertaining to the Property, and (iii) all right, title and interest of Grantor in, to and under adjoining streets, rights of way and easements, SUBJECT TO those matters of record and all building codes and other applicable laws, ordinances and governmental regulations affecting the Property.

Dated:  May ___, 2011

                         **Verdugo Mental Health**,
                         a California non-profit public benefit corporation

                         By:  _____
                         Name:  William J. Smith, PsyD, MBA
                         Title:    Chief Executive Officer

STATE OF CALIFORNIA    )
               ) ss.
COUNTY OF LOS ANGELES   )


    On May ___, 2011 before me, _____, a Notary Public, personally appeared William J. Smith, who proved to me on the basis of satisfactory evidence to be the person whose name is subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his authorized capacity, and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

    I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature _____ (Seal)

SF1:820136

## EXHIBIT A

### Grant Deed Legal Description

All that certain real property in the City of Glendale, County of Los Angeles, State of California, described as follows:

Parcel 1:

Lots 23, 24 and 25 of Eagle Dale, in the City of Glendale, County of Los Angeles, State of California, as per Map recorded in Book 16 Page 185 of Maps, in the Office of the County Recorder of said county.

Except the northerly 105 feet of said land.

Parcel 2:

The northerly 105 feet of Lots 23, 24, and 25 of Eagle Dale, in the City of Glendale, County of Los Angeles, State of California, as per Map recorded in Book 16, Page 185 of Maps, in the Office of the County Recorder of said county.

Also except the westerly 40 feet of the northerly 105 feet of said Lot 23.

Parcel 3:

The east 53 feet of the northerly 105 feet of Lot 25 of Eagle Dale, in the City of Glendale, County of Los Angeles, State of California, as per Map recorded in Book 16, Page 185 of Maps, in the Office of the County Recorder of said county.

Parcel 4:

The northerly 105 feet of the westerly 40 feet of Lot 23 of Eagle Dale, in the City of Glendale, County of Los Angeles, State of California, as per Map recorded in Book 16, Page 185 of Maps, in the Office of the County Recorder of said county.

Parcel 5:

The east 80 feet of that portion of Lot 71 of Watts Subdivision, in the City of Glendale, County of Los Angeles, State of California, as per Map recorded in Book 5, Page(s) 200 & 201 of Miscellaneous Records, in the Office of the County Recorder of said county, lying north of a line parallel with and distant southerly 145 feet, measured along the east line of said Lot, from the south line of Colorado Boulevard, 80 feet wide as established by condemnation in Case No. 118998, Superior Court, in the Office of the County Recorder of said county.

SF1:820136